UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                      :

TUFAMERICA, INC.,                  :

                                        :    Case No. 12 Civ. 3529 (AJN)

                    Plaintiff,     :

                                          :    **LOCAL RULE 56.1 STATEMENT**

                    v.             :

                                          :

MICHAEL DIAMOND, *et al.*,       :

                                          :

                    Defendants.     :

                                          :

-------------------------------------------------------------x

Pursuant to Rule 56.1 of this Court's Local Civil Rules, Defendants Universal–Polygram International Publishing, Inc. (incorrectly named as Universal Music Publishing, Inc. and Universal Music Publishing Group) and Capitol Records, LLC ("UMG Defendants"), along with Defendants Michael Diamond, Adam Horovitz, Estate of Adam Yauch, and Brooklyn Dust Music ("Beastie Boys Defendants"; together with the UMG Defendants, "Defendants"), by and through their attorneys, submit the following joint statement of undisputed material facts as to which there is no genuine issue to be tried in support of the Defendants' respective Motions for Summary Judgment against Plaintiff TufAmerica, Inc. ("TufAmerica").

**Definitions and Citation Format**

This Local 56.1 Statement adopts and incorporates the definitions and abbreviations used in the UMG Defendants' accompanying Memorandum of Law in Support of their Motion for Summary Judgment.  In addition, Defendants use the following citation forms in this Statement of Uncontroverted Facts:

    a.   Exhibits to the Declaration of Nathaniel H. Benforado, dated June 9, 2014, are referred to as "Ex." followed by the exhibit number and, if appropriate, the specific

page reference within the exhibit.  For example, "Ex. 8 at 3" refers to Page 3 of the document attached as Exhibit 8 to the Benforado Declaration.  Where an exhibit bears a production number, the pin citation includes a reference to the production number; for example, "Ex. 3 at TA216" refers to the page bearing production number TA216 of the document attached as Exhibit 3 to the Benforado Declaration.  When reference is being made to the transcript of deposition testimony, the citation includes the last name of the deponent and the specific page and line numbers.  For example, "Ex. 1 (Fisher) at 23:2-6" refers to Lines 2-6 on Page 23 of the transcript of Tony Fisher, excerpts of which are collected and attached as Exhibit 1 to the Benforado Declaration.

b.   Citations to the Declaration of Carla M. Miller, dated June 9, 2014, are referred to as "Miller ¶ _" followed by the cited paragraph number, such that "Miller ¶ 1" refers to Paragraph 1 of the Miller Declaration.

**Trouble Funk**

1.      The musical group Trouble Funk was formed in the mid-1970s.  Ex. 1 (Fisher) at 23:2-6, 23:16-19.

2.      The original members of Trouble Funk included Robert "Dyke" Reed and Tony Fisher.  Ex. 1 (Fisher) at 23:20-24:6.

3.      James Avery joined the group in 1979.  Ex. 2 (Avery) at 89:7-10.

4.      The individual members of the group Trouble Funk never formed a separate legal entity to own or manage their live or recorded performances.  Ex. 1 (Fisher) at 26:2-19; 89:17-90:7; Ex. 2 (Avery) at 88:13-89:1.

5.      The members of Trouble Funk never had a formal agreement to govern their relationship.  Ex. 1 (Fisher) at 32:6-21; Ex. 2 (Avery) at 88:18-89:1, 89:22-91:3, 237:17-243:9.

6.      Mr. Fisher focused on creating music and authorized Mr. Reed to act on his behalf with regard to the group's business affairs.  Ex. 1 (Fisher) at 30:4-14, 33:3-9; 43:17-44:21, 181:18-182:9; 244:11-245:12.

7.      In or around 1982, the members of Trouble Funk formed a record label called D.E.T.T. to manufacture their sound recordings.  Ex. 1 (Fisher) at 24:7-27:1, 55:20-56:2, 94:17-95:8.

8.      The members of Trouble Funk did not have any written agreement with D.E.T.T. nor did they grant D.E.T.T. any ownership interests in the Trouble Funk recordings.  Ex. 1 (Fisher) at 26:2-4, 26:16-19, 89:17-90:7; Ex. 2 (Avery) at 122:9-21.

9.      During this time period, the members of Trouble Funk and their manager, Rio Edwards, distributed Trouble Funk records to local record stores themselves and sold records from the trunk of a car and at live performances.  Ex. 1 (Fisher) at 34:13-21, 42:14-43:8, 44:6-13, 70:3-72:19.

10.      During the early 1980s, the members of Trouble Funk worked with a D.C.-based promoter named Carl "Maxx" Kidd in various capacities.  Ex. 1 (Fisher) at 61:22-63:7, 70:3-73:17, 88:13-89:5, 105:1-106:5, 119:4-16; Ex. 2 (Avery) at 91:14-92:4, 93:20-94:19.

11.      In 1982, the members of Trouble Funk released a single of "Let's Get Small" on the D.E.T.T. record label.  Ex. 1 (Fisher) at 57:4-22, 159:14-20.

12.      Mr. Reed, Mr. Avery, and Mr. Fisher were the authors and performers of "Let's Get Small" listed on the registration produced by TufAmerica in this action, which was filed with the Copyright Office on May 26, 1983.  Ex. 3; *see also* Ex. 1 (Fisher) at 274:20-275:22.

13.     In 1983, the members of Trouble Funk released a single of "Say What" on the D.E.T.T. record label.  Ex. 1 (Fisher) at 101:6-22.

14.     In 1983, the members of Trouble Funk released a double album called "In Times of Trouble," which included the same recording of "Say What" that D.E.T.T. released as a single in 1983.  Ex. 1 (Fisher) at 57:14-22, 101:6-16.

15.     The album "In Times of Trouble" was a collaboration between the members of Trouble Funk and Mr. Kidd.  Ex. 1 (Fisher) at 105:1-22.  Mr. Kidd was a producer on the album. Ex. 1 (Fisher) at 108:6-13; Ex. 2 (Avery) at 125:5-12.   Mr. Kidd's company, Close-Up Inc. marketed the album.  Ex. 1 (Fisher) at 108:14-21; *see also* Ex. 4 at 5-6.   Mr. Kidd was also credited with the cover concept.  Ex. 4 at 5-6.

16.     Mr. Reed, Mr. Avery, and Mr. Fisher were the authors and performers of "Say What" listed on the registrations produced by TufAmerica in this action, which was filed with the Copyright Office on April 22, 1985.  Ex. 5 at TA212; Ex. 6 at TA214; Ex. 1 (Fisher) at 267:1-268:17.

**The Island Agreements**

17.     In or around 1984, Mr. Kidd began shopping Trouble Funk to various major labels looking for a record deal.  Ex. 1 (Fisher) at 85:14-87:8, 114:7-11.  Mr. Kidd wanted Trouble Funk to sign with his record company, T.T.E.D., as a furnishing company that would, in turn, sign a deal with a major label to provide the services of Trouble Funk.  Ex. 1 (Fisher) at 86:2-88:11.

18.     Later that year, Mr. Kidd approached the members of Trouble Funk about entering into a deal with Island Records, Inc. ("Island").  Ex. 1 (Fisher) at 113:10-20; Ex. 2 (Avery) at 130:8-131:2.  Mr. Kidd proposed that the group members sign an agreement with

T.T.E.D. and that T.T.E.D. would sign an agreement with Island to furnish the services of the group.  Ex. 1 (Fisher) at 114:7-115:8, 116:11-117:20.

19.     Island also wanted to deal with the members of Trouble Funk through Mr. Kidd's company and not enter into a deal directly with the group.  Ex. 1 (Fisher) at 113:10-17; Ex. 2 (Avery) at 199:13-200:8.  Mr. Fisher was initially opposed to such a deal and wanted to deal directly with Island.  Ex. 1 (Fisher) at 118:12-120:3.

20.     At a meeting with the members of Trouble Funk, Mr. Kidd, and Chris Blackwell, the owner of Island, Mr. Blackwell made clear to the members of Trouble Funk that Island was not interested in signing a deal directly with the group; instead, in order for Island to be involved in selling and marketing Trouble Funk, they needed to sign with T.T.E.D.  Ex. 1 (Fisher) at 114:12-118:21.

21.     After further discussion, the members of the band, including Mr. Fisher, agreed to the deal with Island and Mr. Kidd, provided that the band would be paid directly by Island.  Ex. 1 (Fisher) at 119:17-120:14.

22.     After discussions and negotiations, the members of Trouble Funk signed a series of agreements with T.T.E.D. and Island.  Ex. 1 (Fisher) 120:4-16, 139:19-22; Ex. 2 (Avery) at 115:9-116:21.

23.     The members of Trouble Funk were represented and advised by counsel when they signed the Island Agreements.  Ex. 1 (Fisher) at 120:4-10, 121:5-10, 125:5-9, 134:7-10; Ex. 2 (Avery) at 67:6-13, 140:3-19, 175:4-8.

24.     First, Mr. Avery, Mr. Fisher, Mr. Reed, and Taylor Reed signed an exclusive recording agreement (the "Recording Agreement") with Mr. Kidd's company T.T.E.D., dated October 11, 1984, whereby the members of the group agreed to provide exclusive recording

service to T.T.E.D.  Ex. 7 at UMG000174-76 (¶¶ 1.01, 1.02, 1.08); Ex. 1 (Fisher) at 122:22-123:7; Ex. 2 (Avery) at 25:7-26:6, 132:7-133:22.

25.    Simultaneously, T.T.E.D. signed a "Production Agreement" with Island, also dated October 11, 1984, promising to deliver sound recordings created by Trouble Funk (and other performers not relevant here) under the Recording Agreement to Island.  Ex. 8 at 1-3 (¶¶ 4-5), 14 (¶ 3), 18 (¶ 8).

26.    Finally, to confirm that the members of Trouble Funk understood and consented to T.T.E.D.'s transfer of rights to Island in the Production Agreement, Mr. Avery, Mr. Fisher, Mr. Reed, and Taylor Reed signed a "Letter of Inducement" with Island, also dated October 11, 1984 that was attached as Exhibit A to the Production Agreement.  Ex. 9; Ex. 1 (Fisher) at 129:16-130:12; Ex. 2 (Avery) at 21:18-22:20, 139:5-140:2, 157:6-13, 164:15-21.

*Recording Agreement*

27.    The Recording Agreement granted T.T.E.D. the exclusive rights to the services and recordings of Trouble Funk.  Ex. 7 at UMG000174-76 (¶¶ 1.01, 1.02, 1.08).

28.    The Recording Agreement provided that it would remain in effect until nine months after the members of Trouble Funk had fulfilled their minimum recording commitment.  Ex. 7 at UMG000174 (¶ 1.02(a)).

29.    Pursuant to the Recording Agreement, the members of Trouble Funk were required to deliver to T.T.E.D. at least two albums of master recordings to satisfy the "Minimum Recording Commitment."  Ex. 7 at UMG000175 (¶ 1.03(a)).

30.    The Recording Agreement also provided that, except as otherwise provided for, only new recordings would apply towards the Minimum Recording Agreement.  Ex. 7 at UMG000175-76 (¶ 1.05 ("Only Master Recordings consisting of Compositions not previously

recorded by the Artist shall apply in reduction of the Recording Commitment, except as otherwise provided herein.")).

31.    The members of Trouble Funk agreed that T.T.E.D. would be the owner of master recordings delivered pursuant to the Recording Agreement, and T.T.E.D. would have the exclusive right to copyright any such master recordings. Ex. 7 at UMG000176 (¶ 1.08).

32.    The Recording Agreement also reflected the understanding of T.T.E.D. and the members of Trouble Funk that the album "In Times of Trouble" had been accepted by Island as the first album in satisfaction of the Minimum Recording Commitment. Ex. 7 at UMG000175 (¶ 1.03(b)).

33.    The Recording Agreement expressly referenced the Production Agreement between T.T.E.D. and Island. Ex. 7 at UMG000174-75 (¶ 1.02(b)). The Recording Agreement described the Production Agreement as providing for, among other things, the production of masters featuring Trouble Funk. Ex. 7 at UMG000174-75 (¶ 1.02(b)). The Recording Agreement also provided that specific terms of the Recording Agreement would be modified if the Production Agreement was modified, amended, or terminated. *See, e.g.*, Ex. 7 at UMG000175 (¶ 1.02(b)), -179 (¶ 3.01(c)), -188-89 (¶ 13.02).

***Production Agreement***

34.    Simultaneously, T.T.E.D. and Island signed the Production Agreement as of October 11, 1984, whereby T.T.E.D. agreed to deliver Trouble Funk recordings exclusively to Island. Ex. 8 at 1 (introduction), 2-3 (¶ 5); *see also* Ex. 1 (Fisher) at 125:10-129:2.

35.    Pursuant to Paragraph 8 of the Production Agreement's Terms and Conditions, Island was assigned the exclusive right to copyright all recordings delivered under the Agreement (as described in Paragraph 3), as well as other rights, including the right to "release

and re-release all recordings made hereunder in all forms and sizes of records as it may in its absolute discretion determine."  Ex. 8 at 18 (¶ 8).

36.      Paragraph 3 of the Production Agreement's Terms and Conditions provided that the rights granted to Island under Paragraph 8 of the Terms and Conditions applied to "each and every master recording featuring an Artist existing at the date hereof (except as expressly provided otherwise herein) or recorded during the applicable Artist Term."  Ex. 8 at 14 (¶ 3).

37.      Pursuant to the Production Agreement, T.T.E.D. submitted, and Island accepted, Trouble Funk as an artist governed by the Production Agreement.  Ex. 8 at 2 (¶ 4(c)).

38.      Consistent with the Recording Agreement, the Production Agreement provided that T.T.E.D. had submitted, and Island had accepted, the album "In Times of Trouble" as the first album counting towards T.T.E.D.'s recording commitment.  Ex. 8 at 3 (¶ 5(b)(ii)).

*Letter of Inducement*

39.      As part of the Island Agreements, the members of Trouble Funk were required to sign, and did sign, the Letter of Inducement, inter alia, to ensure that they would comply with the terms of the Production Agreement.  Ex. 9 at 27 (introduction & ¶ 1(a)); Ex. 1 (Fisher) at 129:16-130:12; Ex. 2 (Avery) at 21:18-22:20, 139:5-140:2, 157:6-13, 164:15-21.

40.      In the Letter of Inducement, the members of Trouble Funk acknowledged that they had reviewed the Production Agreement and understood its terms.  Ex. 9 at 27 (introduction).  They further agreed to comply with all of the terms of the Production Agreement that related to Trouble Funk.  Ex. 9 at 27-28 (¶ 1(c)).

41.      In the Letter of Inducement, the members of Trouble Funk represented, warranted, and agreed that T.T.E.D. had the right to enter into the Production Agreement and to grant the rights it granted to Island in that agreement.  Ex. 9 at 27 (¶ 1(a)).

8

42.     In the Letter of Inducement, the members of Trouble Funk also represented, warranted, and agreed that T.T.E.D.'s warranties and representations concerning Trouble Funk were true and correct, and agreed to be bound by the terms of the Production Agreement as though they were a party to that agreement.  Ex. 9 at 27 (¶ 1(b)).

43.     In the Letter of Inducement, the members of Trouble Funk also agreed that if there was an inconsistency between the Production Agreement and the Recording Agreement, the terms of the Production Agreement would prevail and the members of Trouble Funk agreed to be bound by such terms.  Ex. 9 at 27 (¶ 1(a)).

***Letter of Direction***

44.     The members of Trouble Funk wanted to get paid any royalties owing under the Island Agreements directly from Island and not through Mr. Kidd's company.  Ex. 1 (Fisher) at 115:6-8, 122:9-18, 136:7-18; Ex. 2 (Avery) at 161:22-162:6.

45.     To accomplish this, Mr. Avery, Mr. Fisher, Mr. Reed, and Taylor Reed signed the Letter of Direction with Island as of December 12, 1984.  Ex. 10; Ex. 1 (Fisher) at 137:15-19; Ex. 2 (Avery) at 161:14-21.

46.     The Letter of Direction expressly referenced and ratified both the Production Agreement and the Recording Agreement.  Ex. 10 at UMG000172.

47.     The Letter of Direction directed Island to pay the share of the royalties due to the members of Trouble Funk under the Island Agreements directly to them.  Ex. 10 at UMG000172-73 (¶¶ A, E); Ex. 1 (Fisher) at 138:12-15.

***Trouble Funk Recordings Released By Island***

48.     Pursuant to the Island Agreements, Island released multiple Trouble Funk singles and albums beginning in 1984, including both recordings that existed as of the Island

Agreements and new recordings.  Ex. 1 (Fisher) at 139:19-140:11, 144:12-19, 146:18-147:5, 157:20-160:17; Ex. 2 (Avery) at 60:19-63:11, 64:6-10, 183:2-20.

49.    The members of Trouble Funk were aware of these releases and never objected to any of Island's releases of Trouble Funk recordings.  Ex. 2 (Avery) at 183:10-20; *see also* Ex. 1 (Fisher) at 139:19-140:11, 144:12-19, 146:18-147:5, 157:20-160:17.

50.    Island provided significant financial, marketing and recording support to the members of Trouble Funk.  Island paid for Trouble Funk to go on multiple international tours. Ex. 1 (Fisher) at 140:12-141:16, 142:10-14.   Island also produced a TV program featuring Trouble Funk.  *Id.* at 141:19-142:9.  Island also provided a producer and musicians to record and perform with Trouble Funk, and arranged for studio time.  *Id.* at 148:1-7, 148:16-149:1.  Island featured Trouble Funk in a film about Go-Go music.  *Id.* at 150:22-157:5.  Mr. Blackwell, the owner of Island, also flew the members of Trouble Funk to Jamaica to record and stay at his property.  *Id.* at 162:5-163:19.

51.    Island released the recording "Let's Get Small" as a single in 1985.   Ex. 2 (Avery) at 62:6-63:11.

52.    Island registered a copyright for this recording.  Ex. 11.

53.    Island also released the recording "Let's Get Small" on the compilation album "Go Go Crankin'" in 1985.  Ex. 1 (Fisher) at 157:20-159:20.

54.    Island also released the recording "Let's Get Small" on the EP "Trouble" in 1985 through its subsidiary 4th & Broadway.  Ex. 12.

55.    TufAmerica has defined the "Let's Get Small" recording at issue in this litigation as embodied on the single released by D.E.T.T. on 1982 and the EP "Trouble" released by 4th & Broadway in 1985.  Ex. 13 at 1 (Definition 3 ("4th & Broadway 12 80 (single)")).

56.     The recording of "Let's Get Small" delivered by the band to Island and subsequently released by Island as a single, on the compilation album "Go Go Crankin,'" and on the EP "Trouble," is the same recording that the members of Trouble Funk released on D.E.T.T. Records in 1982.  Ex. 1 (Fisher) at 159:14-20.

57.     Island re-released the studio disc of the album "In Times of Trouble."  Ex. 1 (Fisher) at 144:12-19; Ex. 2 (Avery) at 62:6-16, 146:21-147:2.

58.     Island released the recording "Say What" on the compilation album "Go Go Crankin'" in 1985.  Ex. 1 (Fisher) 159:10-13.

59.     The recording of "Say What" delivered to and released by Island on the compilation album "Go Go Crankin'" is the same recording that the members of Trouble Funk released on D.E.T.T. in 1983.  Ex. 1 (Fisher) 159:14-20.

60.     TufAmerica has defined the "Say What" recording at issue in this litigation as embodied on the 1983 single and album "In Times of Trouble," both released by D.E.T.T.  Ex. 13 at 1 (Definition 2 ("DETT LP 1002 (album)")).

***Termination Agreement***

61.     To document their respective rights following the end of the relationship between the members of Trouble Funk and Island, Mr. Avery, Mr. Fisher, Mr. Reed, and Taylor Reed signed an agreement with Island as of November 30, 1989 ("Termination Agreement").  Ex. 14; Ex. 1 (Fisher) at 166:21-167:10, 169:12-14; Ex. 2 (Avery) at 195:10-15, 201:16-18.

62.     Pursuant to the express terms of the Termination Agreement, the members of Trouble Funk agreed to a prospective termination of all recording obligations and commitments, and ratified and reaffirmed all of the previous grants of rights in the Island Agreements, as well as the representations contained therein.  Ex. 14 at UMG000149 (¶¶ 1-2).

**Composition Assignments**

63.     At some point in the early 1980s, Mr. Fisher, Mr. Avery, and Mr. Reed created a music publishing company called Farr Music.  Ex. 1 (Fisher) at 175:15-176:2.

64.     On October 11, 1984, Mr. Avery and Mr. Reed, acting on behalf of Farr Music, assigned the copyrights in the musical compositions for "Let's Get Small" and "Say What" to Farr Music and Z-Kidd Music.  Ex. 15 at 6-7; Ex. 1 (Avery) at 58:21-59:11.  Mr. Kidd signed on behalf of Z-Kidd Music.  Ex. 15  at 5.

65.     On July 28, 1986, an agreement dated January 5, 1985 was recorded with the Copyright Office whereby Z-Kidd Music transferred 50% of its interest in the composition copyrights for "Let's Get Small," "Say What," and other songs, to Island Music.  Ex. 16.

66.     The compilation album "Go Go Crankin'" released by Island in 1985 states that the publishers for "Let's Get Small" and "Say What" were Farr Music, Z-Kidd Music, and Island Music.  Ex. 17 at 3-4.

67.     On September 24, 1986, an agreement dated September 17, 1986 was recorded with the Copyright Office whereby Island Music and Z-Kidd Music transferred all of their combined interest in the composition copyrights for "Let's Get Small," "Say What," and other songs, to Ackee Music and Maxx Kidd Music.  Ex. 18.

68.     On June 30, 1992, an agreement dated July 1, 1992 was recorded with the Copyright Office whereby Ackee Music assigned its entire interest in the composition copyrights for "Let's Get Small," "Say What," and other songs, to Polygram.  Ex. 19 at UMG000218, -31; *see also* Ex. 20 at UMG000289, -302.

69.     Polygram International Publishing, Inc. is the predecessor corporation to Universal–Polygram International Publishing, Inc.  Miller  ¶¶ 1-3.

70.     Tony Fisher does not receive a portion of the publisher's share of compositions that he wrote.  Ex. 1 (Fisher) at 200:2-15.

**The 1999 TufAmerica Agreements**

71.     In or around 1999, TufAmerica became interested in entering a deal with the members of Trouble Funk whereby TufAmerica would negotiate licenses and/or bring actions against parties for using or exploiting Trouble Funk compositions and recordings without authorization.  Ex. 1 (Fisher) at 186:22-188:17.

72.     On or around December 23, 1999, TufAmerica entered into two exclusive administration agreements with Mr. Reed and Mr. Fisher—a Master Administration Agreement governing master recordings and a Publishing Administration Agreement governing compositions.  Ex. 21; Ex. 22.

73.     Mr. Fisher did not sign the agreements himself but authorized Mr. Reed to enter into the 1999 TufAmerica Agreements on his behalf.  Ex. 1 (Fisher) at 213:11-14, 222:18-223:7.

74.     Mr. Fisher and Mr. Reed were represented and advised by counsel in connection with the 1999 TufAmerica Agreements.  Ex. 1 (Fisher) at 213:15-18, 216:14-19, 260:18-20.

75.     In the 1999 TufAmerica Agreements, Mr. Reed and Mr. Fisher represented that they owned or controlled the master recordings and compositions created before 1990, "including but not limited to those listed in Schedule A."  Ex. 21 at TA218; Ex. 22 at TA226.

76.     The respective Schedule A attached to each of the 1999 TufAmerica Agreements lists the same songs.  *Compare* Ex. 21 at TA223-24 *with* Ex. 22 at TA235-36.

77.     Mr. Reed and Mr. Fisher purported to sell, assign, transfer, and set over to TufAmerica, the "exclusive right to administer all of Trouble's rights in the Masters throughout the universe."  Ex. 21 at TA218 (¶ 1(a)).

78.     Mr. Reed and Mr. Fisher also purported to sell, assign, transfer, and set over to TufAmerica, the "exclusive right to administer all of Trouble's rights in the Compositions throughout the universe."  Ex. 22 at TA226 (¶ 1(a)).

79.     Mr. Reed and Mr. Fisher warranted and represented "that no member of the band nor the band collectively ever signed any agreements regarding these masters and compositions, besides this one, Island (for masters released on '(Insert name of album)', Sony ATV (see attached agreement) and the MCI (for masters released on '(Insert name of album)' agreements." Ex. 21 at TA219; Ex 22 at TA227.

80.     While these agreements carved out recordings covered by agreements with Island, TufAmerica never performed the simple task of checking to see which recordings had been released by Island until April 2014, a few weeks ago after the UMG Defendants had urged TufAmerica to withdraw its claims.  Ex. 23 (Scott) at 200:23-201:15, 203:17-204:13, 205:21-207:21.

81.     Schedule A includes songs that should not have been included as being granted to TufAmerica.  Ex. 1 (Fisher) at 221:6-222:17, 226:3-21.

82.     Schedule A includes "Say What" and "Let's Get Small."  Ex. 21 at TA224; Ex. 22 at TA235.

83.     Mr. Reed passed away in or around 2008.  Ex. 1 (Fisher) at 244:19-245:1.

**The 2012 Avery-TufAmerica Agreement**

84.     Mr. Avery was a performer and author for both "Say What" and "Let's Get Small."  Ex. 5 at TA212; Ex. 6 at TA214; Ex. 3 at TA216; Ex. 1 (Fisher) at 267:1-268:17, 274:20-275:22.

85.    Mr. Avery did not sign the 1999 TufAmerica Agreements.  *See*  Ex. 21 at TA223-25; Ex. 22 at TA231, TA233-36.

86.    Mr. Reed and Mr. Fisher did not have Mr. Avery's authorization to enter into the agreement with TufAmerica.  Ex. 1 (Fisher) at 224:9-225:5; Ex. 2 (Avery) at 36:4-9.

87.    TufAmerica entered into a separate agreement with Mr. Avery on January 1, 2012.  Ex. 24; Ex. 2 (Avery) 28:15-29:8.

88.    In the 2012 Avery-TufAmerica Agreement, Mr. Avery purported to grant TufAmerica an exclusive license to "sue and recover on all accrued and future causes of action in connection all of the Trouble Funk Copyrights" in order to provide TufAmerica with standing. Ex. 24 at TA158 (¶ 2).

89.    The 2012 Avery-TufAmerica Agreement did not specify the copyrights that were governed by the agreement.  Ex. 24 at TA158-60.

**Case Background**

90.    TufAmerica filed the Amended Complaint in this action on December 6, 2012. Ex. 25.

91.    In the Amended Complaint, TufAmerica claims to be the exclusive administrator and licensee of certain master recordings and compositions performed and written by members of the musical group Trouble Funk.  Ex. 25 at ¶¶ 1, 13.

92.    TufAmerica alleged six claims of copyright infringement based on the alleged unauthorized use of four Trouble Funk songs.  Ex. 25 at ¶¶ 20-107.

93.    Defendants filed a motion to dismiss on January 4, 2013 pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted.  Ex. 26.  On September 10, 2013, the Court dismissed all of TufAmerica's claims except for two claims: Claim 1 and Claim 5.  Ex.

27 at p. 18-27.  Claim 1 is premised on the recording and composition for the Trouble Funk song "Say What" as allegedly sampled in the Beastie Boys song "Shadrach."  Ex. 25 at ¶¶ 97-97. Claim 5 is premised on the recording and composition for the Trouble Funk song "Let's Get Small" as allegedly sampled in the Beastie Boys song "Hold It Now Hit It."  Ex. 25 at ¶¶ 104-05.

94.    At a status hearing on April 25, 2014, the Court agreed to receive summary judgment briefing relating to the ownership of the Trouble Funk copyrights still at issue, and TufAmerica's purported authority to act as the exclusive administrator and licensee of these copyrights.  *See* Ex. 28.

Dated: New York, New York
       June 9, 2014

                                                      JENNER & BLOCK LLP

                                                      */s Andrew H. Bart*
                                                      Andrew H. Bart
Nathaniel H. Benforado
919 Third Avenue
New York, New York  10022-3908
(212) 891-1645
*Attorneys for Defendants Universal–Polygram International Publishing, Inc. and Capitol Records, LLC*

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

*/s Theodore C. Max*
Theodore C. Max, Esq. (TM-1742)
Kenneth Anderson, Esq. (KA-0023)
30 Rockefeller Plaza
New York, NY  10112-0015
(212) 653-8700
*Attorneys for Defendants Michael Diamond, Adam Horovitz, the Estate of Adam Yauch, p/k/a Beastie Boys and Brooklyn Dust Music*

17