# EXHIBIT C

1         UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF NEW YORK
3  - - - - - - - - - - - - - - - - -x
4  TUFAMERICA, INC.,                 :
5            Plaintiff,              : Index No.:
6        v.                          : 12-CIV-3529 (AJN)
7  MICHAEL DIAMOND, et al.,          :
8            Defendants.             :
9  - - - - - - - - - - - - - - - - -x
10
11
12       Videotaped Deposition of TONY W. FISHER
13                  Washington, DC
14              Thursday, May 1, 2014
15                   9:03 a.m.
16
17
18
19
20
21
22  Reported By:  Lee Bursten, RMR, CRR

1  Videotaped Deposition of TONY W. FISHER,
2  held at the offices of:
3
4
5       JENNER & BLOCK LLP
6       1099 New York Avenue NW
7       Suite 900
8       Washington, DC 20001
9       (202) 639-6000
10
11
12
13
14      Pursuant to Notice, before Lee Bursten,
15 Registered Merit Reporter, Certified Realtime
16 Reporter, and Notary Public in and for the District
17 of Columbia, who officiated in administering the oath
18 to the witness.
19
20
21
22

1       A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF AND THE WITNESS:
3       KELLY D. TALCOTT, ESQUIRE
4       THE LAW OFFICES OF KELLY D. TALCOTT
5       34 Grove Street
6       P.O. Box 43
7       Sea Cliff, New York 11579
8       (516) 515-1545
9
10 ON BEHALF OF DEFENDANTS UMG - POLYGRAM INTERNATIONAL
11 PUBLISHING INC. and CAPITOL RECORDS LLC:
12      ANDREW H. BART, ESQUIRE
13      JENNER & BLOCK LLP
14      919 Third Avenue
15      37th Floor
16      New York, New York 10022
17      (212) 891-1600
18
19
20
21
22

1   A P P E A R A N C E S   C O N T I N U E D
2  ON BEHALF OF DEFENDANTS MICHAEL DIAMOND, ADAM
3  HOROVITZ, AND THE ESTATE OF ADAM YAUCH, PERFORMERS
4  KNOWN AS THE BEASTIE BOYS:
5       THEODORE C. MAX, ESQUIRE
6       SHEPPARD MULLIN RICHTER & HAMPTON LLP
7       30 Rockefeller Plaza
8       New York, New York 10112
9       (212) 653-8700
10
11 ALSO PRESENT:
12      MICHAEL E. CILIBERTI, Videographer
13
14
15
16
17
18
19
20
21
22

1            C O N T E N T S
2  EXAMINATION OF TONY W. FISHER           PAGE
3   By Mr. Bart                             7
4   By Mr. Max                             231
5
6
7            E X H I B I T S
8          (Attached to transcript)
9  DEFENDANTS' DEPOSITION EXHIBITS          PAGE
10 Exhibit 18   Master Administration Agreement   211
11             between TufAmerica and Robert
12             Reed and Tony Fisher dba Trouble
13             Funk
14 Exhibit 19   Publishing Administration         211
15             Agreement between TufAmerica and
16             Robert Reed and Tony Fisher dba
17             Trouble Funk
18 Exhibit 20   Printout from Trouble Funk        263
19             website
20
21
22

Page 118

1  A   Myself, James Avery, Robert Reed, and
2  Taylor Reed.
3  Q   Okay. So the four of you were there, and
4  Maxx Kidd was there, and Chris Blackwell was there.
5  Was anybody else there?
6  A   Yeah, there were some other people there.
7  I don't remember.
8  Q   Do you remember where in Georgetown this
9  took place?
10 A   It was in a hotel. I don't know exactly
11 what hotel it was.
12 Q   And what do you recall about the
13 discussions during that meeting?
14 A   Well, Chris Blackwell, I distinctly
15 remember him saying that, you know, Maxx Kidd was not
16 only a business, you know, acquaintance, but he was a
17 personal friend, and he's the type of person you're
18 going to love him or you're going to hate him. And
19 he said, "Frankly, I love him, and, you know, if
20 you're going to do business with me, you have to do
21 business with Maxx Kidd."
22 Q   Okay.

Page 119

1  A   I walked out. And they came back and got
2  me. And, you know -- because I wasn't doing business
3  with Maxx Kidd, you know.
4  Q   Well, you say you weren't doing business
5  with Maxx Kidd, but you were personally doing
6  business with Maxx Kidd as a producer in other ways,
7  weren't you?
8  A   Yeah. Yeah. But he was paying me to do --
9  you know what I'm saying.
10 Q   No, I understand.
11 A   I wasn't signing anything with him.
12 Q   Okay.
13 A   Yeah. He wanted me to do some stuff for
14 his artists, pay me, let me get my money, and I do
15 whatever you need done, and that was that. It wasn't
16 personal. Business.
17 Q   So they came and got you, and you went back
18 into the meeting. What else took place?
19 A   Well, we came to an agreement that Island
20 Records would pay us...
21 Q   Directly.
22 A   Directly. And Maxx Kidd would handle all

Page 120

1  of the other acts.
2  Q   Okay.
3  A   Outside of Trouble Funk.
4  Q   Okay. And so as a result of that meeting,
5  there were a whole bunch of discussions and
6  negotiations leading to agreements, correct?
7  A   Correct.
8  Q   Okay. And you guys retained Mr. Tisdale to
9  represent your interests in that, correct?
10 A   I believe so, yes.
11 Q   Okay. And you signed a bunch of documents
12 in the end of 1984 as a result of those negotiations,
13 right?
14 A   I had signed some documents, yes.
15 Q   Okay.
16 A   With Island Records.
17 Q   With Island Records and with Maxx Kidd?
18 A   Not that I remember, no.
19 Q   Okay. When was the -- so there were
20 documents, and I'll show them to you in a couple of
21 minutes, and we can talk about this, there's no
22 secret about what the documents are, and they're all

Page 121

1  dated October 11th, 1984.
2      Have you seen any of those documents in the
3  last 30 years, since the time they were signed?
4  A   No.
5  Q   Okay. Do you recall reading the documents
6  that you signed before you signed them?
7  A   No, I don't recall reading the documents,
8  but I recall the documents being read by the lawyer.
9  Q   By Mr. Tisdale?
10 A   By Mr. Tisdale.
11 Q   So you recall that Mr. Tisdale read them,
12 he spoke to you guys and you guys signed the
13 agreement?
14     MR. TALCOTT: Objection.
15 BY MR. BART:
16 Q   Is that correct?
17 A   No, it wasn't that simple. I remember some
18 agreements that we had to go back and actually change
19 some things.
20 Q   What do you recall --
21 A   And initial them.
22 Q   Okay.

31 (Pages 118 - 121)

Page 122

1  A  They were initialed and signed. The
2  changes were made.
3  Q  Okay.
4  A  And a lot of that stuff was with Island and
5  Maxx Kidd that you spoke of.
6  Q  Okay. You recall that there was a change
7  made in the document before you signed it.
8  A  Right.
9  Q  Because there was a provision saying that
10 Island wasn't going to pay you directly, and you
11 crossed that out and you initialed it, and then you
12 signed it with the change, correct?
13     MR. TALCOTT: Objection.
14 A  Yes. There were also some changes that we
15 had to make that Maxx had put in there as far as
16 trying to control and wanted us to give him full
17 control over our writers' rights and all that stuff.
18 That was crossed out.
19 BY MR. BART:
20 Q  All right.
21 A  And initialed.
22 Q  Why don't you take a look first at what we

Page 123

1  marked yesterday as Exhibit 4.
2  A  Okay.
3  Q  First off, Mr. Fisher, without going
4  through this in detail, take a look at the back page,
5  page 18. That's your signature on the second line,
6  isn't it?
7  A  Yep.
8  Q  Okay. Now, you haven't seen this document
9  since it was signed in 1984, have you?
10 A  No.
11 Q  Okay. Take a look at the document itself,
12 and you'll see on page 2, there's a circle.
13 A  Mm-hmm.
14 Q  And an X underneath it. And you'll see on
15 page 5, page 5, that there is a bracket around
16 paragraph 2.02, and it says "James A." next to it.
17 A  Mm-hmm.
18 Q  And there's a little squiggly line under
19 the number 15,000 down near the bottom of the page on
20 301; do you see that?
21 A  No. Okay.
22 Q  And you'll see that on page 6, there is

Page 124

1  some handwriting, correct?
2  A  Yes.
3  Q  And finally, if you look at pages 15 and
4  17, you'll see that there is certain language that's
5  bracketed there as well?
6  A  Mm-hmm.
7  Q  It's fair to say, isn't it, Mr. Fisher,
8  that you don't know when the handwriting that is on
9  this copy of the document was put on this document,
10 correct?
11 A  Yes.
12 Q  Okay. And you don't know whose handwriting
13 it is either, do you?
14 A  You mean...
15 Q  Where there's handwriting. I'm not talking
16 about the brackets.
17 A  No. No, I don't.
18 Q  For example, on page 6, there's a bunch of
19 handwriting to the right of the top half of the page,
20 on the page that's marked 6.
21 A  I don't know. I have no idea.
22 Q  Okay. Fair enough. So other than being

Page 125

1  able to verify your signature on the document, you
2  don't have any other present recollection of any of
3  the terms or conditions of this agreement, do you?
4  A  No.
5  Q  Okay. And is it your testimony that prior
6  to the time you signed this agreement, that you
7  didn't read it, but your counsel explained it to you?
8  Is that a fair statement?
9  A  Yes.
10 Q  Okay. Let me show you -- you can hold it
11 if you want to. I'm not going to ask you anymore
12 questions on that. I'll show you what's been marked
13 as Exhibit -- well, let me show you 2 and 3, because
14 they're related. Exhibit 3 is an agreement between
15 Island Records and T.T.E.D. Records, as you put it,
16 correct?
17 A  Okay.
18 Q  Okay. Actually, you should, just for --
19 just bear with me one second. Keep this exhibit in
20 front of you for a minute as well, the Exhibit 4.
21 And let me just point you to the language. You have
22 Exhibit 4 in front of you?

32 (Pages 122 - 125)

|   |   | Page 126 |   |   | Page 128 |
|---|---|---|---|---|---|
| 1 | A | Yes. | 1 | | recording agreement, right? |
| 2 | Q | Now, this exhibit, Exhibit 4, is labeled an | 2 | A | Mm-hmm. |
| 3 | | exclusive recording agreement. And at the very, very | 3 | Q | And it says the same date that we're |
| 4 | | bottom of page 1, the very last line, it starts off | 4 | | executing this, Island Records and the company have |
| 5 | | and says, "Island Records Inc. hereinafter Island," | 5 | | entered into a separate record production agreement. |
| 6 | | and you go to the next page, "Company have entered | 6 | | Do you see that? |
| 7 | | into a record production contract of even date, | 7 | A | Yes. |
| 8 | | hereinafter the Island contract." | 8 | Q | Okay. Then I showed you Exhibit 2. Do you |
| 9 | | Do you see that language? | 9 | | have Exhibit 2? |
| 10 | A | Yeah. | 10 | A | Yes. |
| 11 | Q | And the date that's on this recording | 11 | Q | Which at the very top says, "This letter |
| 12 | | agreement is October 11th, 1984, on the very first | 12 | | when signed by you and us shall, along with the |
| 13 | | page, on the first line. Do you see that? At the | 13 | | attached production contract standard conditions, |
| 14 | | very top, right underneath "Exclusive Recording | 14 | | constitute the agreement between you and us." It's |
| 15 | | Agreement." | 15 | | dated October 11th, 1984. It's between Island |
| 16 | A | Yes. Mm-hmm. | 16 | | Records and T.T.E.D. Records. |
| 17 | Q | So there's a reference here to the fact | 17 | | And I'm asking you, do you have any |
| 18 | | that on the same date as this, Island Records, and | 18 | | knowledge that would suggest that these aren't the |
| 19 | | the company, which is T.T.E.D. Records, are entering | 19 | | two contracts that are referring to each other? |
| 20 | | into a separate agreement. | 20 | | MR. TALCOTT: Objection. |
| 21 | | MR. TALCOTT: Objection. | 21 | A | No. |
| 22 | | BY MR. BART: | 22 | | BY MR. BART: |

|   |   | Page 127 |   |   | Page 129 |
|---|---|---|---|---|---|
| 1 | Q | Do you see that language? | 1 | Q | You have no knowledge? |
| 2 | A | Yes. | 2 | A | No. |
| 3 | Q | Okay. Now, take a look at Exhibit 2, which | 3 | Q | Fair enough. And again, just to make the |
| 4 | | is in front of you. | 4 | | record clear, do you have any recollection sitting |
| 5 | A | Mm-hmm. | 5 | | here today that you have ever read the document that |
| 6 | Q | Which is -- has the same date as the other | 6 | | is marked as Plaintiff's Exhibit 2? |
| 7 | | agreement, correct? It's also dated October 11th, | 7 | A | No. |
| 8 | | 1984. | 8 | Q | Defendants' Exhibit 2, I'm sorry. No? |
| 9 | A | Okay. | 9 | A | No. |
| 10 | Q | And it's between Island Records Inc. and | 10 | Q | But that that may well have been a document |
| 11 | | T.T.E.D. Records Inc. Do you see that? | 11 | | that was read by and reported to you by your counsel, |
| 12 | A | Yes. | 12 | | correct? |
| 13 | Q | Okay. Do you have any knowledge or | 13 | | MR. TALCOTT: Objection. |
| 14 | | information that would suggest to you that this | 14 | A | Could have been. I don't know. |
| 15 | | second agreement, Exhibit 4 -- Exhibit 2, I'm | 15 | | BY MR. BART: |
| 16 | | sorry -- is not the agreement referenced in Exhibit | 16 | Q | Okay. Take a look at Exhibit 3, which says |
| 17 | | 4? | 17 | | "Letter of Inducement." |
| 18 | | MR. TALCOTT: Objection. | 18 | A | Mm-hmm. |
| 19 | | BY MR. BART: | 19 | Q | First let's go to the back of it, it's page |
| 20 | Q | Do you understand my question? | 20 | | 31. You see at the bottom, it says page 31? |
| 21 | A | No. | 21 | A | Yes. |
| 22 | Q | Okay. I showed you Exhibit 4, which is the | 22 | Q | Okay. And that's your signature on the |

1 second line, right?
2 A It's hard to say. It's so faded, it's hard
3 to say. It looks like it could be my signature, yes.
4 Q Okay. Take a look at page 18 of Exhibit 4,
5 and hold it up next to page 31 of Exhibit 3. Do you
6 have the two signatures? Those are both your
7 signatures, aren't they, Mr. Fisher?
8 MR. TALCOTT: Objection.
9 A Yes. Exact.
10 BY MR. BART:
11 Q Thank you.
12 A The exact same signature.
13 Q Fair enough. Now, at the beginning of this
14 Exhibit 3, you can put Exhibit 4 away for right now,
15 this is a letter from the members of Trouble Funk,
16 right? It's signed by the four members who were
17 there, Taylor Reed, Robert Reed, Tony Fisher, and
18 James Avery, right?
19 A Mm-hmm.
20 Q Yes?
21 A Yes, sir.
22 Q By the way, are you familiar with the

1 signatures of the other members of the band that if
2 you see their signature, you know it's them?
3 A Yes.
4 Q Can you just take a look at that same page
5 31 that we just looked at.
6 MR. TALCOTT: Back to Exhibit 4?
7 MR. BART: Of Exhibit 3.
8 MR. TALCOTT: Exhibit 3.
9 MR. BART: Yes.
10 BY MR. BART:
11 Q Do you recognize the signatures of the
12 other members of the band other than you?
13 A Well, I recommend -- I recognize -- I
14 recognize Robert's.
15 Q Okay.
16 A We did a lot of signing together.
17 Q Okay. Fair enough.
18 A Yeah.
19 Q Thank you. Do you recognize Carl Kidd's
20 signature?
21 A Not really.
22 Q Okay. Fair enough. Thank you. So this is

1 a letter that is being sent by the members of the
2 band to Island Records dated as of October 11th,
3 1984, and it says in the first paragraph, "Pursuant
4 to an exclusive recording agreement, the artist
5 agreement, between me and T.T.E.D. Records"; do you
6 see that language?
7 A No.
8 Q You don't see the language?
9 A Where is this?
10 Q Okay. We're on Exhibit 3, at the very top,
11 at the very first paragraph. First page.
12 A The first page?
13 Q Yes. Are you with me?
14 A Okay.
15 Q Okay? It says, "Pursuant to an exclusive
16 recording agreement, the artist agreement, between me
17 and T.T.E.D. Records." Do you see that?
18 A Yeah.
19 Q Okay.
20 A I have a question.
21 Q Of course.
22 A Who is "me"?

1 Q Okay. The people sending the letter. This
2 is a letter from -- if you go to page 31, at the very
3 back, where the signatures are. Go to that last page
4 again. You see right above the signatures, it says
5 "Very truly yours," signed by the members of the
6 band?
7 A Mm-hmm.
8 Q Yes?
9 A Yes, I see that. Yes.
10 Q Okay. Fair enough. And so this is a
11 letter addressed on the first page -- go to the first
12 page, it's addressed to Island Records, 14 East 4th
13 Street; do you see that?
14 A Yes.
15 Q Did you ever visit Island Records at 14
16 East 4th Street?
17 A Yes, I believe we visited there a couple of
18 times.
19 Q So this is a letter being sent to Island
20 Records Inc. at 14 East 4th Street, "Gentlemen,"
21 that's the way of starting the letter, and then it's
22 signed "Very truly yours, James Avery, Tony Fisher,

Page 134

1  Robert Reed, and Taylor Reed," right?
2  A   Yes.  I hear you.  Yes.
3  Q   Okay.  But you don't understand the format
4  of this or what the document says?
5  A   No, I don't even remember a document like
6  this.
7  Q   Okay.  Fair enough.  Because you didn't
8  read any of the documents, you were just advised
9  about them by your counsel, correct?
10 A   Right.
11 Q   Okay.  So if I put in front of you the
12 original copies of what was signed as opposed to
13 photocopies of what was signed that day, you wouldn't
14 recognize what was said there because you didn't
15 actually read those documents?
16 A   No, I would recognize what was said.  But I
17 don't remember -- I wouldn't recognize what was said
18 on paper.
19 Q   You would remember what was said between
20 people.
21 A   What was read, yes.
22 Q   But you're not going to remember the text

Page 135

1  of any of these agreements, correct?
2  A   Right.
3  Q   Right?
4  A   Right.
5  Q   Okay.  Now, take a look -- and I'm not
6  going to try and walk you through agreements that are
7  very legal and not part of what you did from 30 years
8  ago.  I just want to point out one thing for you.  If
9  you take a look at pages 2 and 3 of Exhibit 3.
10 A   Mm-hmm.
11 Q   Is yours a two-sided copy?  Yes, okay.  So
12 the paragraph at the bottom of what's marked page 28
13 and the top of page 29, do you see that, paragraph 6?
14 A   Yeah.
15 Q   You see that's crossed off and initialed,
16 right?
17 A   Yes.
18 Q   Okay.  And it's initialed by the four of
19 you, correct?  James Avery, Taylor Reed, Tony Fisher,
20 Robert Reed.
21 A   I don't see my initial on here.
22 Q   On page 29, underneath the paragraph that's

Page 136

1  crossed off, you see "JA" on the top, and then "TR,"
2  "TF," and "RR" underneath it?
3  A   It's -- this initial right here?
4  Q   No, no.  On page -- no, no.  On page 29.
5  It may be too faint for you to see on this copy.
6  A   I only see "TR" on here.
7  Q   Oh, okay.  I have a better copy.  But
8  whatever.  You recall testifying that there was a
9  change made because there was language talking about
10 how Island wasn't going to pay you directly, so that
11 was crossed off because you wanted to be paid
12 directly by Island, correct?
13 A   That was just one of the changes, yes.
14 Q   Okay.  And in fact, do you remember that at
15 the time that all of these agreements were signed,
16 there was a separate agreement providing that Island
17 would pay you directly?
18 A   Yes.
19 Q   Okay.  Let me just show you another copy,
20 and we can try to find the best original one that we
21 can, but if you'll take a look, for example, this is
22 a better copy of page 29 of Exhibit 3.  Do you have

Page 137

1  that in front of you?  Do you see at the top and
2  bottom of that top paragraph, there are four
3  initials, the top one, "JA," and the bottom one,
4  "TR," "TF," and "RR"?
5  A   Yes, I see that.
6  Q   Okay.
7  A   Mm-hmm.
8  Q   So those were James Avery, Taylor Reed,
9  Tony Fisher, and Robert Reed, correct?
10 A   Correct.
11 Q   Okay.  Thank you.
12     MR. BART:  And thank you.  That's your
13 other copy.
14 BY MR. BART:
15 Q   And let me just show you what was marked
16 yesterday as Exhibit 9.  And on the second page,
17 those are the signatures of the members of the band
18 again, correct, including yourself?
19 A   Yes.
20 Q   And this is an agreement where, if you look
21 at the big paragraph A in the middle of the first
22 page, are you with me, where I'm pointing, on the

35 (Pages 134 - 137)

1 first page of that document I just gave you?
2 　　　MR. TALCOTT: Turn it over. Right there.
3 　A　Okay.
4 BY MR. BART:
5 　Q　Okay. Where it goes, "The royalties and
6 sums payable pursuant to 7-A through 7-D of the
7 Island contract shall be divided and paid 58.33
8 percent of 100 percent thereof to artist and 41.67
9 percent of 100 percent to T.T.E.D."
10 　　　Do you see that language?
11 　A　Yes.
12 　Q　Okay. And do you recall that Island agreed
13 that they would pay your share directly to you and
14 Maxx Kidd's share directly to him?
15 　A　Yes.
16 　Q　Okay. Do you remember the percentages that
17 were paid of the overall amount, how much each one of
18 you got?
19 　A　No.
20 　Q　Okay. Fair enough. Now, after -- you can
21 put that down, I'm not going to ask you any more
22 legal agreement questions, at least right now. So

1 after your meeting with Blackwell and Kidd and the
2 other members of the band in Georgetown, and
3 Mr. Blackwell said to you, you know, if you're going
4 to do a deal with me, you have to have Maxx Kidd in
5 it, and you either like him or love him or hate him?
6 　　　You remember the conversation --
7 　A　Yes. I remember that conversation.
8 　Q　You remember it better than I do. I'm just
9 paraphrasing it. After that conversation and after
10 all these agreements were signed, and after you
11 started working together with Island, what if any
12 involvement did Maxx Kidd have with Trouble Funk?
13 Was he working at all on any of the records that
14 Island was releasing of Trouble Funk?
15 　A　Okay. Can you repeat that?
16 　Q　Sure. After the meeting with Blackwell and
17 Kidd.
18 　A　Mm-hmm.
19 　Q　After these agreements are signed that
20 we've just gone through, you're now working in a deal
21 with Island Records.
22 　A　Okay.

1 　Q　You remember that Island Records released a
2 bunch of Trouble Funk records, correct?
3 　A　Right.
4 　Q　Some stuff that went back to '82 or '83 and
5 some newer stuff that came out later that hadn't been
6 on any other album, right?
7 　A　Right.
8 　Q　Okay. So there's old stuff, there's new
9 stuff, it's all coming out on Island after these
10 deals, right?
11 　A　Okay. Right.
12 　Q　Did Maxx Kidd have anything to do with
13 Trouble Funk after Trouble Funk recordings started
14 coming out on Island Records? Was he involved with
15 the band at all?
16 　A　Yes. Island Records gave us tour support.
17 　Q　Okay.
18 　A　And I guess Maxx was appointed to go over
19 there and, you know, promote along with the group,
20 the records.
21 　Q　Okay. So he was involved, when you did
22 tours, Maxx Kidd was part of the tour support that

1 Island provided to you pursuant to your agreements
2 with them, right?
3 　A　Right.
4 　Q　Okay. And where did you tour that Island
5 provided tour support for you?
6 　A　London, Amsterdam, Germany, Switzerland,
7 Paris.
8 　Q　Nice tour.
9 　A　Yeah. A few other places I don't remember.
10 But yeah, it was pretty much in the UK.
11 　Q　Okay. And was that one tour or are those
12 different tours?
13 　A　I think just one tour.
14 　Q　And do you know when that took place?
15 　A　I think around '85. Well, between '85 and
16 '87.
17 　Q　Okay. Fair enough.
18 　A　Yes.
19 　Q　And in fact, wasn't at least one of those
20 shows, I think the London show, recorded and
21 released? Wasn't there --
22 　A　London Town and Country. One was recorded

Page 154

1  mean as an actor. I mean what roles, what services
2  did he render to help make the film, if any?
3      A    Again, he controlled all of the other
4  artists outside of Trouble Funk.
5      Q    Okay.
6      A    So he had Redds and the Boys do -- and
7  because he couldn't control Trouble Funk, he had
8  Redds and the Boys do the title soundtrack.
9      Q    Didn't you guys do a version of Good to Go?
10     A    Yeah, we did -- no, yeah, we did Good to
11 Go. But Movin' and Groovin' was like one of the
12 deejay songs of the soundtrack that they put a lot
13 into, because Maxx controlled Redds and the Boys.
14     Q    Oh, okay. Nobody said that to you
15 directly, did they, that the reason they did it is
16 because Maxx controlled Redds and the Boys, that's
17 just your conclusion based upon knowing Maxx and
18 knowing his relationship with Blackwell?
19     A    Okay. You can put it that way, yes.
20     Q    Okay. So you had this meeting at
21 Gallagher's with --
22     A    By the way, he did say that.

Page 155

1      Q    Who did?
2      A    Maxx.
3      Q    Oh, Maxx said to you --
4      A    "I'm going to push Redds and the Boys on
5  this movie."
6      Q    Fair enough. So you're at the meeting at
7  Gallagher's with Maxx and with Chris Blackwell. Was
8  anyone else present?
9      A    Outside of the group?
10     Q    Yes.
11     A    Not that I can remember.
12     Q    Okay.
13     A    No.
14     Q    And how many members of the group were
15 there?
16     A    It was --
17     Q    The four of you?
18     A    The four of us, yes.
19     Q    So by that time, really the four of you
20 were the core members of the band?
21     A    Yes.
22     Q    And what do you recall being discussed

Page 156

1  about the film project, you know, at that lunch or at
2  that meeting? I assume it was a lunch, but maybe it
3  was a dinner.
4      A    He was pretty much, you know, just telling
5  us about what he wanted to do. And a lot of things
6  changed from that meeting, because I was supposed to
7  have been one of the key actors in there, Tony. They
8  wound up using the name but they got --
9      Q    An actor?
10     A    Yeah, which was something that I found that
11 was influenced by Maxx Kidd.
12     Q    Okay.
13     A    And he also mentioned how big he was going
14 to make the group, you know, and...
15     Q    How big Chris was going to make Trouble
16 Funk?
17     A    That's what Chris Blackwell, yeah, said,
18 wanted to make the group real big. And I remember
19 saying, "I'll believe it when I see it," and their
20 jaws dropped, I mean, you know. But hey --
21     Q    Life is short. So is this before your trip
22 to Europe?

Page 157

1      A    Yes.
2      Q    Okay. So clearly Island had big plans for
3  you in the sense of doing a film, sending you over to
4  Europe, ultimately sending you to Japan, correct?
5      A    Right.
6      Q    Okay.
7      A    Mm-hmm.
8      Q    And the album that was -- there was an
9  album that was released by Island called Saturday
10 Night Live from Washington, DC. Are you familiar
11 with that?
12     A    Yes. Paragon.
13     Q    And that's the same one that was the second
14 disk of --
15     A    Right.
16     Q    Okay. So I just had the title wrong.
17 Island did release that as a separate record called
18 Saturday Night Live from Washington, DC?
19     A    Right. Okay.
20     Q    Thanks. Just one second. Yes. Now, do
21 you remember an album that Island released that had a
22 number of go-go artists including yourself called Go

40 (Pages 154 - 157)

Page 158

1  Go Crankin'?
2  A  I think I remember something like that.
3  Yeah, it was a compilation.
4  Q  And do you remember -- let me just make
5  sure I have that in front of me. I don't. Oh, wait
6  a second. Just take a look at this.
7  A  Yes, "Paint the White House Black." I
8  remember this.
9  Q  And that was the compilation record you
10 were just talking about?
11 A  Yes.
12 Q  And who were the other bands that were on
13 it?
14 A  Chuck Brown. Experience Unlimited.
15 Iceberg Slim. Hot Cold Sweat.
16 Q  How many -- were all of the other bands
17 other than Trouble Funk controlled by Maxx Kidd?
18 A  Yes.
19 Q  Okay.
20 A  Yes.
21 Q  Do you know who this is?
22 A  That's Maxx Kidd.

Page 159

1  Q  Okay. Fair enough. Did you ever hear of
2  an Island label called 4th and Broadway?
3  A  Yes.
4  Q  And isn't that where their offices were
5  located?
6  A  Yes.
7  Q  And some of the product that was released
8  was released on 4th and Broadway, correct?
9  A  Yes.
10 Q  Okay. Thanks. And just bear with me one
11 second. And on this Go Go Crankin' record, Say What
12 was one of the tracks, right?
13 A  Yes. I guess it was. Yes.
14 Q  Okay. And the -- you didn't rerecord it
15 for this purpose, they just took the D.E.T.T. single
16 that had been released and put it out on this, right?
17 A  Yes. Yes.
18 Q  Okay. And actually, the same is true for
19 Let's Get Small, it was the same version?
20 A  Exactly, yes.
21 Q  Fair enough. Thank you. And Island also
22 released the song -- we were talking before about

Page 160

1  Good to Go or Short Fuse or whatever the title
2  ultimately was. Good to Go was a single that was
3  released by the band on Island as well, wasn't it?
4  A  Correct.
5  Q  Okay. And where was that recorded? Was
6  that recorded up in New York at --
7  A  Yes.
8  Q  In that session you were telling us about
9  before?
10 A  Yes.
11 Q  And they also released as a single It's in
12 the Mix, Don't Touch That Stereo. Do you recall when
13 Island released that as a single as well?
14 A  As a rerelease, yes.
15 Q  Yes, that's a rerelease of one of the
16 earlier D.E.T.T. releases, correct?
17 A  Right.
18 Q  Then there was a Live in London album that
19 was released; do you remember that?
20 A  Yes.
21 Q  Okay. And do you recall where it was
22 recorded, where in London you recorded that?

Page 161

1  A  I think that was Town and Country.
2  Q  Is that the name of the venue?
3  A  The club, yes.
4  Q  Okay. And that was just the band
5  performing, correct?
6  A  Yes.
7  Q  There were no other musicians playing that
8  night?
9  A  No.
10 Q  It was all recorded in the same live
11 performance?
12 A  Yes.
13 Q  Okay. Then there was a new single that was
14 released called Women of Principle?
15 A  Woman of Principle.
16 Q  "Woman," singular?
17 A  Woman of Principle.
18 Q  Women of Principle? Singular? "Woman" or
19 "women"?
20 A  "Woman."
21 Q  "Woman." Okay. Fair enough. Thank you.
22 But that was a new single that hadn't been released

41 (Pages 158 - 161)

1 before, correct?
2 A Yes.
3 Q Okay. Why are you sighing?
4 A It was a bad single.
5 Q Oh, okay. Fair enough. And where was that
6 recorded?
7 A I'm not sure, because some of the
8 recordings we did over in the islands, Chris
9 Blackwell's --
10 Q In Jamaica?
11 A In Jamaica, yes.
12 Q Okay. So --
13 A I think that was one of them.
14 Q So Island flew you over to Jamaica to
15 record in Blackwell's studios over there?
16 A Yes.
17 Q And did he have his whole complex there at
18 the time?
19 A Yes. We stayed in his flats, whatever you
20 call it, on the beach.
21 Q That's a resort, basically a resort
22 community, right?

1 A Right. Mm-hmm.
2 Q So they flew you over and you stayed in
3 those residences and recorded at the studio, correct?
4 A Yes.
5 Q How often did you go to Jamaica to record?
6 A I only went once.
7 Q Okay. And how many recordings did you do
8 during that session?
9 A Well, we actually flew over there different
10 times. It's like they -- Robert and James and Taylor
11 went there before me, because they was doing more
12 stuff. I didn't like the way the album was going, so
13 I pretty much, you know...
14 Q Which album were you talking about?
15 A Trouble Over Here.
16 Q Oh, okay. That was -- was that a full
17 album or -- yeah, okay, Trouble Over Here, Trouble
18 Over There?
19 A Yes.
20 Q So you weren't crazy about where it was
21 going, so you didn't get as involved as they did?
22 A No, I didn't.

1 Q Okay. You appeared on all the tracks,
2 though, didn't you, or not?
3 A No.
4 Q No? Which ones didn't you -- which ones
5 did you appear on?
6 A The ones that I wrote.
7 Q Okay. Did you leave the band at any point?
8 A No. We actually -- at one point we -- we
9 had two Trouble Funks.
10 Q Really?
11 A Yeah.
12 Q And when was that?
13 A It was shortly after the album was
14 finished.
15 Q Okay.
16 A Yeah.
17 Q Because you were unhappy with the direction
18 it was going and --
19 A I wasn't happy with the direction. That
20 wasn't -- that was not the Trouble Funk sound.
21 Q So you basically created your own Trouble
22 Funk, and there were competing Trouble Funks out

1 there?
2 A It wasn't really competing. They wanted --
3 (Simultaneous speaking.)
4 Q Well, you had two of them, whether they
5 were competing or not.
6 A One was the Trouble Funk that had Big Tony.
7 Q Okay. You know, I'm not -- I'm not
8 expressing any opinions in this deposition,
9 Mr. Fisher. I'm just --
10 A Yes, sir.
11 Q So there was a point at which right after
12 the release of this that Tony Fisher had a Trouble
13 Funk and the other members had a Trouble Funk?
14 A Yes.
15 Q And they were both out in the marketplace
16 for a while?
17 A Yes.
18 Q And when did the members reconcile and come
19 back and have just one Trouble Funk?
20 A When they realized that...
21 Q Time-wise.
22 A Okay. I don't remember. I don't remember.

1 We did reconcile, though.
2 Q How long a period were you running your own
3 Trouble Funk?
4 A For about a year.
5 Q And it was basically right after the
6 release of this record?
7 A Pretty much, yes. After the release of
8 this record and the release of Trouble Funk on Island
9 Records.
10 Q The Trouble Over Here, Trouble Over There
11 by Island Records?
12 A I mean, when we pretty much was released
13 from the -- from the label.
14 Q Oh, okay. Okay. Well, the album Trouble
15 Over Here, Trouble Over There was sort of like the
16 last big project that you did with Island, correct?
17 A Right.
18 Q And so they marketed that for whatever
19 period of time they marketed it.
20 A Yes.
21 Q And then ultimately, you had a termination
22 agreement with them, right?

1 A Yes.
2 Q You basically parted ways?
3 A Right.
4 Q Actually, let me show you that. Take a
5 look at the third page. I'll wait for you. See it?
6 Is that your signature?
7 A Yes.
8 Q Okay. And you recognize Mr. Reed's
9 signature?
10 A Yes.
11 Q But not the other two, because you're not
12 as familiar with their signatures?
13 A No, I'm not.
14 Q Okay. And do you recall that there was an
15 agreement when you parted ways with Island Records in
16 1989?
17 A Do I recall...
18 Q That there was a written agreement at the
19 time you parted ways with Island Records.
20 A Yes.
21 Q Okay.
22 A Yes.

1 Q Did you have counsel at that point? Did
2 you have a lawyer who was helping you negotiate or
3 deal with this agreement?
4 A You mean...
5 Q What's been marked as Exhibit 17.
6 A I'm not sure -- I'm not sure what this --
7 what is this agreement supposed to be?
8 Q Well, I can read it to you, but, you know,
9 if you don't have -- it basically says -- it's a
10 letter to the four of you.
11 A Uh-huh.
12 Q Saying, from Island Records, dated November
13 30th, 1989. So this is about two years after the
14 release of the Trouble Over Here, Trouble Over There
15 record.
16 A Right.
17 Q And it goes, "Reference is made to the
18 agreements dated October 11th, 1984, between you and
19 us," which we've looked at before, the agreements
20 that I showed you that had that date; do you
21 remember?
22 A Right. Yes.

1 Q Okay. "This letter when signed by you and
2 us shall constitute our mutual agreement to terminate
3 the term of the agreements upon the terms and
4 conditions set forth."
5 So this is a termination agreement that
6 terminates those other agreements, and basically
7 provides that Island keeps its rights, they will
8 continue to pay whatever they're going to pay, and
9 various other things. The agreement -- I don't want
10 to just give you a whole summary of it.
11 A Right. Okay. Yes.
12 Q But it's a termination agreement.
13 A Yes. This is my signature. But I don't
14 remember the agreement.
15 Q Okay. Underneath the four names on the
16 first page, right there where it's addressed to the
17 four of you.
18 A Yes.
19 Q There's a name, "care of Joseph Lloyd
20 Serling, Esq." Do you see that?
21 A Yes.
22 Q Do you know who Mr. Serling is?

1 A No.
2 Q The "Esq." generally references an
3 attorney. So I think it's a safe assumption that
4 they're sending this to you in care of some attorney.
5 But you don't have any recollection of Mr. Serling or
6 having him represent you in any way?
7 A No, I don't remember.
8 Q Okay. Now, right before we got into the
9 discussion of the termination, I had asked you about
10 Woman of Principle, which was a single you didn't
11 like, and it came out roughly in 1987; do you recall
12 that?
13 A Yes.
14 Q And then they're working on the Trouble
15 Over Here, Trouble Over There album, right? That's
16 the one that was being recorded down in --
17 A Yes. Woman of Principle came off that as a
18 single.
19 Q Fair enough. And ultimately, the song
20 Trouble itself came off as a single, didn't it?
21 A Yes. Yes.
22 Q So there were at least two singles from

1 that album; there was Woman of Principle, and there
2 was Trouble, right?
3 A Yes.
4 Q Was there an EP of that that was released
5 from that album as well?
6 A Not that I know of.
7 Q Do you know whether the other Trouble Funk,
8 the non-Tony-Fisher Trouble Funk did any touring to
9 support this record?
10 A No.
11 Q You don't know?
12 A No, I know they did not.
13 Q You know they did not?
14 A Yes.
15 Q Okay. So they didn't -- to your knowledge,
16 did they do any touring in the time when you were
17 running your own Trouble Funk?
18 A No. We actually toured for a while. I
19 mean, we toured for a while.
20 Q Oh, you toured in support of this record?
21 A In support of this record, yes.
22 Q Oh, okay. Before you created your own

1 Trouble Funk, is that --
2 A Right.
3 Q Oh, okay.
4 A Correct.
5 Q So during the time that you were touring to
6 support this record, where were you touring?
7 A The UK.
8 Q Okay. The UK record that we talked about
9 before, that live record from London.
10 A Yes.
11 Q That came out in 1986, as I understand it.
12 But is it your recollection -- because it's your
13 recollection that matters. Is it your recollection
14 that that came out after the Trouble Over Here,
15 Trouble Over There album was released?
16 A I'm not certain. I do know that we went
17 over there more than once.
18 Q Oh, you went over to London more than once?
19 A Yes.
20 Q Oh, okay. Okay. And did you have more
21 than one European tour, or you just went back to
22 London one more time?

1 A We had more than one European tour.
2 Q Okay. And both of them during the term of
3 the Island contract, right?
4 A Yes.
5 Q Okay. And both, they provided tour support
6 for you, for the European tours, correct?
7 A Yes, I believe so.
8 Q Okay.
9 A Yes.
10 Q And where did you perform on the second
11 tour?
12 A Some of those places, we went back to...
13 Q The same places?
14 A Yes. The same areas, different venues.
15 Q Right. Did you go to any new venues, any
16 new areas?
17 A Yes. I don't remember -- I do know the
18 second time, I think the second time around we did
19 the Montreux Jazz Festival.
20 Q Oh, okay.
21 A And then we did Netherland the second time.
22 Q Netherlands?