# EXHIBIT D

1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - -x
4    TUFAMERICA, INC.,                :
5           Plaintiff,                : Index No.:
6         v.                          : 12-CIV-3529 (AJN)
7    MICHAEL DIAMOND, et al.,         :
8           Defendants.               :
9    - - - - - - - - - - - - - - - -x
10
11   Videotaped Deposition of JAMES WILLIAM AVERY, Ph.D.
12                  Washington, DC
13              Wednesday, April 30, 2014
14                   11:18 a.m.
15
16
17
18
19
20
21
22   Reported By:  Lee Bursten, RMR, CRR

| Page 2 | Page 4 |
|---|---|
| 1  Videotaped Deposition of JAMES WILLIAM | 1  APPEARANCES CONTINUED |
| 2 AVERY, Ph.D., held at the offices of: | 2 ON BEHALF OF DEFENDANTS MICHAEL DIAMOND, ADAM |
| 3 | 3 HOROVITZ, AND THE ESTATE OF ADAM YAUCH, PERFORMERS |
| 4 | 4 KNOWN AS THE BEASTIE BOYS: |
| 5       JENNER & BLOCK LLP | 5     THEODORE C. MAX, ESQUIRE |
| 6       1099 New York Avenue NW | 6     SHEPPARD MULLIN RICHTER & HAMPTON LLP |
| 7       Suite 900 | 7     30 Rockefeller Plaza |
| 8       Washington, DC 20001 | 8     New York, New York 10112 |
| 9       (202) 639-6000 | 9     (212) 653-8700 |
| 10 | 10 |
| 11 | 11 ALSO PRESENT: |
| 12 | 12     MICHAEL E. CILIBERTI, Videographer |
| 13 | 13 |
| 14       Pursuant to Notice, before Lee Bursten, | 14 |
| 15 Registered Merit Reporter, Certified Realtime | 15 |
| 16 Reporter, and Notary Public in and for the District | 16 |
| 17 of Columbia, who officiated in administering the oath | 17 |
| 18 to the witness. | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |

| Page 3 | Page 5 |
|---|---|
| 1     APPEARANCES | 1     CONTENTS |
| 2 ON BEHALF OF PLAINTIFF AND THE WITNESS: | 2 EXAMINATION OF JAMES WILLIAM AVERY, Ph.D.     PAGE |
| 3     KELLY D. TALCOTT, ESQUIRE | 3 By Mr. Bart              8 |
| 4     THE LAW OFFICES OF KELLY D. TALCOTT | 4 By Mr. Max              213 |
| 5     34 Grove Street | 5 |
| 6     P.O. Box 43 | 6        EXHIBITS |
| 7     Sea Cliff, New York 11579 | 7     (Attached to transcript) |
| 8     (516) 515-1545 | 8 DEFENDANTS' DEPOSITION EXHIBITS       PAGE |
| 9 | 9 Exhibit 1   Letter of Engagement       16 |
| 10 ON BEHALF OF DEFENDANTS UMG - POLYGRAM INTERNATIONAL | 10 Exhibit 2   10/11/84 letter agreement     20 |
| 11 PUBLISHING INC. and CAPITOL RECORDS LLC: | 11       between Island Records and |
| 12     ANDREW H. BART, ESQUIRE | 12       T.T.E.D. Records |
| 13     JENNER & BLOCK LLP | 13 Exhibit 3   Exhibit "A": Letter of     20 |
| 14     919 Third Avenue | 14       Inducement, 10/11/84 |
| 15     37th Floor | 15 Exhibit 4   Exclusive Recording Agreement,   23 |
| 16     New York, New York 10022 | 16       10/11/84 |
| 17     (212) 891-1600 | 17 Exhibit 5   Form PA, Registration Number PA   23 |
| 18 | 18       298 628 |
| 19 | 19 Exhibit 6   Form PA, Registration Number PA   24 |
| 20 | 20       298-633 |
| 21 | 21 Exhibit 7   Certificate of Recordation,     24 |
| 22 | 22       7/28/86 |

1  A  I did not have these documents in my
2  possession.
3  Q  Did you review them in preparation for your
4  deposition?
5  A  Yes.
6  Q  May I see the folder, please.
7  A  The documents that I --
8  Q  Yes.
9  A  -- that I had?
10  Q  Unless there's other material --
11  A  There's other material in here. This is my
12  work-related material.
13  Q  When you say "work," you mean your work for
14  the EPA?
15  A  Not in this folder. I'm saying in my --
16  Q  No, I'm talking about the manila folder
17  that you have in front of you right now. Does that
18  consist solely of documents that you received
19  relating to this case?
20  A  Yes.
21  Q  May I see the folder, please?
22      MR. TALCOTT: He can just give it...

1      MR. BART: He can give them one at a time.
2  I just thought it made more sense for me to mark them
3  collectively.
4  BY MR. BART:
5  Q  Is that the full contents of the folder?
6  A  Yes.
7  Q  There are more documents inside there?
8  A  Those were the documents given by
9  Mr. Talcott.
10  Q  What were the other materials?
11  A  Those are my personal materials.
12  Q  Do they relate to this case?
13  A  Yes.
14  Q  Okay. May I see them, please.
15  A  These are just copies of the document that
16  I gave you.
17  Q  Thank you. Let me deal with what you just
18  handed me first. You handed me two documents that
19  you said were part of your personal papers, correct?
20  A  They are -- they are documents that were
21  given to me.
22  Q  By whom were they given to you?

1  A  Taylor Reed.
2  Q  And when did Taylor Reed give you these
3  documents?
4  A  Two days ago.
5  Q  Did you have copies of either of these two
6  documents?
7  A  No.
8      MR. BART: Let's mark as Defendants' Avery
9  Exhibit 2 a document dated October 11th, 1984,
10  between Island Records and T.T.E.D. Records. And as
11  Exhibit 3, a document marked "Letter of Inducement"
12  of that same date.
13      (Defendants' Exhibit 2 and Exhibit 3 were
14  marked for identification and attached to the
15  deposition transcript.)
16  BY MR. BART:
17  Q  Mr. Avery, let me show you first the
18  document which we've now marked as Defendants' Avery
19  Exhibit 2, and ask you if you can identify that
20  document for me.
21  A  This document was given to me by Taylor
22  Reed.

1  Q  Yes. Had you ever seen that document
2  before Mr. Reed gave it to you?
3  A  I did not recall it until he gave it to me.
4  Q  And once he gave it to you, did you recall
5  it?
6  A  No, I did not.
7  Q  Okay. And did you have a copy of this
8  document prior to getting a copy from Mr. Reed?
9  A  No.
10  Q  And sitting here today, do you have a
11  recollection of having seen that document before
12  getting it from Mr. Reed?
13  A  No, I did not.
14  Q  Can you state under oath that you never saw
15  it, or is it your testimony that you don't recall
16  whether you saw it or not?
17  A  I don't recall.
18  Q  Okay. Let me put in front of you a
19  document marked Avery Exhibit 3 and ask you to
20  identify that document for me.
21  A  This is a document that I received from
22  Taylor Reed.

Page 22

1  Q   And can you identify that document? What
2  is it?
3  A   The title of this document is "Exhibit A:
4  Letter of Inducement."
5  Q   Have you seen that document before?
6  A   This document I've seen before.
7  Q   And you signed that document, didn't you?
8  A   I did.
9  Q   And you signed it at or about the time
10 that's reflected on that agreement, correct?
11 A   That I do not recall.
12 Q   But you did sign the document, correct?
13 A   I signed -- my signature is on page 31 of
14 this document.
15 Q   Can I see that for one second? Here, you
16 can have that in front of you, Mr. Avery.
17 A   Okay.
18 Q   Your signature is the first signature on
19 page 31 of that document, correct?
20 A   Yes.
21 Q   Do you recognize the signatures of any of
22 the other people on that page?

Page 23

1  A   I don't recognize the signature. I
2  recognize -- no, I don't recognize the signatures.
3  Q   Do you recognize the signature at the
4  bottom middle of the page on the left side?
5  A   I don't recognize the signatures. I can
6  read them, but I don't recognize them.
7  Q   Okay. Fair enough. May I have that
8  document back? Thank you. Now, in addition, you
9  produced or you gave to me at my request certain
10 documents that Mr. Talcott gave to you.
11 A   Yes.
12     MR. BART: Let me mark those as well. I'll
13 mark as Exhibit 4 an October 11th, 1984 document
14 titled "Exclusive Recording Agreement."
15     (Defendants' Exhibit 4 was marked for
16 identification and attached to the deposition
17 transcript.)
18     MR. BART: We'll mark as Exhibit 5 a
19 copyright registration form bearing Bates stamps UMG
20 152 through 155.
21     (Defendants' Exhibit 5 was marked for
22 identification and attached to the deposition

Page 24

1  transcript.)
2      MR. BART: As Exhibit 6, a copyright
3  certificate bearing Bates stamps UMG 156 to 159.
4      (Defendants' Exhibit 6 was marked for
5  identification and attached to the deposition
6  transcript.)
7      MR. BART: As 7, a certificate from the
8  Copyright Office bearing UMG 163 to 166.
9      (Defendants' Exhibit 7 was marked for
10 identification and attached to the deposition
11 transcript.)
12     MR. BART: Whatever the next Exhibit Number
13 is, 8, UMG 160 to 162.
14     (Defendants' Exhibit 8 was marked for
15 identification and attached to the deposition
16 transcript.)
17     MR. BART: And 9, UMG 172 and 3.
18     (Defendants' Exhibit 9 was marked for
19 identification and attached to the deposition
20 transcript.)
21     MR. BART: Excuse me for just one second.
22     THE VIDEOGRAPHER: Going off the record.

Page 25

1  The time is 11:40.
2      (Recessed at: 11:40 a.m.)
3      (Reconvened at: 11:44 a.m.)
4      THE VIDEOGRAPHER: Back on the record. The
5  time is 11:44.
6  BY MR. BART:
7  Q   Mr. Avery, right before the break, we
8  marked a series of documents. And the first of those
9  -- these are the documents that you received from
10 Mr. Talcott. Let me put back in front of you what's
11 been marked as Exhibit 4, which is titled "Exclusive
12 Recording Agreement," with a date of 10/11/84.
13     Mr. Avery, prior to receiving that document
14 from Mr. Talcott, did you ever see that document
15 before?
16 A   This exact document, I do not recall if
17 this is the exact document. I have seen -- I don't
18 know if this is the exact document. I've seen a
19 document similar to this one.
20 Q   Okay. But you've seen a document similar
21 to that, and you can't testify under oath today
22 whether that's the same one that you have in front of

Page 26
1  you, correct?
2  A  No, I cannot.
3  Q  Okay. Does your signature appear on that
4  document?
5  A  My signature appears on page 18 of this
6  document.
7  Q  Okay. Thank you. We'll come back and deal
8  with all of these. I'm really just marking what you
9  received for right now. The next document that we
10 marked was a copyright certificate bearing Bates
11 stamps UMG 152 to 155. Well, first off, there are a
12 whole series of copyright documents that we marked
13 here as Exhibits 5 through 8.
14    Had you ever seen any of them before?
15 A  No.
16 Q  Okay. Then we'll just deal with them in
17 the ordinary course. These are documents that you
18 received from Mr. Talcott recently, correct?
19 A  Yes.
20 Q  Okay.
21 A  These -- clarification. These documents,
22 when you say "these," which --

Page 27
1  Q  The copyright certificates, the ones that I
2  have just been alluding to.
3  A  Correct.
4  Q  Let me go back to the retainer agreement.
5  If you need to see it again, I'll give it to you.
6  It's the only copy I have right now.
7  A  I don't know what you're referring to.
8  Q  This is the April 14th, 2014 letter.
9  A  Okay.
10 Q  There's a reference at the top to James
11 Avery, care of Rasheed M. McWilliams, Esq. Who is
12 Mr. McWilliams?
13 A  Mr. McWilliams is my entertainment
14 attorney.
15 Q  Okay. And how long has he been your
16 attorney?
17 A  I don't know the exact date right now.
18 Q  For more than ten years?
19 A  No.
20 Q  Okay. And when you say your "entertainment
21 attorney," generically what types of services does he
22 render to you?

Page 28
1  A  With regard to music production and
2  advising me with regard to music production.
3  Q  When was the first time that you had a
4  conversation with Mr. Talcott?
5  A  I don't remember the first conversation.
6  Q  Was it this year?
7  A  Further back than this year.
8  Q  Okay. And was it relating to this
9  particular lawsuit?
10 A  No.
11 Q  What subject matter did it relate to?
12 A  With regard to my signing with Tuff City to
13 represent me and services for copyright
14 infringements.
15    MR. BART: Let me mark as Exhibit 10 -- let
16 me do one thing just to make sure I don't lose track
17 here. Let me mark this document as Defendants' Avery
18 Exhibit 10. It's a document bearing Bates stamps TA
19 158 through 160.
20    (Defendants' Exhibit 10 was marked for
21 identification and attached to the deposition
22 transcript.)

Page 29
1  BY MR. BART:
2  Q  Mr. Avery, I put in front of you a document
3  that I've identified before as bearing Bates stamps
4  TA 158 through 160, which states that it is an
5  agreement effective dated January 1, 2012. Can you
6  identify this document for me?
7  A  Yes. This is an agreement between myself
8  and TufAmerica.
9  Q  In your previous answer, before I marked
10 this exhibit, you referenced conversations or at
11 least a conversation with Mr. Talcott about having
12 TufAmerica represent your interests with regard to
13 copyright infringement matters. Do you recall that
14 testimony?
15 A  Yes, I do recall the testimony.
16 Q  Were those discussions discussions that
17 culminated in the execution of this agreement?
18 A  You have to clarify, because I don't
19 understand what you mean.
20 Q  Fair enough.
21 A  That that conversation culminated in this
22 agreement.

Page 130

1 promoter. That's all I know.
2 Q But he was around with the band for several
3 years, wasn't he, working with the band in some
4 capacity or other?
5 A The time that I was there, he didn't come
6 until -- that's the only time I seen him, was here
7 and when he came to distribute records. That's it.
8 Q Well, before you signed with Island
9 Records, wasn't Mr. Kidd the person who first
10 mentioned to the band the possibility that the band
11 could sign with Island Records?
12 A Yes.
13 Q And do you recall what he told you about
14 that?
15 A Not exactly. All I know, that there was
16 interest in Trouble Funk.
17 Q And --
18 A And that he was shopping a deal. That's
19 all.
20 Q Okay. But that's good. That he was
21 shopping the deal, that he was out there trying to
22 find interest in you signing with a bigger label,

Page 131

1 correct?
2 A Yes.
3 Q Okay. Do you know whether he was shopping
4 any other bands at the time, other than Trouble Funk?
5 A I don't know.
6 Q And did you tell him it was okay to shop
7 Trouble Funk?
8 A I had no say-so in that. I didn't tell him
9 anything.
10 Q Did other members of the band have any
11 say-so, or you don't know?
12 A I don't know.
13 Q Would either Robert Reed or Tony Fisher be
14 more likely in terms of their roles with the band to
15 have had those conversations than you?
16 A Again, I came in the band -- before the
17 band was already started, so I don't know.
18 Q Fair enough. But you knew that Maxx Kidd
19 said there was interest in Trouble Funk, and that he
20 was out shopping the band, correct?
21 A That's all.
22 Q Okay. And did he tell you that the way

Page 132

1 that he could shop you around is if you were signed
2 to a label of his?
3 A No.
4 Q Well, did he tell you that he had his own
5 record label?
6 A No.
7 Q Now, earlier this morning -- let me just
8 make sure I have this. Hold on. You gave me a
9 document I'll give back to you, Exhibit 4. Now, this
10 was a document that you said Mr. Talcott gave to you
11 to help you prepare for your deposition in this case;
12 is that correct?
13 A Which document are you referring to?
14 Q I just put it -- I gave it to you a second
15 ago. Exhibit 4. It's labeled "Exclusive Recording
16 Agreement."
17 A Oh, okay. Say again about this document.
18 Q This is one of the documents that
19 Mr. Talcott gave you to help you prepare for this
20 deposition, correct? This is one of the documents
21 you brought with you today.
22 A One of the documents that Mr. Talcott gave

Page 133

1 me, yes.
2 Q And that's your signature on the last page,
3 on page 18, correct?
4 A Correct.
5 Q Okay. Now, the document is entitled
6 "Exclusive Recording Agreement," correct? On the
7 first page.
8 A Correct.
9 Q And it has a date of 11 -- October 11th,
10 1984, correct?
11 A Correct.
12 Q And it reflects that it's an agreement
13 between four members of the musical group Trouble
14 Funk, care of Raphael Tisdale, who you've testified
15 before was your attorney at the time, correct?
16 A Correct.
17 Q And T.T.E.D. Records Inc., correct?
18 A Correct.
19 Q And you knew in 1984, did you not, that
20 T.T.E.D. Records was an entity owned or controlled by
21 Maxx Kidd, correct?
22 A At the time of this, yes.

34 (Pages 130 - 133)

| Page 134 | Page 136 |
|---|---|
| 1  Q  Yes. | 1  A  No. |
| 2  A  Yes. | 2  Q  Okay. Fair enough. Now, on page 5 of this |
| 3  Q  Now, there is handwriting on the copy, on | 3  agreement, there's a paragraph, 2.02, that is |
| 4  this copy of the agreement, correct? | 4  bracketed and has next to it on the right the words |
| 5  A  Correct. | 5  "James A." Do you see that? |
| 6  Q  Okay. And before Mr. Talcott gave you a | 6  A  Yes. |
| 7  copy of this agreement, you had not seen this | 7  Q  Taking a wild educated guess, I would take |
| 8  document since the time you signed page 18; isn't | 8  it as a reference to you? |
| 9  that correct? | 9  A  I do not know. |
| 10  A  That's correct. | 10  Q  That's not your handwriting? |
| 11  Q  Okay. Now, on page 2 to 3, there is a | 11  A  That's not my handwriting. |
| 12  circle around paragraph 1.05. | 12  Q  And you don't have any recollection sitting |
| 13  A  Correct. | 13  here today of any issues or concerns or discussion |
| 14  Q  Which says that "Only master recordings | 14  about that paragraph, do you? |
| 15  consisting of compositions not previously recorded by | 15  A  No. |
| 16  the artist shall apply in reduction of the recording | 16  Q  Okay. There's also, on the bottom of that |
| 17  commitment except as otherwise provided herein." | 17  same page, a squiggly line under the number 15,000, |
| 18      Do you see that? | 18  for $15,000. Do you see that? |
| 19  A  Yes, I do. | 19  A  Yes. |
| 20  Q  Do you have a recollection sitting here | 20  Q  Do you recall any discussion or -- any |
| 21  today as having read or remembered that paragraph | 21  discussion about a $15,000 advance as part of this |
| 22  from 1984? | 22  agreement? |

| Page 135 | Page 137 |
|---|---|
| 1  A  No. | 1  A  Not as part of that agreement. The only |
| 2  Q  And just to be clear, and I should have | 2  thing I remember about $15,000 is in the -- in the |
| 3  addressed this earlier, you don't have any legal | 3  one that I told you where I knew that my signature, |
| 4  training, do you? | 4  strikeouts and initials, any time I strike out or |
| 5  A  No. | 5  write anything, it has my initials. |
| 6  Q  Okay. And you haven't studied contracts or | 6  Q  So that's the letter of inducement? |
| 7  interpretation of contracts in any of your many | 7  A  Letter of inducement. |
| 8  educational pursuits? | 8  Q  So that letter has $15,000 also; is that |
| 9  A  Say again. | 9  correct? |
| 10  Q  Have you ever taken a business law course | 10  A  It does reference $15,000. |
| 11  or taken -- | 11  Q  Now, on the next page, page 6 of this |
| 12  A  Oh, no. | 12  exhibit, there's handwriting to the right of the |
| 13  Q  -- a course which deals with the | 13  first half of the page. Do you see that? |
| 14  interpretation of contracts? | 14  A  Yes, I do. |
| 15  A  I am a -- we have to have that kind of -- | 15  Q  Do you know whose handwriting that is? |
| 16  this is dealing with scientific contracts at EPA, | 16  A  No, I do not. |
| 17  it's what's called contract to office representative, | 17  Q  Okay. Do you have any recollection of any |
| 18  but not a contractor, but as the technical expert, | 18  discussion about that handwriting from 1984? |
| 19  you have to have basic training, but not legal | 19  A  No. |
| 20  training. | 20  Q  Do you know whether any of the handwriting |
| 21  Q  And certainly you didn't have that training | 21  on this document existed on this document in 1984? |
| 22  back in 1984, correct? | 22  A  I do not know. |

VERITEXT REPORTING COMPANY

212-267-6868                 www.veritext.com                 516-608-2400

Page 138

1  Q  And you don't have any understanding as to
2  why any of the bracketed handwriting appears on this
3  document; isn't that correct?
4  A  No.
5  Q  It is correct that you don't have a
6  recollection?
7  A  I don't have a recollection.
8  Q  Okay. Fair enough. All right. We can put
9  that agreement to the side. Let's take a look at the
10 letter of inducement that you gave me, which I put
11 somewhere and I have to find.
12     MR. MAX: It's 11.
13     MR. BART: It's 11. Thank you. There we
14 go. No, it's not. You were trying to trick me.
15     MR. MAX: I'm sorry.
16     MR. BART: It's all right. I'm out of
17 order here. So let me find out why I go from 1 to --
18 you know what, did I give you back Exhibit 2, by any
19 chance?
20 A  No.
21 BY MR. BART:
22 Q  Do you have Exhibit 2 there?

Page 139

1  A  No.
2  Q  You don't have the one that says "Letter of
3  Inducement"?
4  A  It says 11, 4, 3.
5  Q  Which is 3?
6  A  Letter of inducement.
7  Q  Okay. Let's deal with that. So you recall
8  this exhibit, correct?
9  A  Correct.
10 Q  We've testified -- you testified about
11 this, and it bears your signature on page 31,
12 correct?
13 A  Correct.
14 Q  And it has the names of the three other
15 members -- or three other members of the band and a
16 reference to your attorney, Mr. Tisdale, correct?
17 A  Where is the reference?
18 Q  Right under the names on page 31. "Care
19 of," typed in, "Raphael Tisdale, Esquire," with a
20 street address.
21 A  Yes.
22 Q  Now, do you have a recollection sitting

Page 140

1  here today of having read this document back in 1984?
2  A  Yes.
3  Q  Okay. And do you recall any discussions
4  that you had with anyone at that time about this
5  agreement?
6  A  Yes, with our attorney.
7  Q  Okay. All right. I assume that you're
8  claiming attorney-client privilege with regard to
9  your conversations with your attorney about this
10 agreement, correct?
11 A  Yes.
12 Q  Okay. Now, the first paragraph of the
13 agreement -- well, let me ask you a different
14 question. Do you recall what if any sections of this
15 letter of inducement you discussed with your
16 attorney?
17 A  Discussed the whole thing. I think --
18 Q  Okay.
19 A  -- we discussed the whole...
20 Q  Fair enough. You'll see in the -- hold on
21 a second. I'm sorry. Let me take you back to
22 Exhibit 4 for one second, if I can. That's the one

Page 141

1  that's labeled "Exclusive Recording Agreement." Do
2  you have that back in front of you?
3  A  Yes.
4  Q  And this agreement, if you turn to page --
5  to the bottom of the first page.
6  A  Yes.
7  Q  Says, in paragraph 1.02-B, there's a
8  sentence --
9  A  Wait a minute.
10 Q  On the first page of the exclusive
11 recording agreement.
12 A  Okay.
13 Q  The last full paragraph on the first page.
14 A  Mm-hmm.
15 Q  It starts with the letter B.
16 A  Mm-hmm.
17 Q  And five lines from the bottom it says,
18 "Each option shall be exercised by company, giving
19 you written notice at least 30 days prior to the
20 expiration of the then-term of this agreement as the
21 same may have been suspended or extended as provided
22 herein."

Page 154

1 even testify under oath that any handwriting on this
2 document was on the document at the time you signed
3 the agreement?
4　A　I don't know.
5　Q　Correct?
6　A　I don't know.
7　Q　Okay.
8　A　I don't remember.
9　Q　Okay. So based on what you do know, based
10 on your recollection sitting here today, and the fact
11 that you can't testify under oath that any of the
12 handwriting on pages 1 through 17 were even on the
13 document when you signed it, there is nothing on this
14 document that you can point to as any indication that
15 this wasn't an authentic document, is there?
16　　MR. TALCOTT: Objection.
17 BY MR. BART:
18　Q　You can answer the question.
19　A　I don't know if it's an authentic document
20 or not.
21　Q　Right. But my question is, there's nothing
22 on this document that you can point to and say, "Look

Page 155

1 at that, that's the reason why I don't think this is
2 authentic," is there?
3　　MR. TALCOTT: Objection.
4 BY MR. BART:
5　Q　You can answer the question.
6　A　I don't know.
7　Q　Okay. And with regard to Exhibit 2, it's
8 similarly true that there's nothing about this
9 document that you can point to and say that this was
10 not the final production agreement between Island
11 Records and T.T.E.D. Records, is there?
12　　MR. TALCOTT: Objection.
13　A　I have no idea what agreement Maxx made
14 with Island Records.
15 BY MR. BART:
16　Q　Well, you signed a document where you
17 represented to Island Records that you did know what
18 the terms of his agreement were, didn't you? Take a
19 look at Exhibit 3, and the first paragraph of that.
20 Do you have Exhibit 3? I'll wait until you have it
21 in front of you.
22　A　3.

Page 156

1　Q　Yes. The first paragraph. We were just
2 reading this a few minutes ago.
3　A　Mm-hmm.
4　Q　"I hereby acknowledge that producer, Maxx
5 Kidd" --
6　A　What line?
7　Q　It's the third line of the first paragraph.
8　A　Exhibit 3?
9　Q　Yes. That's the letter of inducement. You
10 have that?
11　A　This is Exhibit 3. It says "Letter of
12 Inducement."
13　Q　Yes, that's right.
14　　MR. TALCOTT: Which line?
15 BY MR. BART:
16　Q　The third line. It's a sentence towards
17 the right that starts, "I hereby acknowledge."
18　A　Okay.
19　Q　"That producer," and that's T.T.E.D.
20 Records, correct? Or it says so on the second line.
21　A　Mm-hmm.
22　Q　"Is entering into a record production

Page 157

1 agreement with you to which the foregoing letter of
2 inducement is attached (the production agreement), a
3 copy of which I have received, read, and understood."
4　　Do you see that language?
5　A　Yes.
6　Q　And so in signing this document, which you
7 did sign on page 31, which you've testified about
8 before, you were representing to Island Records that
9 the production agreement between T.T.E.D. and Island
10 is a document that you have received, read, and
11 understood, correct?
12　A　It is correct that I signed this document,
13 but I just don't recall this particular agreement.
14　Q　Okay. And you may not recall the
15 agreement, and that's fine. It's 30 years later,
16 Mr. Avery, and I accept that. All I'm trying to
17 establish is there's nothing about the document that
18 has been marked as Exhibit 2 or Exhibit 3 that gives
19 you any reason to doubt and to tell me under oath
20 that the production agreement was not the agreement
21 signed between Island and T.T.E.D., is there?
22　　MR. TALCOTT: Objection.

Page 158

1  BY MR. BART:
2  Q   You can answer the question.
3  A   I don't know.
4  Q   Okay. All you can tell me is what you
5  know.
6  A   Yes, I don't know.
7  Q   Okay. Fair enough. Now, in this letter of
8  inducement, and again, this is a letter of inducement
9  that you discussed and were represented by
10 Mr. Tisdale with relation to, correct?
11 A   Correct.
12 Q   Okay. And it says in paragraph 1-A that
13 "The producer has the right to enter into the
14 production agreement and to assume all the
15 obligations, warranties, and undertakings to you on
16 the part of the producer therein contained."
17     Do you see that language?
18 A   Yes.
19 Q   And this is your representation to Island
20 Records as part of the letter of inducement, correct?
21     MR. TALCOTT: Objection.
22 BY MR. BART:

Page 159

1  Q   This is part of a document that you're
2  signing and giving to Island Records, right, a letter
3  of inducement from the four members of the band to
4  Island Records, correct?
5  A   Correct.
6  Q   Okay. And then the language I just read is
7  part of what you're telling them in this letter,
8  correct? Did I misread the paragraph -- the language
9  that I just read into the record, Mr. Avery?
10 A   No.
11 Q   Okay.
12 A   This is the agreement that I signed.
13 Q   Okay. That's fair enough. And you go on
14 in paragraph B right below that and say that "All of
15 producer's warranties, representations, covenants,
16 and agreements contained in the production agreement
17 which concern me are true and correct."
18     Do you see that language?
19 A   I have to back up for a minute. I said
20 that this is the agreement I signed. I again say
21 that there's an error in this agreement, and I recall
22 telling our lawyer to take that out. And so I can't

Page 160

1  say that this is the agreement that I signed. But I
2  recall signing an agreement. And what I recall, that
3  there were -- after we signed, that there were no
4  errors, that Tisdale Funk was not in it.
5  Q   You said that when you made changes to an
6  agreement, you would cross it out and initial it,
7  correct?
8  A   Right.
9  Q   And that's what happened here, correct?
10 A   Lines -- there are some strikeouts and
11 initials --
12 Q   There's one paragraph that's struck out.
13 There's not lines. There's one paragraph that's
14 taken out. And you each initialed it, correct?
15 A   Correct.
16 Q   Okay. And the reason that that paragraph
17 is taken out, if you look at it, the paragraph that's
18 there that's taken out is saying that Island -- if
19 you look at paragraph 6, "I hereby acknowledge and
20 agree that you shall not have any obligation to make
21 any payments whatsoever to me, it being agreed and
22 understood that I shall look solely to producer for

Page 161

1  any and all royalties, recording fees, and other
2  monies that will be payable to me."
3      Do you see that language? I don't need to
4  read the rest, but do you see that?
5  A   I see it.
6  Q   And in fact, the reason that was struck out
7  is because you reached a separate agreement which was
8  memorialized in a separate document that Island would
9  pay you directly because you didn't want to be -- to
10 take the risk of getting your money through Maxx
11 Kidd; isn't that correct?
12 A   I don't know if that's correct, the way you
13 stated it.
14 Q   Okay. It's a fact, is it not, that Island
15 agreed with you in a separate document that they
16 would pay you directly, and that that is why this
17 language was taken out, and that the parties
18 initialed it and took it out of the agreement; isn't
19 that correct?
20 A   We signed this to get paid directly from
21 Island, that is correct.
22 Q   Okay. But I'm saying something more than

41 (Pages 158 - 161)

### Page 162

1  that. This agreement, if it wasn't struck out, would
2  have said that you didn't have a right to get paid
3  directly, correct?
4     A   Correct.
5     Q   And you didn't want that, correct?
6     A   Correct.
7     Q   You didn't want to have to chase Maxx Kidd
8  down to get your money, correct?
9     A   I don't -- I don't agree to what you just
10 said.
11    Q   Whether you agree with it or not, isn't it
12 a fact that Island agreed to take that out, and
13 signed a separate document with you providing that
14 they would pay you directly?
15    A   Island signed a letter of inducement saying
16 that they would pay us directly.
17    Q   Okay. But my question -- that's true too.
18 But my question to you is, didn't they sign a
19 separate document in addition to this providing that
20 they would pay you directly, and the percentages that
21 they would pay you?
22    A   I'm confused about -- which separate

### Page 163

1  document are you referring to now?
2     Q   I'm asking as to whether you have a
3  recollection of there being a separate document
4  signed by the parties that -- pursuant to which
5  Island said that.
6     A   Could you point that document out, please?
7     Q   Okay. I will, but my first question to you
8  is, do you have a memory -- this is a deposition of
9  your memory, Mr. Avery. And so the question is --
10 and I grant you it's 30 years later and some of these
11 questions are hard, but that's what happens when
12 cases are brought on claims from 30 years ago.
13        But isn't it a fact that after the
14 execution of this letter of inducement by you and
15 Island, that there was a separate letter agreement
16 signed by the parties which provided expressly that
17 you would get paid directly from Island and how much
18 money you would get?
19    A   Yes. This letter of inducement.
20    Q   No, in addition to -- I said after the
21 execution -- I agree with you, the letter of
22 inducement was signed, and it provides that. But I'm

### Page 164

1  asking you a different question. Isn't it in fact
2  the case that in addition to both of you people
3  signing the letter of inducement, that there was a
4  signed document that provided for the direct payment
5  from Island to you of your royalties?
6         Let me back up a minute. Is it your
7  testimony under oath, 30 years later, that there was
8  a later version of this letter of inducement that was
9  signed which had a different paragraph in it that
10 said that you were going to get paid directly by
11 Island?
12        MR. TALCOTT: I object to the form.
13    A   I don't understand what you're asking.
14 BY MR. BART:
15    Q   I want to make sure I understand what
16 you're testifying. You agreed that -- several times,
17 that you signed this letter of inducement, correct?
18    A   I signed a letter of inducement, yes.
19    Q   No, that you signed the page that is page
20 31 of this document, correct?
21    A   Correct. Correct.
22    Q   And that you recognized that when you made

### Page 165

1  changes in documents, you crossed them through and
2  you initialed them, correct? And that's what
3  happened here, to reflect that you were signing it
4  subject to that change, correct?
5     A   I recall these strikeouts, yes. And I also
6  recall that we told him to take out Tisdale Funk. I
7  recall that.
8     Q   Well, you told him to do that, and you put
9  a cross-out through here, and initialed it to
10 indicate that you were signing it subject to that
11 deletion, correct?
12        MR. TALCOTT: Objection to form.
13    A   I recall this Tisdale Funk being corrected.
14 And that was the document that I signed. I recall
15 that.
16 BY MR. BART:
17    Q   Really? Do you have a copy of that?
18    A   No, I don't have it.
19    Q   Does anybody have a copy of it?
20    A   I don't know.
21    Q   Is it your testimony under oath 30 years
22 later that there is a different copy of this

| Page 166 | Page 168 |
|---|---|
| 1  agreement that was signed that has different language | 1  requiring Island to pay you directly, are you? |
| 2  in it other than paragraph 6 that relates to your | 2  A   No. |
| 3  payment? | 3  Q   Okay. And is there anything in this |
| 4  A   I -- say the question again. | 4  agreement in Exhibit 3 that you contend is erroneous |
| 5  Q   I'm asking you, you said that you signed a | 5  or false in any way other than the mistaken reference |
| 6  document, the letter of inducement, that provided | 6  in one of the five times the band's name is mentioned |
| 7  that you were going to get paid directly by Island. | 7  in paragraph 8 to Tisdale Funk instead of Trouble |
| 8  A   Correct. | 8  Funk? |
| 9  Q   Okay. You agree with me, do you not, that | 9  A   That's the only thing that I can recall. |
| 10 there's nothing in this exhibit that you have in | 10 Q   Now, what I was trying to ask you before is |
| 11 front of you that says that you're going to be paid | 11 that you and other members of the band expressed to |
| 12 directly by Island, correct? This copy. This | 12 Island by crossing off and initialing this signed |
| 13 document that you're looking at that's Exhibit 3. Is | 13 copy of the agreement, that you were not willing to |
| 14 there anything in here that says that they're going | 14 agree that they didn't have to pay you directly, |
| 15 to pay you directly? | 15 correct? |
| 16      In fact, there's a provision that says | 16 A   "They" being who? |
| 17 they're not going to pay you directly which was | 17 Q   Island. That your approval and signing of |
| 18 crossed out, correct? | 18 this agreement was subject to the fact that this |
| 19 A   Correct. | 19 provision had to be taken out, that the provision |
| 20 Q   Okay. It's not your testimony, is there, | 20 saying that Island doesn't have to pay you directly |
| 21 that there was a subsequent version of this agreement | 21 was something that you were rejecting and indicating |
| 22 that you signed that provided that they were going to | 22 that by crossing it off and initialing it, correct? |

| Page 167 | Page 169 |
|---|---|
| 1  pay you directly, is there? | 1  A   Yes. |
| 2  A   Subsequent... | 2  Q   Okay. And Island agreed with you, correct? |
| 3  Q   Yes. You're not testifying that the | 3  A   Yes. We were paid directly from Island. |
| 4  document that you signed that was the letter of | 4  Q   And not only did they agree because you |
| 5  agreement had an express provision in it saying that | 5  were paid, but in fact, Island agreed in a separate |
| 6  they were going to pay you directly? | 6  letter agreement with you that they would pay you |
| 7  A   You mean the letter of inducement? | 7  directly, didn't they? Or don't you have any |
| 8  Q   Yes. | 8  recollection? You just have no recollection? |
| 9  A   I don't recall. I don't recall. | 9  A   I just don't -- I can't -- I don't know |
| 10 Q   And in fact, there was a document in which | 10 what the letter says. I don't recall it. |
| 11 Island agreed to pay you directly, but it wasn't a | 11      MR. BART: Let me mark as whatever the next |
| 12 letter of inducement, it was a document that was | 12 number is, 13. |
| 13 signed by the parties two months later; isn't that | 13      (Defendants' Exhibit 13 was marked for |
| 14 correct? | 14 identification and attached to the deposition |
| 15 A   I don't -- I don't know. Two months later? | 15 transcript.) |
| 16 Q   Yes. It's nothing that's in front of you. | 16 BY MR. BART: |
| 17 This is not a quiz on something that you have in | 17 Q   Mr. Avery, I put in front of you a document |
| 18 front of you. | 18 that was produced in discovery in this action. |
| 19 A   I don't recall. | 19 A   Okay. |
| 20 Q   Okay. So my question to you is, you're not | 20 Q   Bearing Bates stamp numbers UMG 172 and |
| 21 testifying under oath here today that the letter of | 21 173. |
| 22 inducement that you signed has a provision in it | 22 A   Mm-hmm. |

Page 194

1   A   I don't know.
2       MR. BART: Why don't we take a couple of
3   minute break so I can see if I can condense down what
4   I have left.
5       THE VIDEOGRAPHER: Going off the record.
6   The time is 4:08.
7       (Recessed at: 4:08 p.m.)
8       (Reconvened at: 4:16 p.m.)
9       THE VIDEOGRAPHER: Back on the record. The
10  time is 4:16.
11  BY MR. BART:
12  Q   Mr. Avery, there came a time when you and
13  the other members of Trouble Funk terminated your
14  agreement with Island; isn't that correct?
15  A   I'm not sure if we terminated or Island
16  terminated. I don't recall.
17  Q   Okay. There was a termination agreement
18  that was signed between the parties; is that true?
19  A   I don't recall it. I would like to see a
20  copy of it, because I just don't recall the
21  termination agreement.
22  Q   That's not one of the documents that you

Page 195

1   produced here today, correct?
2   A   No, I don't have that.
3   Q   And have you seen a termination agreement?
4   A   No.
5       MR. BART: Let me mark as Exhibit 17.
6       (Defendants' Exhibit 17 was marked for
7   identification and attached to the deposition
8   transcript.)
9   BY MR. BART:
10  Q   Mr. Avery, I've put in front of you a
11  document that is Bates stamped UMG 149 to 151.
12  A   Okay.
13  Q   First, I'm just going to ask you to confirm
14  that the signature on page 3 is your signature.
15  A   Yes.
16  Q   We've seen it often enough that it's pretty
17  clear by now. And do you recall this agreement?
18  A   I don't recall it right now. Can I read
19  it?
20  Q   Yes, of course.
21  A   Okay.
22  Q   You let me know when you're ready.

Page 196

1   A   Okay.
2       Okay.
3   Q   Now, you'll see at the top, after the
4   initial portion, it says, "Gentlemen: Reference is
5   made to the agreements dated October 11th, 1984,
6   between you and us (the agreements)." Do you see
7   that language?
8   A   Yes.
9   Q   And you understand that to be a reference
10  to Exhibits 2, 3, and 4 that we've been talking about
11  today, correct?
12  A   I assume that, yes.
13  Q   Okay. Now, as of that time, in 1989, did
14  the members of the band have any ongoing relationship
15  with Mr. Kidd?
16  A   No.
17  Q   When did that -- I'm sorry?
18  A   That I can recall, no.
19  Q   When did that relationship end? When did
20  you stop having any -- I mean, you clearly were still
21  working with him in the In Times of Trouble and in
22  1984, around the times of these agreements. When did

Page 197

1   the relationship between the band and -- working
2   relationship between the band and Mr. Kidd stop?
3   A   I don't know exactly. But very soon
4   after -- after the -- after the Trouble Over Here,
5   Trouble Over There album.
6   Q   Okay. The one that we -- this Exhibit 16?
7   A   No. The cover of that album is not
8   included in this package.
9   Q   Okay. One second. Well, the Trouble Over
10  Here, Trouble Over There album, at least according to
11  the discographies, came around 1987. You may or may
12  not have any personal recollection about that. But
13  what was it about that record that you can tie the
14  end of the relationship with Mr. Kidd to that? How
15  do you know it was shortly after that time?
16  A   Repeat the question again.
17  Q   The question was, when did the relationship
18  between the band and Mr. Kidd stop?
19  A   It may have been sooner. It may have been
20  during the movie time, because we were misrepresented
21  to Island on the records, via Maxx Kidd.
22  Q   What does that mean? What do you mean by

Page 198

1 when you say we were misrepresented to Island, the
2 records? I don't understand.
3    A   He told Island Records that he had all the
4 go-go bands signed to this label, and we had not
5 signed to this label, in his negotiation with
6 Trouble -- with Island Records.
7    Q   When you say that he told Island Records
8 that he had all of the bands signed to his label, you
9 had an agreement with his label, correct?
10    A   Not at that time.
11    Q   So this is before the time of the 1984
12 agreements that we've been looking at?
13    A   Correct.
14    Q   Okay. So he told everybody, he told Island
15 that he had rights to these bands before he actually
16 had the rights to the bands?
17    A   That's correct.
18    Q   But you didn't find out about that until
19 later?
20    A   Until Island Records came to visit
21 Washington, DC.
22    Q   And when was that? When they did the

Page 199

1 movie, do you mean?
2    A   I don't remember the exact date when that
3 happened.
4    Q   But you said it was in connection with the
5 Island movie. Is that when Island came to
6 Washington, DC?
7    A   I don't remember the exact date. I just
8 recall that as being one of the problems.
9    Q   Okay. Do you have recollection -- all of
10 this that you're talking about happened after the
11 agreements in 1984, though, correct?
12    A   No.
13    Q   Okay. Well, you couldn't have broken your
14 relationship with Maxx Kidd when you signed
15 agreements with him after that date, could you?
16    A   You said all of this happened. And I said
17 that before the signing with Island Records, that,
18 you know, that he had told them that we were signed,
19 and I said that we were not signed, we had talked to
20 Island about that because we wanted to sign to Island
21 directly. But Island said they had their own
22 agreement with Maxx Kidd and we could not sign

Page 200

1 directly. This was before we signed the agreement.
2    Q   Okay. So they told you that you couldn't
3 sign directly because they had an agreement with Maxx
4 Kidd, and so you wound up signing indirectly through
5 Maxx Kidd anyway, correct?
6    A   Through T.T.E.D. Records.
7    Q   Through T.T.E.D.?
8    A   Through T.T.E.D. Records, yes.
9    Q   But that left a bad taste in your mouth
10 because of that?
11    A   Correct.
12    Q   So even though you signed with Island, at
13 that point, you didn't trust him anymore and you
14 didn't want to have any further dealings with him?
15    A   Correct.
16    Q   Okay. Fair enough. Now, were you still
17 represented by Mr. Tisdale at the time that you
18 signed this termination agreement, Exhibit 17?
19    A   No.
20    Q   Who was your counsel at this point?
21    A   I did not have counsel at that point.
22    Q   Did the other members of the band have

Page 201

1 counsel?
2    A   I don't know.
3    Q   Well, it says on the agreement itself,
4 "Care of Joseph Lloyd Serling, Esq., 10 Columbus
5 Circle, New York, New York"; do you see that?
6    A   Yes.
7    Q   And because it says "Esq.," he's a lawyer.
8 Do you know who Mr. Serling was?
9    A   No.
10    Q   But he was a lawyer, at least on this
11 agreement, identified as being affiliated with you,
12 correct? Not you personally, but the four of you,
13 right? It's addressed to the four members of the
14 band, care of Mr. Serling, correct?
15    A   Correct.
16    Q   And you received a copy of this, and you
17 signed it, correct?
18    A   Correct.
19    Q   Okay. Do you have any memory of the terms
20 of the agreement independent of what it says on the
21 page?
22    A   No.

## Page 202

1  Q  Now, you said earlier today, we had a very
2  brief conversation about composition copyrights, that
3  you were familiar with a company called Hugabut
4  Music. Do you recall that?
5  A  I think that name came out of the song
6  that's on the album, Taylor Reed wrote, and it was
7  just Hugabut. That's the only thing I can recall
8  about it now.
9  Q  Okay. Bear with me one second. You
10 produced at the beginning of this deposition two
11 composition copyrights that were registered in 1986
12 for Say What and Let's Get Small. I'll put them in
13 front of you. They're Exhibits 5 and 6. Let's look
14 at the one for Let's Get Small first.
15 A  Okay.
16 Q  Okay?
17 A  Okay.
18 Q  And which one is that, which exhibit number
19 is that?
20 A  It says 5.
21 Q  Okay. Now, this is a copyright submission
22 for the musical composition Let's Get Small, correct?

## Page 203

1  A  It says Form PA.
2  Q  Do you know what that means?
3  A  I think -- I guess this is a sound
4  recording contract. I don't know.
5  Q  You don't know one way or the other?
6  A  Yes.
7  Q  Okay.
8  A  Let's see.
9  Q  Take a look at the bottom of the document.
10 It says, "Copyright claimants." And it says "Ackee
11 Music Inc." Have you ever heard of Ackee Music Inc.?
12 A  I've seen it on album covers. I don't know
13 exactly -- I don't know Ackee Music Inc.
14 Q  And it says "Maxx Kidd's Music." Both have
15 an address in Hollywood, the same address in
16 Hollywood, California. Do you see that?
17 A  Yes, I do.
18 Q  And below that it says -- because it says
19 that the three authors are Mr. Fisher, Mr. Reed, and
20 you, correct?
21 A  Yes.
22 Q  And it says, "Hugabut Music acquired its

## Page 204

1  interest by agreement with Tony Fisher, Robert Reed,
2  and James Avery."
3  Do you see that?
4  A  Yes, I see it. It says "continued."
5  Q  And the continued is at the end of the back
6  page.
7  A  End of the back --
8  Q  Page 155.
9  A  Mm-hmm.
10 Q  Where it goes on to say, "Maxx Kidd's Music
11 acquired its interest by agreement with Hugabut
12 Music"; do you see that?
13 A  Yes.
14 Q  "And Ackee Music acquired its interest by
15 agreement with Maxx Kidd's Music." Do you see that?
16 A  Yes.
17 Q  So the transfers here are from you,
18 Mr. Fisher, and Mr. Reed to Hugabut Music, from
19 Hugabut Music to Maxx Kidd's Music, and from Mac
20 kid's music to Ackee Music, correct?
21 A  That's what's listed on the document.
22 Q  Okay. Are you familiar with any agreement

## Page 205

1  -- well, Hugabut was a company that -- first of all,
2  was Hugabut Music a company?
3  A  I can't recall -- I don't recall -- all I
4  recall is that was the name of the publishing thing,
5  when it was registered, I think. That's all I
6  recall.
7  Q  There's an address there too, 301 G Street.
8  A  Right.
9  Q  Whose address was that?
10 A  That's my former apartment address.
11 Q  Your former apartment address?
12 A  Yes.
13 Q  Okay. And so then there was -- hold on a
14 second. Earlier on this morning, I showed you I
15 think it was Exhibit -- hold on one second. Let me
16 get the right number here so I don't get more
17 twisted. 11. Do you have Exhibit 11 in front of
18 you?
19 A  10, 15, 2 -- no, I do not have Exhibit 11.
20 Q  You don't have 11? That was this
21 co-publishing agreement.
22 A  It's not here. Is it?