# EXHIBIT D

*Big Tony*
*#*
*MaxKidd*

J484(2)12

ISLAND RECORDS INC.
14 East 4th Street
New York, New York 10012

Dated: as of October 11 , 1984

T.T.E.D. Records, Inc.
3180 Bladensburg Road, N.E.
Washington, D.C. 20018

Gentlemen:

This letter, when signed by you and by us ("Company") shall, along with the attached Production Contract Standard Conditions (the "Conditions"), constitute the agreement between you and us whereby you will furnish to us exclusively in the territory described herein various recording artists and the product thereof as set forth in this letter and the Conditions.

1.   ARTISTS

The artists subject hereto shall be each and every musical recording artist or group of artists (other than those artists who are rejected in accordance with the procedure set forth in paragraph 4 below) which is, whether directly or indirectly, now or at any time during the Term of this agreement a party to a contract or agreement with you or any Controlled Entity pursuant to which you or any Controlled Entity own or control the rights to such artist's recordings or recording services. ("Controlled Entity" shall mean CARL KIDD, professionally known as MAX KIDD, or any person, firm or corporation that directly, or indirectly through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, you or MAX KIDD.) Each such artist is hereinafter referred to as an "Artist" and collectively as "Artists".

2.   TERRITORY

The Territory referred to in Condition 1 shall be the world.

3.   TERM

The period (the "Term" or the "Period") referred to in Condition 1 shall consist of an initial period commencing on the date hereof and expiring two (2) years thereafter and the option periods as provided in the immediately following sentence, if Company exercises such option(s). Company shall have two (2) consecutive, exclusive and irrevocable options to extend the Term for additional periods of eighteen (18) months each. Company shall exercise its option, if at all, by giving you written notice thereof at any time prior to or on the date on which the Term would otherwise expire. Notwithstanding the foregoing, Company shall not be entitled to exercise its option for either such option period unless, as of the date that the Term would otherwise expire, Company has at least three (3) Album Artists

1

EXHIBIT
Defs' 2
4/30/14   LB

on its artist roster. As used in the preceding sentence, an "Album Artist" shall mean an Artist hereunder who has not become a rejected artist and with respect to whom you: (i) have produced and delivered to Company at least one (1) album, or (ii) are producing for Company or have been requested by Company to produce an album.

4.   SUBMISSION OF ARTISTS

(a)   During the Term hereof, you shall submit to Company, in accordance with the procedure set forth below, each and every Artist. Submission of an Artist to Company shall be made by way of a tape copy of all available newly-recorded master recordings (fully edited, mixed and mastered), but in no event less than a number of such master recordings sufficient to constitute a Single Record. Concurrently with each such submission, you shall send a notice identifying the name of the Artist and the title(s) of the master recordings submitted to Company's Vice President of Business Affairs. Unless Company notifies you within twenty (20) days after its receipt of such notice and the delivery to Company of such tape copy, that Company has accepted the Artist, such Artist shall be deemed to be rejected by Company.* Your submission to Company of an Artist shall constitute your warranty and representation that there is or will be a contract covering such Artist's recording services which enables you to perform your obligations hereunder and which contains the terms required pursuant to paragraph 6 below.

(b)   You shall have the right to authorize or permit any other phonograph record manufacturer, distributor or label ("Third Party") to make and sell records derived from recordings by any rejected Artist.

(c)   You and Company hereby acknowledge that you have submitted, and Company has accepted, the following Artists:  (i) CHUCK BROWN AND THE SOUL SEARCHERS; and (ii) TROUBLE FUNK.

5.   DELIVERY OBLIGATION

(a)   (i)   With respect to each Artist accepted by Company hereunder, you shall deliver to Company the master recordings constituting the Single record initially submitted to Company (the "First Single").

(ii)   Company shall have the irrevocable right and option, to be exercised by written notice to you no later than the date six (6) months after the delivery of the First Single of an Artist, to require you to produce and deliver to Company additional master recordings embodying that Artist's performances sufficient to constitute a second Single record (the "Second Single").

(iii)   Company shall have the irrevocable right and option, to be exercised by written notice to you no later than the date ninety (90) days after the initial commercial release in the United States by Company of the Second Single of an Artist or four (4) months after the delivery of the Second Single of such Artist, whichever is sooner (but in no event shall Company be obligated to exercise such option any earlier than the date nine (9) months after the date of the delivery of the First Single by that Artist) to require you to produce and deliver to Company additional master recordings embodying that Artist's performances sufficient to constitute an album (the "First Album"). Company may, if it so elects, exercise such option with respect to a particular Artist in addition to or in lieu of the option set forth in paragraph 5(a)(ii) above by the last date set forth in said paragraph 5(a)(ii).

*Company shall have no rights with respect to recordings by any such rejected Artist(s)

(iv)  Company shall have irrevocable, consecutive rights and options to require you to produce and deliver such additional albums embodying an Artist's performances as you have rights to pursuant to the contract regarding that Artist's services; provided, that in no event shall Company be entitled to more than ten (10) albums from each Artist. Company may exercise its options with respect to each Artist one (1) album at a time, provided that Company shall not be entitled to exercise an option for a particular Artist's album unless it has theretofore exercised its option for that Artist's preceding album. Company shall exercise its option for an album by an Artist, if at all, by written notice to you no later than the date nine (9) months after the delivery to Company of the immediately preceding album by that Artist. (Each such album of an Artist for which Company exercises its option shall sometimes herein be referred to as the Second Album, Third Album, and so forth.)

(b)  Notwithstanding anything to the contrary contained in paragraph 5(a) above:

(i)  With respect to CHUCK BROWN AND THE SOUL SEARCHERS, the First Single shall be produced and delivered to Company within thirty (30) days following the execution hereof. The Single entitled "WE NEED SOME MONEY" shall not be deemed to be the First Single (nor shall Company be required to pay any advance in respect of such Single), but the master recordings contained thereon shall be subject to all of the terms and conditions of this agreement, except that you may continue to manufacture and distribute such Single throughout the world, as a Single record only. Company shall control all other rights in and to the master recordings contained on such Single, except as expressly set forth in paragraph 11(a) below. You shall be solely responsible for accepting, disposing of and settling accounts with respect to all returns of copies of such Single manufactured by or for you.

(ii)  With respect to TROUBLE FUNK, you have submitted, and Company has accepted, an album entitled "IN TIMES OF TROUBLE", which album is a "double" album, consisting of one (1) "live" disc and one (1) "studio" disc. You acknowledged that, without limiting its rights under this agreement, Company shall have the right to edit said album in consultation with you and to release it in the form of one or more "single" albums. If released as more than one single disc, such album shall nevertheless constitute only one (1) album by such Artist in fulfillment of your obligations regarding such Artist; provided, however, that if Company initially releases a single disc album derived from such double album and thereafter release a second single disc album derived from the master recordings not included on the first disc, and if, as of the end of the last complete semi-annual accounting period hereunder, your royalty account is fully recouped, Company shall pay to you as an additional advance the sum of Fifty Thousand ($50,000) Dollars. If your account is then unrecouped, Company shall not be obligated to pay any additional advance.

(c)  With respect to each Artist:

(i)  The First Single shall be delivered to Company within ten (10) days after Company's acceptance of such Artist;

(ii)  The Second Single shall be delivered to Company within thirty (30) days after Company's exercise of its option therefor and receipt by you of the applicable commencement advance; and

3

(iii) Each album requested shall be delivered within three (3) months after Company's exercise of its option therefor and receipt by you of the applicable commencement advance.

(d) All master recordings shall be subject to Company's approval as technically and commercially satisfactory. For the purposes of this agreement, master recordings will in no event be acceptable to Company until you shall have delivered to Company the fully mixed, edited and equalized and leadered two-track stereophonic 15 i.p.s. quarter-inch tape recording for such master recordings (which tapes shall be acceptable in accordance with the applicable standards set forth herein) together with the materials and information required in paragraph 5(g) below. If you deliver any recording hereunder which does not conform to the foregoing recording standards, you will re-record such recording at your own expense until you deliver to Company a recording which conforms to said recording standards.

(e) The material to be recorded hereunder shall be mutually approved by you and by Company. The individual producer(s) of the master recordings subject hereto shall be mutually approved by you and by Company.

(f) Master recordings delivered for use on Singles shall be delivered in both 7-inch and 12-inch versions and shall be accompanied by instrumental and/or "dub" versions for use on the "B" side of 12-inch Singles.

(g) Concurrently with the delivery of the master recording hereunder, you shall also deliver to Company, at your expense, all of the following elements: (i) label copy, including song titles (and subtitles), names of composers, complete publisher line (plus the current address and telephone number of all publishers), affiliation (ASCAP, BMI, etc.), timings, any arranger and/or accompaniment credits, names of engineers, list of musicians with instruments played, exact recording date(s) and studio location(s), indication whether recording is track, sweetening or vocal overdub, and producer and/or production company credits; (ii) in writing, the sequence and final timings for all configurations of records; (iii) information for liner credits and liner notes for albums and for any photography needed (including Artist's photograph) in connection with the album cover; (iv) in writing, all consents, clearances and releases, including first use mechanical licenses, if any, required for the use of all elements above specified; and (v) in writing, all data necessary or appropriate for securing copyright protection.

(h) Without limiting any of Company's rights hereunder, you shall deliver exclusively to Company each and every master recording recorded by an Artist during the Artist Term of that Artist's Artist Contract unless and until: (i) such Artist is rejected by Company, or (ii) Company fails to exercise an option for additional master recordings of such Artist.

6. ARTIST CONTRACTS

(a) Except as provided in paragraph 6(c) below, each Artist shall be a party to a contract (the "Artist Contract") pursuant to which such Artist is required, during the term thereof (the "Artist Term"), to perform exclusively for you for the purpose of making phonograph records. Concurrently with the submission of an Artist, you shall furnish Company with a copy of that Artist's Artist Contract.

(b) Without limiting any of Company's rights or your obligations hereunder, each Artist Contract shall contain the following provisions:

(i)   The Artist shall be required to record one (1) Single, and you shall have options for a second single and a minimum of eight (8) albums.

(ii)   Singles shall be delivered to you within thirty (30) days after your request, and albums shall be delivered within three (3) months after your request.

(iii)   The Artist Contract shall be expressly made subject to assignment by you to Company in accordance with the terms of this agreement and shall provide that Company may, on your behalf, exercise, implement or enforce any of the rights granted by the Artist to you. Company shall be given the right to cure any default by you under the Artist Contract within thirty (30) days after Company's receipt of written notice of such default from Artist. The Artist Contract shall provide that, in the event of such assignment to Company, Company shall not be responsible for obligations incurred by you prior to such assignment.

(c)   You represent that your Artist Contracts which are in full force and effect as of the date hereof comply with the requirements set forth in paragraph 6(b) above, except as expressly described in Schedule I annexed hereto. With respect to each Artist Contract identified on Schedule I, you shall use your best efforts to cause the Artist to enter into an amendment to such Artist Contract which would have the effect of causing such Artist Contract to conform to said requirements; provided, however, you shall not be deemed in breach hereof if that Artist refuses to enter into such an amendment.

(d)   Unless Company notifies you otherwise, you shall exercise every option to extend the term of an Artist Contract at least twenty (20) days before the last day on which such option is exercisable, and you shall simultaneously send Company a copy thereof. If you do not do so in any instance, Company shall have the right to cause such Artist Contract to be assigned to Company (and, accordingly, shall have the right to exercise the option concerned on your or Company's behalf).

(e)   Without limiting any of the foregoing, you shall comply with all of your obligations under each Artist Contract and shall take all necessary actions to maintain each Artist Contract in full force and effect unless and until Company fails to exercise an option hereunder for such Artist.

(f)   Within thirty (30) days after Company's acceptance of an Artist, you shall furnish Company with an agreement between Company and that Artist (the Artist "inducement letter"), signed by Artist, which agreement shall be in the form annexed hereto as Exhibit "A". Company shall have no obligation to pay any advance or other sums in connection with such Artist unless and until Company has received such inducement letter.

7.   ROYALTIES

The royalty referred to in Condition 2(a) shall be as follows:

(a)   In respect of records manufactured, sold and not returned in the United States (other than records so manufactured but sold at special export price for resale outside of the United States):

(i)   Twelve (12%) percent in respect of albums. If net sales through normal retail channels in the United States of any album hereunder

embodying solely the performances of an Artist, on which royalties are payable pursuant to this agreement (after deduction of applicable reserves), shall exceed 500,000 units, then the royalty on all such sales in excess of 500,000 units shall be thirteen (13%) percent, rather than twelve (12%) percent.

    (ii)  Ten (10%) percent in respect of all other records.

    (b)  In respect of records manufactured, sold and not returned in the United Kingdom (other than records so manufactured but sold at special export price for resale outside of the United Kingdom):

    (i)  Eleven (11%) percent in respect of albums.

    (ii)  Nine (9%) percent in respect of all other records.

    (c)  In respect of records manufactured, sold and not returned in West Germany, France, Japan, Canada and Holland (other than records so manufactured but sold at special export price for resale outside of such countries):

    (i)  Eight (8%) percent in respect of albums.

    (ii)  Six and two-thirds (6-2/3%) percent in respect of all other records.

    (d)  In respect of records manufactured, sold and not returned throughout the rest of the world (other than records so manufactured but sold at special export price for resale outside of such territories):

    (i)  Six (6%) percent in respect of albums.

    (ii)  Five (5%) percent in respect of all other records.

    (e)  You shall be solely responsible for and shall pay all sums due each Artist and individual producer and all recording costs ("Recording Costs") incurred in connection with the master recordings hereunder. "Recording Costs" shall include without limitation recording fees and royalties for all musicians, performers or persons connected with such recordings (including instrumentalists, leaders, contractors, arrangers, copyists and vocalists, and your producer), studio rentals, editing and mastering costs, union pension and welfare payments based on payroll, if applicable, instrument hire, equipment rental, payroll taxes, costs of reference dubs and equalizing time, and all other costs and expenses incurred hereunder which are now or hereafter recognized as recording and mastering costs (but not including the costs of producing metal parts) in the phonograph record industry, provided, however, that Company shall have the right, in its discretion, to pay any such costs and to deduct the amount thereof from any and all Advances and/or royalties due you hereunder.

8.   ADVANCES

Company shall pay the following advances to you:

    (a)  Ten Thousand ($10,000) Dollars in respect of each of the First Single and, if requested, the Second Single of Artists which are delivered to and accepted by Company. Notwithstanding the foregoing, Company shall instead pay to

you an advance of Twenty Thousand ($20,000) Dollars in respect of the First Single by CHUCK BROWN AND THE SOUL SEARCHERS. If net sales through normal retail channels in the United States of the First Single of an Artist (other than CHUCK BROWN AND THE SOUL SEARCHERS), on which royalties are payable (after deduction of applicable reserves), exceed 60,000 units as of the date on which you commence to record the Second Single by such Artist, then the advance for the Second Single of that Artist, if Company exercises its option therefor, shall be Fifteen Thousand ($15,000) Dollars rather than Ten Thousand ($10,000) Dollars.

(b)   The following sums for each album by a particular Artist, if Company exercises its option(s) therefor, which sums shall be inclusive of any and all advances theretofore paid to you or on your behalf in connection with the recording of any previous master recordings included in that album:

(i)   With respect to the First and Second Albums by a particular Artist, Seventy-Five Thousand ($75,000) Dollars.

(ii)   With respect to the Third Album by a particular Artist, One Hundred Thousand ($100,000) Dollars.

(iii)   With respect to the Fourth Album by a particular Artist, One Hundred Twenty-Five Thousand ($125,000) Dollars.

(iv)   With respect to the Fifth Album by a particular Artist, One Hundred Fifty Thousand ($150,000) Dollars.

(v)   With respect to the Sixth Album by a particular Artist, One Hundred Seventy-Five Thousand ($175,000) Dollars.

(vi)   With respect to the Seventh, Eighth, Ninth and Tenth Albums by a particular Artist, Two Hundred Thousand ($200,000) Dollars.

(c)   The foregoing advances shall be payable as follows:

(i)   With respect to the First Single of an Artist, the advance shall be payable within fifteen (15) business days after the delivery of such First Single to Company.

(ii)   With respect to each subsequent Single and/or album requested by Company, the advance shall be payable one-third (1/3) within fifteen (15) business days after Company's receipt of notice that you have commenced recording the applicable master recordings, one-third (1/3) within fifteen (15) business days after Company's receipt of notice that you have commenced mixing such master recordings, and the balance within fifteen (15) business days after delivery by you to Company of the applicable master recordings.

(iii)   Notwithstanding the foregoing, with respect to the First Single of CHUCK BROWN AND THE SOUL SEARCHERS only, the advance shall be payable as follows:   one-half (1/2) within fifteen (15) business days after Company's receipt of notice that you have commenced recording such First Single or on October 15, 1984, whichever is later; and the balance within fifteen (15) business days after delivery by you to Company of such First single or on October 15, 1984, whichever is later. With respect to the First album of "TROUBLE FUNK" only, the advance shall be payable as follows:   Sixty Thousand ($60,000) Dollars promptly

following execution of this agreement or delivery of the First Album by such Artist, whichever is later; and the balance thirty (30) days later.

(d)    All monies paid to you or on your behalf (other than royalties and mechanical royalties), including the advances set forth above, shall constitute advances recoupable from all royalties payable hereunder. Mechanical royalties shall not be used to recoup any advances hereunder.

9.    TRADEMARK

All records subject hereto released by Company during the Term of this agreement shall employ on all album jackets and, space permitting, on labels your trademark "T.T.E.D. RECORDS" (hereinafter referred to as the "Mark"). The size and prominence of the Mark shall be determined by Company in its reasonable discretion, after consultation with you.  Any inadvertent failure by Company to comply with the foregoing shall not constitute a material breach of this agreement or be deemed to cause any damage to you.  You hereby irrevocably grant to Company the exclusive right to use and to authorize others to use the Mark throughout the Territory for advertising and purposes of trade, and otherwise in connection with the sale of phonograph records hereunder and on and in connection with such records.  All such uses shall be without any additional payment to you or any other party.  You warrant and represent that the Mark shall be and remain your sole and exclusive property throughout the Territory and you hereby agree to indemnify and hold Company, its successors and assigns harmless against any and all claims, losses, damages, cost and expense (including reasonable attorneys' fees), which Company may pay, incur or sustain by reason of the use of the Mark.  If the use of the Mark is not permissible, then Company may, in its discretion, sell records subject hereto solely under Company's and/or its distribution company's trademark. The registration and maintenance of the Mark shall be your sole responsibility and shall be in your name, for your benefit, and at your expense.

10.    VIDEOS

(a)    Company shall have the right to require any Artist to perform, at a fee not to exceed union scale, during the period hereof at such times and places as Company designates for the production of films or videotapes featuring that Artist's performances of Compositions embodied on master recordings delivered hereunder (hereinafter "Videos").  Company shall be the exclusive owner throughout the world and in perpetuity of such Videos and all rights therein, including all copyrights and renewal of copyrights, and shall have all of the rights with respect thereto which are set forth in the grant of rights provisions of this agreement, including, without limitation, the right (but not the obligation) to use and exploit such Videos in any and all forms.

(b)    All sums paid by Company in connection with the production of Videos shall constitute advances hereunder and shall be recoupable from any and all royalties payable to you pursuant to this agreement, except that no more than fifty (50%) percent of such sums may be recouped from so-called "record" royalties (i.e., royalties in respect of the exploitation of Master Recordings hereunder other than royalties payable pursuant to this paragraph 10).

(c)    As to the exploitation of the Videos by Company's licensees, Company shall credit your account with fifty percent (50%) of Company's net receipts attributable to the Videos.  ("Net Receipts" shall mean Company's gross receipts less any amount which Company pays in connection with the exploitation of

*promotional marketing and manufacturing expenses, unless otherwise agreed to in writing by You.

the Videos, including payments to publishers, labor organizations, shipping and duplication costs, and an administrative fee equal to ten percent (10%) of gross receipts.) Your share of Company's net receipts shall be inclusive of, and you shall be solely responsible for, any compensation for the services of the producer of the master recordings and for any other royalty participant (excluding any unions or guilds or the video producer and director) who are entitled to a royalty in respect of such Videos. As to the sale of the Videos by Company directly in the form of videocassettes, videodiscs or other devices intended primarily for home use or private viewing, Company shall credit your account with a royalty in accordance with the royalty provisions of this agreement, except that the retail selling price of such devices shall be deemed to be Company's published price to its distributors.

(d)   The selection of the Composition to be embodied on a Video and of the producer, director, concept and storyboard shall be subject to your and Company's mutual approval, which shall not be unreasonably withheld; provided, however, if you and Company are not able to agree upon one or more of the aforesaid elements, Company's decision shall control.

11.   LIMITATIONS ON RIGHTS

(a)   You represent, and Company acknowledges, that you have heretofore granted to a third party the exclusive right to manufacture and distribute in the United Kingdom the CHUCK BROWN AND THE SOUL SEARCHERS recording of "WE NEED SOME MONEY" as a Single record, and that such third party has the non-exclusive right to include such recording on compilation albums with your reasonable approval. You agree that you shall not grant your approval for any such use without first obtaining Company's approval, which approval shall not be unreasonably withheld. Company shall have all other rights in such territory with respect to such recording, including, without limitation, the non-exclusive right to include such recording on compilation albums.

(b)   You represent, and Company acknowledges, that you have heretofore granted to a third party the exclusive right to manufacture and distribute in West Germany, Austria and Switzerland the First Album by TROUBLE FUNK.

12.   NOTICES

All notices to be given to either party hereunder and all statements and payments to be sent to you hereunder shall be addressed to each party at its address set forth above, or at such other address as such party shall designate in writing, and shall be served by either personal delivery (to an officer of Company if to Company), mail or telegraph, all charges prepaid. Any notices alleging breach of contract, if mailed, may only be sent by certified or registered mail, return receipt requested. Except as otherwise provided herein, all notices shall be deemed given when personally delivered, mailed or delivered to a telegraph office, all charges prepaid, except that notices of change of address or any notice alleging breach of contract shall be effective only after the actual receipt thereof. Duplicate copies of all notices to Company shall be sent to Grubman Indursky & Schindler, P.C., 575 Madison Avenue, New York, New York 10022, Attention: Arthur I. Indursky, Esq. Duplicate copies of all notices to you shall be sent to Kendall A. Minter, Esq., 221 West 57th Street, New York, New York 10019. The failure to comply with either of the aforesaid duplicate notices shall not constitute a breach hereof or affect the validity of the notice concerned.

13.  <u>RELEASE</u>

(a)   Provided that you have complied with all of your obligations hereunder, Company shall release in the United States each album of an Artist delivered pursuant to that Artist's recording obligation within ninety (90) days after you deliver such album. If Company fails to comply with the preceding sentence, your sole remedy shall be to notify Company within sixty (60) days after the end of such period of your desire that Company's rights with respect to that Artist be terminated if Company does not so comply within sixty (60) days after Company's receipt of your notice. If Company fails to do so, Company shall have no liability whatsoever to you or the Artist, but Company's rights with respect to future recordings by such Artist shall automatically terminate and such Artist shall become a rejected artist.

(b)   Provided that you have complied with all of your obligations hereunder, and provided further that an album of an Artist achieves a position in the top 50 of Billboard Magazine's "Pop" or "Black" album charts, then Company shall release or cause its licensees to release that album in the United Kingdom no later than ninety (90) days after the date on which such chart position is first achieved. Company may, in its sole discretion, release such album by importing copies into the United Kingdom for sale. If Company fails to comply with its obligation under this paragraph 13(b), your sole remedy shall be to notify Company within thirty (30) days after the end of such period of your desire that Company's rights in that territory with respect to that artist be terminated if Company does not so comply within sixty (60) days after Company's receipt of your notice. If Company fails to do so, Company shall have no liability whatsoever to you or to the Artist, but Company's rights in the United Kingdom with respect to future recordings by such Artist shall automatically terminate.

14.  DISTRIBUTION

Company warrants and represents that during the Term hereof all albums released hereunder shall be distributed in their initial release via the same method of distribution as the albums of the majority of Company's top "pop" artists (i.e., currently, distribution by Atlantic Records).

15.  CONDITIONS

In the event of any conflict or inconsistency between the terms of this letter agreement and the annexed Conditions, the terms and conditions of this letter agreement shall prevail.

The remaining terms and provisions of this agreement are contained in the attached Conditions. Please confirm your acceptance of and agreement to these terms and Conditions by signing below where indicated.

Very truly yours,

ISLAND RECORDS INC.

By _____

AGREED AND ACCEPTED:

T.T.E.D. RECORDS, INC.

By _____

Federal ID # _____

10

T.T.E.D. RECORDS

## ISLAND RECORDS INC.
## PRODUCTION CONTRACT
## STANDARD CONDITIONS

1.   In these conditions the following expressions shall have the following meanings:

"the Agreement" shall mean the letter to which these Conditions are attached, together with these Conditions.  Where paragraphs are referred to, these shall mean the paragraphs of the attached letter, the conditions herein being referred to as Conditions.

"the Territory" shall mean the Territory specified in paragraph 2 of the Agreement.

"United Kingdom" shall mean and include Great Britain, Northern Ireland, the Isle of Man and the Channel Isles.

"Producer" shall mean the producer whose name and address appears at the head of the Agreement.

"the Artist" shall mean the artist or artists described in paragraph 1 of the Agreement.  In the event that more than one Artist is named, all warranties, covenants or undertakings relating to the Artist in the Agreement shall be deemed to apply and be binding on each such Artist individually, whether performing alone or together with one or more of the other Artists so named or with or without other artists not so named.  The expression "the Artist" shall, where the context admits, include the masculine and feminine thereof.

"the period" shall mean the period specified in paragraph 3 of the Agreement.

"master", "master recordings", "record", and "sound recordings" shall mean and include all forms of recording (both visual and non-visual) including without limitation discs of any speed or size, pre-recorded tapes, cassettes, cartridges and any other recording devices now known or which may hereafter become known.

"the Company" shall mean Island Records, Inc. its successors in title, licensees and assignees.

"reduced rate" shall mean a price less than two-thirds (2/3) that at which the Company's full price records are usually sold.

"recording" shall mean a sound recording made in accordance with this Agreement.

"album" shall mean a twelve-inch (12") thirty-three and one-third (33 1/3) r.p.m. record or the equivalent thereof containing not less than thirty-five (35) minutes and not more than forty (40) minutes in playing time of newly recorded performances by the Artist.

2. (a) Subject to the Producer complying with his obligations hereunder, the Producer shall be entitled to a royalty (subject as otherwise specified in this Condition) at the rates specified in paragraph 7 of the Agreement in respect of each record solely incorporating an Artist's performances recorded in pursuance of this Agreement and sold by the Company or by any person, firm or company authorized by the Company, calculated in accordance with the following provisions:

(b) (i) The said royalty shall be calculated on the basis of ninety percent (90%) of the recommended retail selling price for the time being in the country of sale (exclusive of taxes and duties, and after deducting an amount in respect of the cost of packaging which shall be twelve and one-half percent (12-1/2%) of such price in the case of 7" 45 rp.m. single records which are packaged in color or other special sleeves and for long playing or extended play disc records which are packaged in Company's standard single fold sleeves, and fifteen percent (15%) of such price in the case of single fold sleeves for long playing or extended play records with special labels or inner bags and double fold sleeves, and twenty percent (20%) of such price in the case of all tapes) of all records manufactured and sold in pursuance hereof and for which the Company is paid, save as otherwise provided in this Condition 2. In the event any special effects on sleeves (e.g., embossing, color posters, booklets, etc.) are inserted or added and the costs of such sleeves containing such additional effects exceed the aforementioned percentages, then such costs shall be borne by the Producer. If, at Producer's request or with Producer's approval, Company releases records as picture discs or if records are pressed on material other than the standard black vinyl, then any additional cost incurred by the Company as a result of such pressings shall be borne by the Producer. In respect of records sold in the form of compact discs, Producer's royalty rate shall be calculated on the recommended retail selling price of the corresponding vinyl disc record as if such records had been sold in the form of vinyl disc records (and if there is no corresponding vinyl record, then the royalty rate shall be calculated on the recommended retail selling price of Company's "top-line" similar records).

(ii) In respect of records sold other than in the form of disc records, including in the form of cassettes, cartridges and other forms of pre-recorded tape, video tape and any similar devices, the royalty payable thereon shall be that which would have been payable if such records had not been sold in such form, except that if such records are manufactured and sold by Company's non-regular licensees, the royalty rate for sales of such records shall be one-half (1/2) of the applicable royalty rate set forth in paragraph 2(b)(i) above, and the royalty shall be calculated on the same retail list price basis as Company is paid.

(iii) In respect of records incorporating performances recorded hereunder together with performances not recorded hereunder, the royalty shall be a fraction of the royalty otherwise payable hereunder, the numerator of such fraction being the number of tracks on such record recorded hereunder and the denominator being the total number of tracks on such record.

(iv) In respect of records sold at a reduced rate either before or after such records have been removed from the Company's published catalogues, or sold to any government, its subdivisions, departments or agencies (including records sold for re-sale through military facilities) and in respect of records sold to educational institutions or libraries or sold as budget lines or premiums or sold through a record club, mail order enterprise or similar organization and/or sold through retail stores in conjunction with special radio or television advertisements

(including without limitation records of the type presently distributed by K-Tel or Ronco) the royalty rate payable thereon shall be one-half (1/2) of the royalty rate which would have been payable thereon if such records had not been so sold, provided that the royalty payable to the Producer in respect of such records shall in no event exceed fifty percent (50%) of the net receipts of the Company in respect of such records. However, no royalties shall be payable with respect to records distributed through a club operation either as a result of a member joining, recommending another to join a club or as a result of the purchase of a required number of records or otherwise as so-called "free" or "bonus" records, regardless of whether these are through a club operation or not.

(v)   No royalty shall be payable in respect of records which are distributed for promotional or incentive purposes or sold as "cut outs".

(vi)   In respect of records sold at a discount to distributors, sub-distributors, dealers or others, whether or not affiliated with the Company, the royalty shall be reduced in the same proportion as the regular wholesale price of such records is reduced on such records.

(vii)   In calculating the number of records sold hereunder, the Company shall have the right to deduct returns and credits of any nature arising in the normal course of business, including without limitation those on account of 100% return privilege, exchange privilege, defective merchandise and errors in invoicing and shipment.

(viii)   In respect of records sold for export, the recommended retail price referred to in sub-condition 2(b)(i) shall be deemed to be the recommended retail price in the country of sale of such records.

(ix)   In respect of records manufactured and sold outside the United States of America by licensees of the Company, the recommended retail price referred to in sub-condition 2(b)(i) hereof shall be deemed to be the price on the basis of which the Company's licensees account to the Company and as to which the Company shall notify the Producer upon request, and in the event that the Company's licensees shall deduct an amount in respect of the cost of packaging in excess of that provided in Condition 2(b)(i) hereof, or shall make any other deductions not otherwise herein provided for, such higher amount and other deductions shall be deducted in calculating royalties payable to the Producer in respect of such licensees' territory in lieu of the deductions specified under Condition 2(b)(i) hereof, but without prejudice to the provisions of subparagraph (ii) above.

(x)   In respect of records sold by licensees of the Company being generally known as a compilation album and consisting of other recordings of various artists other than the Artist together with recordings by the Artist, the base royalty for the purpose of the calculation in sub-condition 2(b)(iii) shall be three-fourths (3/4) of the otherwise applicable royalty.

(xi)   Any royalty due to the Artist or to a producer or engineer or to any union or union fund (including without prejudice to the generality of the foregoing to AF of M and/or AFTRA, but not including payments based on record sales) or to any third party (other than mechanical royalty payable to the copyright owner of the music recorded on such recordings) in respect of any recording made hereunder shall be paid by the Producer out of the royalty payable to the Producer

hereunder. If the Producer fails to make such payments, the Company may, in its absolute discretion, elect to do so on behalf of the Producer, provided that the Company may recoup such payments from all advances and royalties which may become due to the Producer pursuant to this Agreement and any other agreement between the Producer and the Company and/or its associated companies.

(xii) No royalty shall be paid in respect of records distributed on a no charge basis to distributors as so-called free goods or sold at discounts of fifty percent (50%) or more off the Company's or the Company's licensees' regular wholesale price ("free goods"); provided that in the United States such records do not exceed twenty (20%) percent of albums or EPs shipped to distributors and thirty (30%) percent of singles shipped to distributors and, provided further, that Company shall have the right to exceed said limitations for short term special promotions or marketing campaigns by its distributor (currently Atlantic Recording Corporation ("Atlantic")). Notwithstanding anything to the contrary herein, with respect to records subject hereto which are distributed in the United States by Atlantic, the number of records distributed as "free goods" hereunder shall not exceed the number of such records distributed as "free goods" under Company's distribution agreement with Atlantic.

(c) If the Company should license any recording hereunder for use on a flat fee basis (i.e., any basis other than one of a royalty based on the price of the recording) the Company shall credit Producer's account with fifty percent (50%) of the net proceeds received by it from any such license.

3. In consideration of the Agreement on the part of the Company herein contained, the Producer hereby grants to the Company the rights referred to in Condition 8 hereof in each and every master recording featuring an Artist existing at the date hereof (except as expressly provided otherwise herein) or recorded during the applicable Artist Term. The Producer warrants and represents to the Company that it has and will have all rights to which the Company is entitled under Condition 8 hereof in all such master recordings and that it is and will remain fully able to comply with and enforce its warranties and undertakings herein contained.

4. The Producer undertakes with the Company to procure that each Artist:

(a) Will not during the Artist Term render his services with or without others to any person, firm or company whatsoever whereby such services or the products thereof may be recorded in any form for the purpose of manufacture and release for sale to the public of records embodying such services or the products thereof.

(b) For a period equal to the greater of five (5) years immediately following the delivery of the master recording or three (3) years immediately following the expiration of the Artist Term will not perform any musical work recorded by the Company under this Agreement whereby such performance may be recorded in any form for the purpose of manufacture and release for sale to the public of records embodying such performance.

(c) During the period will not allow his name, professional name or likeness to be used in connection with recording or record sales without the prior written consent of the Company.

(d) Will record for the Company and the Producer will deliver to the

Company the number of recordings set forth in the attached letter agreement consisting solely of newly recorded performances by the Artist acceptable to the Company (not including live performance or re-recorded albums) during each period of twelve (12) calendar months during the period. Except as otherwise provided in paragraph 5(b)(ii) of the letter agreement, the Company shall have the right, subject to your consent, to release live performances of the Artist and if the Company elects to do so such performances shall be governed by the terms and conditions of this Agreement, except that such performances shall not count towards the recording commitment due under this Agreement and no advance shall be payable thereon. For the purpose of this sub-clause, a "live album" shall mean an album more than one-fifth (1/5) of the playing time of which shall consist of recordings of public performances by the Artist of musical works. A so-called "double album" or "multiple album package" shall be deemed to be one (1) album only, regardless of the playing time thereof or the number of disc records required to embody the recordings thereon and "newly recorded performances" shall mean performances performed and recorded during the period and not previously released hereunder or under any other agreement embodying the Artist's performances. A "re-recorded album" shall mean an album more than one-fifth (1/5) of the playing time of which shall consist of re-recordings by the Artist of musical works previously recorded by the Artist under this or any other agreement and released for sale on record.

(e) Owns all rights to the name and/or professional name heretofore adopted by Artist (the "name") and the Artist has the sole and exclusive right to use and allow others to use the name in connection with the sale and manufacture of records made hereunder and that he grants the exclusive use of the name to the Company in connection with recordings hereunder for the period of the Agreement and the non-exclusive right thereafter.

5.   The Company shall:

(a)   Agree with the Artist and the Producer regarding the selection of musical material to be recorded hereunder (such agreement not to be unreasonably withheld by either party).

(b)   Decide in its sole discretion whether or not such lyrics and music as recorded are acceptable and satisfactory for the manufacture and sale of records. For the purpose of this Agreement, sound recordings will not be acceptable to the Company until the Producer has delivered to Company the fully mixed, sequenced and equalized 15 i.p.s. two track master tapes of the recording and all consents, approvals, copyright clearances, credits and other material required by the Company to release records embodying such sound recordings and obtained a receipt therefor signed by an officer of the Company.

6.   Accounts between the Company and the Producer shall be taken as at the last day of June and the last day of December in each year and the Company shall pay such sums as may be certified by its accountant to be due to the Producer at his last known address within ninety (90) days of the appropriate account date and each such payment shall be accompanied by a statement setting forth in reasonable detail the computation of the amount thereof. All such statements shall be binding on the Producer and not subject to any objection by him whatsoever, unless specific objection in writing stating the basis thereof is given to the Company within two (2) years from the date the statement in question is rendered. No action, suit, or proceeding of any nature in respect of any royalty statement or other accounting rendered by the Company hereunder may be maintained against the Company unless

such action, suit or proceeding is commenced against the Company in a court of competent jurisdiction within thirty (30) months after the date rendered.   The Company's obligations to pay royalties in respect of records sold outside the United States of America shall be limited to that amount of such royalties as the Company shall actually receive in the United States of America or as shall be credited to Company's account against an advance previously actually received, provided that in any countries where currency transfer restrictions are in force, if the Company can lawfully pay or transfer the same to an account in the name of the Producer in such country, the Company may thereby satisfy its obligations to the Producer.   The Company shall be entitled in its reasonable discretion to withhold from any payments hereunder reasonable reserves against returns.   Such reserve shall not exceed thirty-five (35%) percent with respect to albums.   The Company shall be entitled to deduct and retain from all royalties otherwise payable to the Producer hereunder any and all sums due to the Company under Condition 7 hereof, any and all unrecouped advances paid to the Producer and/or the Artist or any of the individuals comprising the Artist under this Agreement, and any and all other sums due to the Company from the Producer and/or the Artist, any and all funds expended by Company to produce promotional videos of Artist's performances as provided elsewhere herein, and any and all sums which the Company may be required by any governmental regulations to deduct therefrom, including any and all withholding, V.A.T., or like taxes deducted from any and all royalties paid to the Company by its overseas licensees in respect of sales of records hereunder.   The Company shall maintain books of account concerning the sale of records hereunder.   An independent certified public accountant appointed by Producer may, on Producer's behalf and at Producer's expense, examine the Company's sale books relating to the distribution and sale of records hereunder (but excluding any of the Company's books or records relating to the manufacture of records hereunder) solely for the purpose of verifying the accuracy thereof and only during Company's normal business hours and upon not less than thirty (30) days' written notice and not more than once in each year.   The Company's said books relating to any particular royalty statement may be examined as aforementioned only within two (2) years after the date rendered and such audit shall not exceed two (2) weeks in duration.   Company shall have no obligation to permit the Producer's representative to so examine the said books relating to any particular royalty statement more than once.   Producer shall cause its accountant to deliver a copy of his audit report to Company within three (3) months after the completion of said accountant's examination of Company's books and records at Company's offices.   The rights hereinabove granted to the Producer shall constitute the Producer's sole and exclusive right to examine the Company's books and records.

7.    The Producer warrants and undertakes with Company:

     (a)   That all recordings made by each Artist hereunder shall be free from, and the Producer will indemnify the Company against and satisfy, all payments and royalties which may now or hereafter become due to all persons, bodies and organizations (excluding composers and the AFM Music Performance Trust fund and Special Payments Fund, but including without prejudice to the foregoing, musicians, vocalists, arrangers, producers and engineers) whose performances or other services are embodied in such recordings or who may otherwise be entitled to any payment in respect of such recordings in respect of all exploitation thereof and all payments in respect of all recording costs in connection therewith, and the Producer further warrants and undertakes to pay the cost of all original artwork in respect of jackets and covers of albums made from recordings delivered hereunder.

(b)   The Producer warrants and undertakes that if the Producer or any Artist or any person, firm or corporation affiliated or associated with the Producer or an Artist shall own and/or control the copyright in such material wholly or in part directly or indirectly (hereinafter referred to as "Controlled Composition"), such Controlled Composition shall be licensed to Company and its licensees, for the United States, at a rate equal to three-fourths (3/4) of the compulsory license rate under the copyright law of the United States in effect on the date of the delivery of the master recording embodying such composition hereunder.   Each Controlled Composition shall also be licensed to Company and its licensees, for Canada, at the compulsory licensing rate under the copyright law of Canada in effect at the time of delivery of the master recording embodying such composition hereunder. Notwith-standing the foregoing, Producer warrants and represents that the maximum aggregate copyright royalty rate payable in respect of any long playing record album hereunder containing one (1) or more disc records or the tape equivalent thereof regardless of the number of compositions contained herein and regardless of whether or not such compositions are reproduced twice on Company's "1 + 1" cassette configurations shall not in the United States exceed seven and one-half (7-1/2) times the minimum statutory compulsory license rate in effect on the date of the initial release in the United States of such album (i.e., such maximum aggregate copyright royalty rate was $.31875 as of January 1, 1983), shall not in Canada exceed ten times the minimum statutory compulsory rate in effect in Canada on the date of the initial release in the United States of such album (i.e., such maximum aggregate copyright royalty rate was $.20 Canadian as of January 1, 1983). Producer further warrants and represents that the maximum aggregate copyright royalty rate payable in respect of any 7" single hereunder, regardless of the number of compositions contained therein shall not in the United States exceed one and one-half times the minimum statutory compulsory license rate in effect in the United States upon the delivery of the master recording contained on such single (e.g., such maximum aggregate copyright royalty rate was $.06375 as of January 1, 1983) and shall not in Canada exceed two (2) times the minimum statutory compulsory license rate in effect in Canada upon the initial release of such single (e.g., such maximum aggregate copyright royalty rate was $.04 Canadian as of January 1, 1983) and the maximum aggregate copyright royalty rate hereunder payable in respect of any 12" EP record hereunder, regardless of the number of compositions contained therein shall not in the United States exceed three (3) times the minimum statutory compulsory license rate in effect in the United States upon the delivery of such 12" EP record (e.g., such maximum aggregate copyright royalty rate was $.1275 as of January 1, 1983) and shall not in Canada exceed four (4) times the minimum statutory per composition rate in effect in Canada upon the initial release of such 12" EP record (e.g., such maximum aggregate copyright royalty rate was $.08 Canadian as of January 1, 1983).   The foregoing mechanical license royalties shall only be payable with respect to records for which royalties are payable to the Producer in accordance with Condition 2 hereof. Accordingly, in the event the actual aggregate copyright royalty rate in respect of any long playing record, 45 r.p.m. single or 12" EP record hereunder shall exceed the applicable maximum aggregate copyright royalty rate hereinabove specified, then the aggre-gate copyright royalty rate for the Controlled Compositions, if any, contained thereon shall be reduced by an amount equal to such excess. If the actual aggregate copyright royalty rate payable by the Company in respect of any such long playing record, 7" single or 12" EP record, as the case may be, shall, even as reduced in accordance with the immediately preceding sentence, still exceed the applicable maximum aggregate copyright royalty rate hereinabove specified, then the Company shall have the right, at the Company's election, in addition to any other rights or remedies which the Company may have in such event, to deduct an amount equal to

the additional payments required to be made by the Company as a result thereof from any sums payable to the Producer hereunder. Any assignment made of the ownership or copyright in, or the rights to license or administer the use of, any Controlled Composition, shall be subject to the terms and provisions hereof. No copyright royalties shall be payable in respect of Controlled Compositions which are arrangements of musical material in the public domain.

(c)    The Producer warrants and undertakes with the Company that the material recorded hereunder shall not constitute a libel or slander of any person and shall not infringe upon or violate any other right of any person. The Producer warrants and undertakes that in the event an Artist records any musical composition hereunder which is not a Controlled Composition, Producer shall use its best efforts to cause the copyright proprietors of such compositions to issue mechanical licenses to Company at the rates applicable to Controlled Compositions hereunder and upon remaining terms no less favorable to Company than those contained in the then current standard mechanical license form being utilized by The Harry Fox Agency, Inc.

(d)    All Controlled Compositions, together with all other selections embodied in the masters which are furnished or selected by Producer, as well as any other materials, ideas or other properties furnished or selected by Producer and contained in or used in connection with the masters, the packaging therefor, or the advertising thereof, will not violate or infringe upon any common law or statutory right of any person, firm or corporation, including, without limitation, contractual rights, copyrights and rights of privacy.

(e)    Producer further warrants and represents to Company that in respect of motion pictures, films and videograms manufactured hereunder, each Controlled Composition shall be licensed to Company and its licensees for the Territory for use and reproduction thereof in any and all media whether now known or unknown (including without limitation broadcast, pay, cable, satellite, close-circuit and any other form of television now known or hereafter to be invented, theatrical and non-theatrical exhibition and videogram use) for a fee to be negotiated in good faith by Producer and Company in light of industry standards at the time of such use (provided that Company may so use the Composition prior to reaching an agreement), subject in the case of videograms to the further payment by Company or its licensees of royalties not exceeding the minimum customary rates prevailing in the industry from time to time. In the event that notwithstanding the foregoing Company or any of its licensees is required to make payments in excess of the maximum sums specified in this paragraph, then without prejudice to Company's other rights the amount of such excess shall be deductible from other payments due to Producer hereunder. Producer further represents and warrants that it will cause the publisher of the Controlled Compositions to issue a royalty free license to Company or its designees for all promotional uses of the Controlled Compositions hereunder. Promotional uses shall mean uses of the Composition which are primarily intended by Company to promote the exploitation of the Composition or of phonograph records embodying such Composition.

8.    The Producer hereby assigns to the Company by way of assignment of present and future copyright and the Company shall be entitled to the sole and entire copyright in all recordings made by each Artist during the applicable Artist Term whether or not delivered to Company, including without prejudice to the generality of the foregoing, the sole and exclusive right in perpetuity throughout the Territory:

(a)   Of production, reproduction, sale and distribution (under such trademarks and/or labels as the Company may select) and performance (including broadcasting) throughout the Territory by any and every means whatsoever of such recordings.

(b)   To release and re-release all recordings made hereunder in all forms and sizes of records as it may in its absolute discretion determine.

(c)   At its discretion to decide whether and/or when to commence or discontinue or recommence the exercise of any of its rights hereunder.

(d)   To fix and alter the sale price of all records made from recordings hereunder as it may in its absolute discretion feel expedient.

(e)   To use and publish the Producer's and the Artist's name, likeness, biographical material and photographs for labelling, cataloguing and exploiting recordings hereunder.

(f)   To authorize any person, firm or corporation to do all or any such acts and things as are referred to in this Condition.

9.   IT IS HEREBY AGREED AND DECLARED that all recordings featuring an Artist and recorded in pursuance hereof are the absolute property of the Company and the Company will continue to account to the Producer for the royalties thereon both during the period and thereafter.

10.   (a)   In the event of the Producer using the Company's or the Company's associated studios for recording an Artist in connection with recordings to be delivered hereunder and released by the Company during the period of this Agreement, the Company agres that it will make such studios available to the Producer on the same terms, both financial and otherwise, as are available to other artists having exclusive recording agreements with the Company and in addition thereto, the Company shall make available to the Producer for recording the Artist all or any special financial rates or other terms which it may have negotiated for the use of any other recording studios PROVIDED ALWAYS AND IT IS HEREBY DECLARED that the Company shall have the right to recover all monies owing to the Company or the Company's associated companies by the Producer and/or the Artist in pursuance of his use of the aforementioned facilities by way of deduction from any royalties and fees accruing to the Producer hereunder.

(b)   In the event the Producer shall for any reason whatsoever delay the commencement or completion of, or the Artist shall be unavailable for any recordings sessions hereunder, the Producer shall, upon Company's demand, promptly reimburse Company in an amount equal to any expenses or charges actually incurred or paid by Company by reason thereof, and in the event the Producer shall fail to do so, the Company shall in addition to any other rights or remedies which the Company may have in such event, have the right to deduct an amount equal to any such expenses or charges from any monies payable by the Company to the Producer hereunder.

(c)   Producer agrees to cause Artist to be properly rehearsed and appear at the times and places designated by Company for all recording and filming sessions requires hereunder.   At each such session Producer shall cause Artist to render Artist's professional services to the best of Artist's ability and to rehearse,

record and re-record the material designated by Company under the general direction of such individual producer as may be designated by Company after consultation with Artist and Producer.

11.   If, within twelve (12) months after exercising its option for additional product from an Artist, the Company shall fail to record the minimum number of records provided for such Artist, and if, within sixty (60) days after the expiration of such time period, Producer shall notify the Company by registered mail of Producer's request that the Company record such of Artist's performances as will fulfill the Company's minimum obligation hereunder, then the Company shall, at its option, within sixty (60) days after the Company's receipt of such request, either record such performances or pay to Producer an amount equal to seventy-five (75%) percent of the sum equal to the advance due in respect of such product (whether album or single) for that Artist less the Recording Costs for the immediately preceding product, but in no event more than Twenty-Five Thousand ($25,000) Dollars for an album or Three Thousand ($3,000) Dollars for a Single. If the applicable product is that Artist's first album, then the amount of the Recording Costs for the preceding product shall be deemed to be the Recording Costs for that Artist's preceding Single multiplied by eight (8). Such payment shall be in full settlement of the Company's obligation in connection therewith. In the event that Producer does not so notify the Company within such sixty (60) day period, then the Company shall be under no obligation to the Producer for failure to record such minimum number of record sides.

12.   (a)   The Producer undertakes to procure each Artist forthwith to execute an inducement letter in the form annexed hereto and until such time as such fully executed letter is provided to the Company the Company shall have no obligation to pay any monies to the Producer hereunder although this Agreement shall otherwise be in full force and effect upon signature hereof and the Producer further undertakes that in the event of any person or persons joining the Artist as a member of a group (including by way of substitution for an existing member or as an additional member) he will procure that such person shall execute an inducement letter upon the same terms and conditions as those annexed and it is agreed to and acknowledged that no additional royalty shall be payable to the Producer in respect thereof.

(b)   If the Artist consists of more than one Artist generally peforming together as a group then this Agreement shall apply to such persons' performances as a group and shall extend to and govern their performances as individuals or with other persons. If during the term of this Agreement any Artist leaves or ceases to perform with the other Artists as such group, the Artists shall give prompt notice thereof to the Company in writing, and the Company shall have the right, without waiving any other right or remedy at any time thereafter, to terminate this Agreement either as to the remaining Artists or as to the leaving Artist only, or as to both the leaving and remaining Artists. This Agreement shall, however, remain in full force and effect with respect to all other Artists. In the event that the Company does not terminate this Agreement with respect to a leaving or remaining Artist, in respect of the remaining Artist this Agreement shall also continue in all respects and in respect of the leaving Artist this Agreement shall also continue in all respects.

(c)   If at any time the Producer fails to perform any of his obligations hereunder (including but not limited to the Producer's failure to deliver to Company the agreed number of masters at the time requested by Company to deliver such

recordings) Company may suspend its obligations hereunder for the duration of such failure.

13. The Company may assign all or any of its rights and liabilities hereunder or the benefit of this Agreement to any subsidiary, affiliated, or controlling corporation or to any person owning or acquiring a substantial portion of the stock or assets of Company. Company may also assign its rights hereunder to any of its licensees to the extent necessary or desirable in Company's sole discretion to implement the license granted. The Producer shall not have the right to assign any of its rights or liabilities hereunder, except to a company wholly owned or controlled by Producer; provided, that Producer and the assignee execute and deliver to Company documents evidencing the assignee's willingness to comply with your obligations hereunder, which documents shall be in a form satisfactory to Company.

14. If the performance of this Agreement shall be delayed or become impossible or impractical by reason of force majeure or any cause outside the control of the Company then the Company shall be entitled (by notice in writing to the Producer) to suspend the operation of this Agreement until the performance of this Agreement shall again become possible and such suspension shall be without liability or compensation to the Producer. However, during any such period of suspension other than by reason of default by the Producer the Company shall continue to account to the Producer for any royalty due to him under this Agreement. If the suspension shall continue in such manner that the operation of this Agreement shall in the opinion of the Company cease to be commercially viable for the Company, then the Company shall have the right (notwithstanding that the cause of such suspension may have been removed) to terminate this Agreement without any liability or compensation to the Producer.

15. (a) The Producer agrees with the Company to execute such further document or documents as may be necessary to further confirm the terms of this exclusive production Agreement. If any provision of this Agreement shall be held void, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and, accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, invalid or inoperative provision had not been contained herein.

(b) The Company shall not be deemed to be in breach of any of the Company's obligations hereunder unless and until the Producer shall have given the Company specific written notice of the nature of such breach and the Company shall have failed to cure such breach insofar as possible within thirty (30) days of Company's receipt of such written notice.

16. Nothing in this Agreement shall be construed as constituting any partnership between the Company and the Producer and no variation of this Agreement shall be binding on any party hereto unless made in writing and signed by the Producer and by a duly authorized representative of the Company.

17. The Producer hereby grants unto the Company all applicable consents in order that the Company should have the fullest use of the Artist's services hereunder and the products thereof.

18. The Producer hereby warrants, represents and agrees that:

(a) The Producer is, or prior to the recording of the first recording

hereunder will become, a signatory to the 1972 AFM Record Labor Agreement and Special Payments Fund Agreement and the 1971-74 AFTRA Code for the Phonograph Record Industry and that the Producer will, during the term hereof, become a signatory to any AFM or AFTRA agreements which shall succeed the foregoing Agreements and Code.

(b)   All of the recordings hereunder shall be recorded in all respects in accordance with the then current AFRM and AFTRA agreements and in accordance with agreements with all other unions having jurisdiction.

(c)   The Producer shall cause the Artists to become and remain members in good standing of any appropriate union or unions with which the Producer or the Company may at any time have an agreement lawfully requiring such union membership.

(d)   Recording sessions for all records made pursuant to this Agreement shall be conducted by the Producer under the Producer's recording license.

(e)   The provisions of any applicable collective bargaining agreement between the Producer and the Company and any labor organization which are required by the terms of such agreement to be included in this Agreement shall be deemed incorporated herein as if such provisions were expressly set forth herein.

19.   In the event that the Company shall request an Artist to perform for the purpose of being filmed for promotional purposes, Producer hereby grants to the Company in respect of such performances all applicable statutory consents and as beneficial owner grants and assigns to the Company by way of present and future assignment the sole, exclusive and perpetual rights and copyright throughout the world in and to the performances comprised in such film or films so that the Company shall be entitled by itself or by permitting others to sell, release and otherwise deal with such film and films or part or parts thereof as Company shall think fit without further payment to Producer.

20.   If an Artist should cease to pursue his career as an entertainer or if Artist should be convicted of a felony, or if an Artist should fail, refuse or neglect to comply with any of his obligations hereunder, Company, in addition to any other rights or remedies which it may have hereunder or otherwise, may elect to terminate this Agreement with respect to such Artist only by notice in writing to the Producer, and thereby be relieved of any liability for the executory provisions of this Agreement.

21.   Without limiting any other rights Company may have, it is specifically understood and agreed that in the event of Producer's dissolution or the liquidation of Producer's assets or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization by, for or against Producer or in the event of the appointment of a receiver or trustee for all or a portion of Producer's property, or in the event that Producer shall make an assignment for the benefit of its creditors or commit any act for or in bankruptcy or become insolvent or in the event Producer shall fail to fulfill its obligations under this Agreement, then at any time after the occurrence of any such event, Company shall have the option by notice in writing sent to Producer at Producer's address last known to Company, to require that any and all Artists render their personal services directly to Company for the remaining balance of the applicable Artist Terms, including extensions thereof, for the purpose of making phonograph records, upon all the same terms and conditions as are contained in the Artist Contracts.

22.   (a)   Producer agrees to indemnify and hold Company harmless against any liability, damage, cost or expense (including reasonable attorneys' fees) occasioned by or arising out of any claim, demand or action inconsistent with any agreement, representation, grant or warranty made or assumed by Producer hereunder, which has resulted in a final judgment or been settled with Producer's consent, which consent shall not be unreasonably withheld (subject to the provisions of paragraph 22(b) below).

(b)   Company agrees to give Producer notice of any action to which the foregoing indemnity applies and Producer may participate in the defense of same, at Producer's expense, through counsel of its own choosing; however, the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company. Producer shall have the right to disapprove the settlement of any claim which Company may propose to make, provided that Producer first either furnishes a corporate surety bond suitable to Company in an amount equal to the total potential liability under any such claim as determined by counsel for Company or places such amount in an escrow account approved by Company to be held for payment to Company of any subsequent liability which may be incurred by Company as a result of any such claim. Company shall notify Producer of any such settlement proposal and Producer shall have five (5) business days after the receipt of such notice in which to disapprove such settlement proposal and either furnish the required bond or place the necessary funds in escrow. If Producer fails to either furnish the required bond or place the necessary funds in escrow as provided above, Company shall have the right to settle any such claim without Producer's approval. Without in any way limiting the generality of the indemnity and the hold-harmless provisions of the Agreement, as between Company and Producer, Company's liability shall in all events be limited to the amount for which Company could have settled any such claim if Producer had approved the settlement proposed by Company.

(c)   Producer agrees to pay Company on demand any amounts for which it may be responsible under the foregoing indemnity, and without limiting any of its other rights or remedies, upon the making or filing of any action, claim or demand subject hereto, Company shall be entitled to withhold sums payable under this Agreement in an amount reasonably related to the potential liability, plus costs and reasonable attorneys' fees, provided that Company shall not so withhold if Producer posts a bond which has been approved in all aspects (form, amount, duration, surety, etc.) by Company. Producer, at Company's request, will cause Artist to cooperate fully with Company in any controversy which may arise with third parties concerning this Agreement or any of Company's rights hereunder.

23.   Producer and each Artist hereby grant to Company non-exclusive merchandising rights with respect to the Artist insofar as they relate to the manufacture, sale and distribution of T-shirts, mirrors, iron-on transfers, belt buckles, pins, buttons, posters and all other personality products relating to the Artist, solely by means of album or record jacket inserts, and Producer and Artist hereby grant to Company the non-exclusive right to use the Artist's name (both legal and professional), photographs, likeness and portrait in any means whatsoever in connection with the exercise of the merchandising rights here granted. In connection therewith, Company shall credit Producer's royalty account with fifty (50%) percent of Company's net receipts from the sale and exploitation of such merchandising rights, after recoupment of Company's direct cost. Net receipts shall be defined to mean Company's gross receipts from the sale and exploitation of such merchandising rights less production, album insertion and distribution costs incurred by Company and applicable taxes paid by Company.

23

24.   This Agreement shall be governed by the laws of the State of New York and applicable to contracts made and to be wholly performed therein.

To induce ISLAND RECORDS INC. ("Company") to enter into the foregoing agreement with T.T.E.D. RECORDS, INC. (hereinafter referred to as "Producer") (the "Agreement"), I hereby assent to the execution of the Agreement and agree to be bound by it, including, without limitation, by all provisions of the Agreement relating to me, directly or indirectly. I acknowledge that Company shall have no obligation to make any payments whatsoever to me in connection with any master recordings or phonograph records made pursuant to the Agreement or in connection with any services rendered by me or the fulfillment of my obligations under the Agreement. I guarantee absolutely and unconditionally the full performance by Producer of the Agreement, and I agree to and do hereby indemnify, save and hold Company harmless from any loss, damage, liability or expense (including reasonable attorneys' fees and legal expenses), which might arise out of, result from or relate to any failure of Producer to fulfill its obligations under the Agreement or be incurred in the enforcement by Company of its rights under this guaranty. My liability under this guaranty is direct and immediate, and not conditioned or contingent upon the pursuit by Company of any remedy it may have against Producer. This guaranty shall not be subject to revocation at any time or for any reason, including, without limitation, any modification or extension of the Agreement with or without notice to me. No delay on the part of Company in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights, no notice to me or demand upon me shall be deemed a waiver of my obligations or of the rights of Company to take further action without notice or demand as provided herein.

CARL KIDD, professionally known
as MAX KIDD

SCHEDULE I

| ARTIST | DATE OF ARTIST CONTRACT | VARIANCE FROM REQUIREMENTS OF PARAGRAPH 6(b) |
|--------|-------------------------|----------------------------------------------|
|        |                         |                                              |

EXHIBIT "A"

LETTER OF INDUCEMENT

_____, 1984

Island Records Inc.
14 East 4th Street
New York, New York 10012

Gentlemen:

Pursuant to an exclusive recording agreement (the "Artist Agreement") between me and T.T.E.D. RECORDS, INC. ("Producer"), Producer is entitled to my exclusive services for the recording of phonograph records. I hereby acknowledge that Producer is entering into a record production agreement with you to which the foregoing Letter of Inducement is attached (the "Production Agreement"), a copy of which I have received, read and understood.

In consideration of your executing the Production Agreement, and as a further inducement for you to do so (it being to my benefit as a recording artist that you execute same), I hereby represent, warrant and agree, for your express and direct benefit, as follows:

1.   (a)   Producer has the right to enter into the Production Agreement and to assume all of the obligations, warranties and undertakings to you on the part of Producer therein contained, and Producer shall continue to have such right during the term of the Production Agreement and thereafter until all of such obligations, warranties and undertakings have been fully performed and discharged. I shall perform all of my obligations under the Artist Agreement so that Producer can fully comply with his obligations under the Production Agreement. If the Production Agreement and the Artist Agreement are in any way inconsistent with respect to the nature or extent of my obligations, the provisions of the Production Agreement shall prevail and I shall be bound thereby.

(b)   All of Producer's warranties, representations, covenants and agreements contained in the Production Agreement which concern me are true and correct, and I hereby join in same as though I were a party to the Production Agreement.

(c)   I shall fully and completely comply with, perform and discharge all of the terms, conditions, obligations and undertakings contained in the Production Agreement which directly or indirectly relate to me, including but not limited to the grant of rights to my exclusive recording services, the rights to use my name and likeness, the rerecording and other restrictions contained therein. I shall not do,

27

attempt to do, or suffer to be done, during or after the term of the Production Agreement, any act in derogation of or inconsistent with your rights and privileges under the Production Agreement.

2.    I acknowledge that my services are of a special, unique and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for in damages in an action at law, and that a breach of my obligations under the Production Agreement will cause you irreparable injury and damage, entitling you to injunctive and other equitable relief in addition to your other rights and remedies.

3.    In the event that, at any time during the term of the Artist Agreement (including renewals, extensions, suspensions and periods added by amendment or any other agreement), (a) Producer is not entitled to my recording services for any reason whatsoever (including, without limitation, Producer's failure to exercise options properly or Producer's breach of the Artist Agreement), or (b) for any reason whatsoever the Artist Agreement expires or terminates, (whether by its terms or by reason of Producer's default or otherwise), (c) Producer breaches any of Producer's material obligations under the Production Agreement (including, but not limited to Producer's failure or refusal to deliver to you any master recordings required to be delivered to you under the Production Agreement) or (d) Producer commits any other Default Event(s) (as such term is described in Paragraph 15 of the Production Agreement) then, at any time after the occurrence of any such event, in addition to any other remedies which may be available, you shall have the option (the "Substitution Option") by notice to me to require that I render my personal services (and I shall render such personal services) directly to you for the remaining balance of the term of the Artist Agreement, including any extensions thereof, for the purpose of making phonograph records, upon all the same terms and conditions as are therein contained, except that you shall not be obligated to pay any advances to me or on my behalf other than the payment of approved recording costs and the royalty rates payable to me shall not exceed seventy-five (75%) percent of the applicable royalty rate under the Production Agreement (and my royalties shall be subject to recoupment of all advances theretofore or thereafter payable under the Artist Agreement).

4.    In the event I attempt to terminate the Artist Agreement during the term thereof, I shall give you written notice at least sixty (60) days prior to the date on which such termination is to become effective. If the Artist Agreement expires or terminates without action on my part (e.g., as a result of Producer's failure to exercise an option), I shall give you written notice within fifteen (15) days following the event which causes or will cause the expiration or termination of the Artist Agreement.

5.    You may institute any action or proceeding against me, directly or indirectly, with or without joining Producer, (a) in your own name to enforce your rights under the Production Agreement, under this letter agreement, or pursuant to the Artist Agreement, or (b) in your own name or in Producer's name to enforce Producer's rights and remedies under the Artist Agreement.

6.    I hereby acknowledge and agree that you shall not have any obligation to make any payments whatsoever to me, it being agreed and understood that I shall look solely to Producer for any and all royalties, recording fees and other monies

which may be payable to me in connection with (a) the recording of all masters under the Artist Agreement, (b) the manufacture and sale throughout the world of records embodying said masters, (c) any other exploitation of said masters throughout the world, and (d) any other services performed by me pursuant to the Artist Agreement. I shall not assert any claim for any such monies against you or attempt to prevent the manufacture, sale, distribution or exploitation of records or other derivatives manufactured from masters recorded under the Artist Agreement or otherwise subject to the Artist Agreement.

7.  I hereby agree to be bound by the terms and provisions of any amendment or modification of the Artist Agreement which may become effective after the date hereof as though I were a direct party to such amendment or modification.

8.  I am the sole owner of the professional name "_____" and will be the sole owner of any other professional name which I (with your consent) may elect to use during the term hereof. I have the right and power to grant you the right to use said professional name and any other professional name which I (with your consent) may elect to use during the Term hereof. I shall not use any professional name other than "_____" during the term hereof without your prior written consent. I shall not authorize or permit any other person to use my professional name during the term of the Artist Agreement in connection with the recording, production, manufacture, sale or advertising of phonograph records, or in connection with personal appearances (or any advertising related thereto). In the event any person who now is or may hereafter be a member of the group, presently professionally known as "_____" (the "Group"), becomes a Leaving Member (as defined below), or in the event you terminate the Production Agreement as to some but not all members of the Group, then: (a) the Leaving Member or the members of the Group as to whom the Production Agreement is terminated shall not thereafter use, or authorize or permit any other person to use, in any manner whatsoever (including, but not limited to, in the phrase "formerly a member of" the name "_____" (or any other name which the Group may then be using) or any name similar thereto; (b) the name "_____" and any other name which the Group may then be using shall be and remain owned by the Group and subject to your rights under the Production Agreement; and (c) the persons engaged to replace the Leaving Member or the members of the Group as to whom the Production Agreement is terminated shall be subject to your approval, which may be withheld for any reason. You shall have the right to approve any person who I desire to add to the Group as an additional member, which approval may be withheld for any reason.

9.  You shall have the irrevocable option to utilize directly the exclusive recording services of any individual member of the Group who, during the term of the Artist Agreement, ceases to be an actively performing member of the Group (any such individual is hereinafter referred to as a "Leaving Member"). Such option may be exercised by you by written notice given to such Leaving Member no later than ninety (90) days after the date upon which you receive the written notice required to be served by Producer pursuant to subparagraph 19(c) of the Production Agreement. If you exercise such option with respect to any such Leaving Member, such Leaving Member shall be deemed to have executed your then-current standard form exclusive recording contract, pursuant to which such Leaving Member agrees to render his exclusive recording services to you, which shall contain the following basic provisions:

(a)   The term of such exclusive recording contract with such Leaving Member shall be for an initial period of twelve (12) months, commencing as of the date of your written notice to him pursuant to this paragraph 9, and you shall have such number of separate irrevocable options as equal the number of renewal options remaining under the Artist Agreement as of the date such individual becomes a Leaving Member.  Each option shall give you the right to renew such term for a period of twelve (12) months.  Such option periods shall run consecutively beginning at the expiration of such initial period, all upon the same terms and provisions applicable to such initial period.  Each such renewal option may be exercised by you giving such Leaving Member written notice (at my address hereunder or at such other address of which such Leaving Member notifies you in writing) at least thirty (30) days prior to the commencement of the renewal period for which such renewal option is exercised.

(b)   During the initial period and each option period of such recording contract, such Leaving Member shall record a sufficient number of master recordings embodying his performances to constitute one (1) LP.

(c)   With respect to masters recorded by such Leaving Member under such recording contract, you shall pay only those recording costs which have been approved by you in writing.  All advances and union scale payments to such Leaving Member, and all amounts paid by you in connection with the recording of master recordings pursuant to such agreement, as well as such Leaving Member's pro rata share of any debit balance in the Group's account under the Artist Agreement at the time you exercise your option under this paragraph, shall constitute advances against royalties payable by you with respect to master recordings embodying the performances of such Leaving Member.

(d)   The royalty rate shall be that set forth in the Artist Agreement. At your request, Producer shall cause any such Leaving Member to execute and deliver to you any and all documents which you may deem necessary or expedient to evidence the foregoing including, without limitation, the above-described exclusive recording contract with you, but your rights hereunder shall not be diminished by such Leaving Member's failure or refusal to execute such recording contract.

10.   All notices to me shall be sent to me at the address written below or such other address as I may give you notice of in writing.

11.   The use of the word "I" or "my" herein shall refer jointly and severally to all persons whose signatures appear below, and the necessary gramatical changes

required to make these provisions apply in the plural sense and to either males or females shall in all instances be assumed as though in each case fully expressed.

Very truly yours,

_____

_____

_____

_____

AGREED TO AND ACCEPTED:

ISLAND RECORDS INC.                     _____
                                        Address

By _____

AGREED TO AND ACCEPTED:

T.T.E.D. RECORDS, INC.

By _____