**EXHIBIT G**

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------x
TUFAMERICA, INC.,
    Plaintiff,
                                12cv3529(AJN)
    -against-
MICHAEL DIAMOND, ADAM HOROVITZ and
ADAM YAUCH, P/K/A BEASTIE BOYS,
UNIVERSAL MUSIC PUBLISHING, INC.,
    UNIVERSAL MUSIC PUBLISHING GROUP,
BROOKLYN DUST MUSIC and CAPITAL
    RECORDS, LLC,
    Defendants.
------------------x
            30 Rockefeller Plaza
            New York, New York
            May 20, 2014
            10:27 a.m.

    VIDEOTAPE DEPOSITION of AARON S.
FUCHS, the Witness in above-entitled
action, held at above time and place,
taken before Francine Sky, a Certified
Shorthand Reporter and Notary Public of
the State of New York, pursuant to the
Federal Rules of Civil Procedure, and
stipulations between Counsel.
400
```

Page 2

```
APPEARANCES:

    THE LAW OFFICES OF KELLY D. TALCOTT
        Attorneys for Plaintiff
        34 Grove Street
        P.O. Box 43
        Sea Cliff, New York 11579
    BY:  KELLY D. TALCOTT, ESQ.



    SHEPPARD MULLIN RICHTER & HAMPTON, LLP
        Attorneys for Defendants
        Michael Diamond, Adam
        Horovitz, Adam Yauch, p/k/a
         Beastie Boys
        30 Rockefeller Plaza
        New York, New York 10112
    BY:  THEODORE C. MAX, ESQ.



400
```

Page 3

```
A P P E A R A N C E S:  (Continued)

    JENNER & BLOCK, LLP
        Attorneys for Defendants
        UMG PolyGram International
        Publishing, Inc. and Capitol
        Records, LLC
            919 Third Avenue
            New York, New York 10022
    BY:  NATHANIEL H. BENFORADO, ESQ.



Also Present:

    GEORGE LIBBARES, Videographer
    Veritext New York
            *   *   *
```

Page 4

```
            IT IS HEREBY STIPULATED AND
    AGREED, by and among counsel for
    the respective parties hereto, that
    the filing, sealing and
    certification of the within
    deposition shall be and the same
    are hereby waived.
            IT IS FURTHER STIPULATED AND
    AGREED that all objections, except
    as to form of the question, shall
    be reserved to the time of the
    trial.
            IT IS FURTHER STIPULATED AND
    AGREED that the within deposition
    may be signed before any Notary
    Public, with the same force and
    effect as if signed and sworn to
    before the Court.


            ~ oOo ~
```

Page 9

2 infringement in that case?
3    A.   An uncleared sample.
4    Q.   Do you know the name of the
5 musical composition or sound recording
6 in that case?
7    A.   Yeah. "Impeach the
8 President" by the Honey Drippers.
9    Q.   Where was that case pending?
10   A.   Manhattan.
11   Q.   The first case involving the
12 matter against Codigo was that in
13 Manhattan as well?
14   A.   Yes.
15   Q.   In terms of depositions, have
16 you been deposed any other times other
17 than those two occasions?
18   A.   I can't remember right now.
19   Q.   Do you have transcripts from
20 your depositions in those two matters?
21   A.   I never asked for them, no.
22   Q.   With regards to the matter
23 against Codigo, who represented you in
24 that deposition?
25   A.   Mr. Talcott.

Page 10

2    Q.   Do you know if Mr. Talcott
3 has a copy of the deposition in that
4 case?
5    A.   I don't.
6    Q.   Did Mr. Talcott represent you
7 in the matter against Profile?
8    A.   No.
9    Q.   Who represented you in that
10 matter?
11   A.   A lawyer named Hy Shore.
12   Q.   Can you spell that.
13   A.   Yeah. H-Y, S-H-O-R-E.
14   Q.   Do you know what firm Mr.
15 Shore is associated with?
16   A.   He was a private
17 practitioner.
18   Q.   Where was he practicing?
19   A.   Downtown Manhattan.
20   Q.   So just so we're clear, I
21 want to give you some basic ground
22 rules in terms of the deposition.
23       As you know you're under
24 oath. And with regards to the question
25 and answers, my questions and your

Page 11

2 answers will be taken down by the
3 stenographer and they're also recorded
4 by the videographer.
5        In order to have a written
6 record, the responses to my questions
7 need to be in audible forms. So nods
8 of the head like you just did --
9    A.   Yeah.
10   Q.   -- they're not going to be
11 recorded. So I would ask that you give
12 an audible response. I would also ask
13 that you let me finish the question
14 before answering, so that the record
15 will be clear and it also gives your
16 attorney a chance to object if he needs
17 to.
18       With regards to objections,
19 he may object as to the form. That
20 does not mean that you should not
21 answer. You still can answer, but it
22 just preserves an objection to the
23 question for the record, if the matter
24 goes to trial.
25       If Mr. Talcott objects on the

Page 12

2 basis of privilege, then I would ask
3 that you not answer and we'll try to
4 sort that out.
5        With regards to a question,
6 if you do not understand the question
7 or you want it repeated, please
8 indicate that you have a question or
9 you want it repeated. Otherwise if you
10 answer a question, it will be assumed
11 you understood the question.
12       Do you understand those
13 instructions?
14   A.   Yes.
15   Q.   What is your current
16 employment?
17   A.   I'm the head of Tuff City
18 Records.
19   Q.   Now, what is Tuff City
20 Records?
21   A.   It's a record company.
22   Q.   Is it incorporated?
23   A.   Yes.
24   Q.   Where is it incorporated?
25   A.   Manhattan.

Page 13

2  Q. So in the State of New York?
3  A. Yes.
4  Q. When you say you're the head,
5  are you the CEO?
6  A. I've never given myself that
7  designation -- more or less president
8  is what I've called myself.
9  Q. Are there other officers of
10 Tuff City Records, Inc.?
11 A. No.
12 Q. Are you a shareholder of Tuff
13 City Records, Inc.?
14 A. Yes.
15 Q. What percentage of shares do
16 you own?
17 A. I don't remember.
18 Q. You don't know. Are there
19 any other shareholders?
20 A. No.
21 Q. So you're the sole
22 shareholder?
23 A. And I may be wrong in
24 characterizing myself as a shareholder.
25 I may be confusing this with companies

Page 14

2  that I take a percentage of.
3     So I don't know if my company
4  is made up of shares or if I'm just a
5  sole -- it's, you know, if I'm just, if
6  I just own it.
7  Q. Let's take a step back. The
8  Plaintiff in this matter is TufAmerica,
9  Inc., correct?
10 A. Yes.
11 Q. What is TufAmerica, Inc.?
12 A. It's the corporate entity
13 that I'm the president of -- head of.
14 Q. So that's a corporation,
15 correct?
16 A. Yes.
17 Q. Now you had mentioned the
18 Tuff City Records. Is that a
19 subsidiary of TufAmerica, Inc.?
20 A. Yes.
21 Q. With regards to TufAmerica,
22 Inc. are there any other officers?
23 A. No.
24 Q. Are there any other
25 shareholders of TufAmerica, Inc.?

Page 15

2  A. No.
3  Q. Is TufAmerica, Inc. also
4  incorporated in New York?
5  A. Yes.
6  Q. And is its principal place of
7  business in Manhattan?
8  A. Yes.
9  Q. What is the address of
10 TufAmerica, Inc.?
11 A. 246 West 38th Street.
12 Q. What is the business of
13 TufAmerica, Inc.?
14 A. We're a record company.
15 Q. When you say you're a record
16 company, can you explain what you mean
17 by that?
18 A. Yeah. We manufacture
19 records, CDs and digital sales. We
20 sell music digitally. And we earn
21 income for artists any way that income
22 can be earned for them. Whether it be
23 through record sales, third-party
24 licenses, litigating infringements on
25 their copyrights.

Page 16

2  Q. How many different artists
3  does TufAmerica, Inc. represent?
4  A. Could be 50.
5  Q. With regards to the artists
6  involved in the matter of TufAmerica
7  versus Michael Diamond et al, who are
8  the artists that are involved in this
9  action?
10 A. A group called Trouble Funk.
11 Q. And is the group Trouble Funk
12 still recording?
13 A. Yes.
14 Q. Are the members of Trouble
15 Funk that are recording today, the
16 original members of Trouble Funk?
17 A. A number of the principal
18 members are still composed of the core
19 of the group.
20 Q. Who are the principal
21 members?
22 A. Well, the two principals are
23 Tony Fisher and James Avery.
24 Q. Were there any other members
25 of the band when the group originally

Page 69

2  A. No.
3  Q. When was the last time you
4  were in contact with Mr. Gandel?
5  A. Easily, ten years ago.
6  Q. Topic No. 4, "The
7  Development, Significance and Use of
8  Each Musical Component, Instrument Note
9  Or Lyric Contained in the Portions of
10 Trouble Funk Musical Compositions and
11 Sound Recordings Described in
12 Paragraphs 23, 24, 75, 76 of the
13 December 6, 2012 Amended Complaint"; is
14 there anyone at TufAmerica that has
15 knowledge or information with regard to
16 that topic?
17 A. No.
18 Q. With regards to topics 3 and
19 4, have you had any discussions with
20 any of the members of Trouble Funk with
21 regards to these topics?
22 A. No.
23 Q. With regards to topic No. 5,
24 "The development, significance and use
25 of the phrase 'Say What' in the Trouble

Page 70

2  Funk musical compositions and sound
3  recordings"; do you have any knowledge
4  or information with regard to that
5  topic?
6  A. No.
7  Q. Have you had any discussions
8  with Mr. Gandel on that topic?
9  A. No.
10 Q. Have you had any discussions
11 with any of the members of Trouble Funk
12 on that topic?
13 A. No.
14 Q. With regards to topic No. 9,
15 "The registration of Trouble Funk
16 Musical Compositions and Sound
17 Recordings with the United States
18 Copyright Office"; do you have any
19 knowledge or information with regard to
20 that topic?
21 A. I be -- yes.
22 Q. So you do have knowledge and
23 information with regard to that topic?
24 A. By us. I don't have any
25 knowledge of how it may have been done

Page 71

2  originally by them.
3  Q. By TufAmerica when you refer
4  to "us"?
5  A. Yes.
6  Q. And with regards to anyone
7  else in terms of registrations?
8  A. No.
9  Q. Do you know whether Mr.
10 Gandel in his due diligence did a
11 search with regards to Trouble Funk
12 musical compositions and sound
13 recordings in the United States
14 copyright office?
15 A. No.
16 Q. Have you communicated with
17 him in regards to this topic?
18 A. No.
19    MR. TALCOTT: Objection.
20 Q. Have you communicated with
21 any members of Trouble Funk with
22 regards to this topic?
23 A. No.
24 Q. With regards to topic 18,
25 which is the quote, "Delivery, Location

Page 72

2  and Status of Master Recordings and
3  Other Delivery Items Referenced in the
4  December 22, 1999, Master
5  Administration Agreement Between
6  Plaintiff and Trouble Funk"; do you
7  have knowledge and information with
8  regards to that topic?
9  A. They were in Washington, D.C.
10 and we were in New York City. So I can
11 tell you that, you know, that was the
12 geography of it. If that's what you
13 mean by location.
14 Q. Well, these are items that
15 are referenced in the December 22, 1999
16 Master Administration Agreement.
17    Is there anyone at TufAmerica
18 who has knowledge with regards to those
19 referenced items in the agreement?
20    MR. TALCOTT: Objection.
21 A. I can't remember.
22 Q. Would Mr. Gandel have
23 knowledge as to that?
24 A. I can't speak for him.
25 Q. And you haven't talked to him

Page 145

2 the Master Administration Agreement and
3 the Publishing Administration
4 Agreement, did you know at that time
5 that there were allegations regarding
6 sampling by the Beastie Boys of Trouble
7 Funk music?
8   A.   What year?
9   Q.   End of 1999.
10  A.   Did I know that the Beastie
11 Boys had sampled Trouble Funk at that
12 time?
13  Q.   Did you know there were
14 allegations?
15  A.   I can't remember. It wasn't
16 what was driving the deal.
17  Q.   Have you heard of the Beastie
18 Boys?
19  A.   Yes.
20  Q.   When did you first become
21 aware of the Beastie Boys?
22  A.   Sometime in the early '80s.
23  Q.   How did you become aware of
24 the Beastie Boys?
25  A.   They were in the rap

Page 146

2 business, I was in the rap business.
3 It was -- wasn't a big business at that
4 time.
5   Q.   Had you ever heard the
6 Beastie Boys perform the music that is
7 the subject of TufAmerica Exhibit 2?
8   A.   A record, live? Do you mean
9 something at all?
10  Q.   In any way, shape or form.
11  A.   I can't remember. I'm sure I
12 heard "Hold it Now, Hit It".
13  Q.   Are you familiar with the
14 album Paul's Boutique?
15  A.   Yes.
16  Q.   When did you first hear
17 Paul's Boutique?
18  A.   I don't know if I heard the
19 album, but I was aware that it was
20 released.
21  Q.   Are you familiar with the
22 song or the musical recording
23 "Shadrach"?
24  A.   Not intimately.
25  Q.   You said you are familiar

Page 147

2 with "Hold it Now, Hit It"?
3   A.   Yes.
4   Q.   And when did you first hear
5 that?
6   A.   When it came out, '83/84.
7   Q.   Have you heard it since then?
8   A.   Yeah.
9   Q.   How many times have you heard
10 it?
11  A.   Not sure.
12  Q.   Hundreds of times?
13  A.   I don't know. A few times.
14  Q.   Can you be more precise about
15 what you mean by a few?
16  A.   I think it was either on the
17 radio or MTV. It wasn't that I was
18 actively or consciously looking or
19 listening for it. But I'm aware of the
20 song.
21  Q.   And it's gotten a lot of play
22 over the years?
23  A.   Yes.
24  Q.   What about --
25  A.   I'm not with Arbitron, but as

Page 148

2 a layperson, I would assume it has.
3   Q.   What about "Car Thief", have
4 you ever heard "Car Thief"?
5   A.   Not by title.
6   Q.   With regards to "Hold it Now,
7 Hit It," you said you've heard that.
8       Have you ever heard of the
9 album License to III?
10  A.   Yes.
11  Q.   Do you own a copy of that?
12  A.   No.
13  Q.   Do you own a copy of Paul's
14 Boutique?
15  A.   No.
16  Q.   What about "The New Style,"
17 have you ever heard that song?
18  A.   I've heard of it. I can't
19 remember the way -- how it goes.
20  Q.   I would like you to pull out
21 what has been marked as TufAmerica 3,
22 which I think you looked at, and I'm
23 going to ask you a few questions about
24 that as well.
25       MR. TALCOTT: Can we take a

Page 149

1
2  break before we get into that?
3      MR. MAX: Yes. Sure.
4      THE VIDEOGRAPHER: The time
5  is 2:32 p.m. We're off the
6  record.
7      (Whereupon, a short recess
8  was taken.)
9      THE VIDEOGRAPHER: The time
10 is 2:42. We're on the record.
11     Q. Mr. Fuchs, if you could pull
12 out TufAmerica 3, I have a couple of
13 questions about that document.
14     Referring you to paragraph
15 13.
16     A. Yes.
17     Q. Is that paragraph 13
18 accurate?
19     A. To the best of my knowledge.
20     Q. Referring you to paragraph
21 19. Is that paragraph accurate?
22     A. Yes.
23     Q. I would like you to pull out
24 what has been marked as TufAmerica
25 Exhibit 9 for identification. The

Page 150

1
2  document bearing Bates number UMG 17
3  through 47.
4      A. Okay.
5      Q. First, I would like to ask
6  you, have you ever seen this document
7  before?
8      A. No.
9      Q. Prior to sitting here today,
10 you've never seen this document?
11     A. No. I have not.
12     Q. Have you ever heard that
13 Island Records, Inc. entered into an
14 agreement as of October 11, 1984 with
15 T.T.E.D. Records, Inc.?
16     A. No.
17     Q. So prior to coming here
18 today, you were unaware of this
19 document?
20     A. That's right. I mean -- let
21 me clarify that, between the time you
22 produced it in the course of this
23 lawsuit and it was made -- and it was
24 made aware, my counsel was made aware
25 of it, at that point I was made aware

Page 151

1
2  of it.
3      Q. Prior to the production of
4  this document in this lawsuit, you were
5  unaware of this document?
6      A. That's right. And I knew
7  that they Trouble Funk you know did
8  record for Island at one point, but I
9  didn't know about this document.
10     Q. Do you know whether Mr.
11 Gandel had ever seen this document or
12 reviewed the document?
13     A. No, I don't.
14     Q. Do you know whether this
15 document, TufAmerica Exhibit 9, was
16 reviewed with regards to the due
17 diligence for the Publishing
18 Administration Agreement, TufAmerica 4,
19 and the Master Administration
20 Agreement, TufAmerica Exhibit 5?
21     A. I don't know if this document
22 was reviewed for those purposes. And I
23 don't know how -- okay, I mean...
24     I don't know that it was
25 reviewed for those purposes.

Page 152

1
2      Q. Referring you to the page
3  bearing Bates number UMG 26, do you
4  recognize any of the signatures on that
5  page?
6      A. I recognize the signature of
7  Max Kidd.
8      Q. How do you recognize that
9  signature?
10     A. Because it's clear. It looks
11 like print.
12     Q. Do you know who Max Kidd is?
13     A. He was a Washington, D.C.
14 music business person.
15     Q. Have you ever had any
16 involvement with Mr. Kidd?
17     A. No.
18     Q. Referring you now to another
19 document, TufAmerica Exhibit 10. If
20 you could pull that out.
21     A. Okay.
22     Q. Have you ever seen this
23 document before?
24     A. No.
25     Q. This document bears Bates

Page 229

   records are kept, I call for the
   production of those digital sales
   records.
       MR. MAX: I would like to
   mark as TufAmerica Exhibit 32, a
   document bearing Bates number TA
   305.
       (Tuf Exhibit 32, marked for
   identification.)
   Q. Mr. Fuchs, if you could look
   at this document and let me know once
   you've had a chance to review it.
       (Witness reviews document.)
   A. Okay.
   Q. Do you recognize this
   document?
   A. Yes.
   Q. What is this document?
   A. A royalty statement.
   Q. With regard to this statement
   it's dated March 21, 2013; is that
   correct?
   A. Yes.
   Q. Now, with regards to the

Page 230

   artists under this agreement, who would
   be paid under this agreement?
   A. If you mean do we pay members
   of the group individually?
   Q. Well, I'm just trying to
   understand.
       I think before you testified
   that the checks go to the attorney for
   Trouble Funk, correct?
   A. Yeah.
   Q. Here's my question: Does Mr.
   Avery get paid under this statement or
   are separate statements issued with
   regards to Mr. Avery based on his
   agreement?
   A. We -- they've changed,
   they've asked us to change the way we
   disburse moneys.
       I can't remember whether it
   evolved from all royalties being sent
   to Kurosh to separate royalties being
   changed -- being sent to Avery or his
   representative. I'm not sure. It's
   been --

Page 231

       RQ MR. MAX: To the extent
   there are correspondence relating
   to Mr. Avery as receiving separate
   statements and to the extent
   there's correspondence relating to
   that change I call for production
   of those documents.
       I have no further questions
   at this time.
       MR. BENFORADO: No questions
   from me.
       MR. TALCOTT: There's none
   from me.
       MR. MAX: Thank you very
   much, Mr. Fuchs.
       THE VIDEOGRAPHER: The time
   is 5:11 p.m. We're concluded and
   off the record.
       (Time noted: 5:10 p.m.)

Page 232

   STATE OF NEW YORK   )
                       : ss.
   COUNTY OF_____ )

       I, AARON S. FUCHS, the
   witness herein, having read the
   foregoing testimony of the pages of
   this deposition, do hereby certify it
   to be a true and correct transcript,
   subject to corrections, if any, shown
   on the attached page.


   _____
   AARON S. FUCHS


   Sworn and Subscribed
       this_____day of _____,2014.



   _____
   Notary Public