# EXHIBIT T

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3    ------------------x
 4    TUFAMERICA, INC.,          :
 5           Plaintiff,          : Index No.:
 6      v.                       : 12-CIV-3529 (AJN)
 7    MICHAEL DIAMOND, et al.,   :
 8           Defendants.         :
 9    ------------------x
10
11
12         Videotaped Deposition of TONY W. FISHER
13                    Washington, DC
14                   Thursday, May 1, 2014
15                       9:03 a.m.
16
17
18
19
20
21
22   Reported By: Lee Bursten, RMR, CRR
```

Page 2

```
 1         Videotaped Deposition of TONY W. FISHER,
 2   held at the offices of:
 3
 4
 5          JENNER & BLOCK LLP
 6          1099 New York Avenue NW
 7          Suite 900
 8          Washington, DC 20001
 9          (202) 639-6000
10
11
12
13
14         Pursuant to Notice, before Lee Bursten,
15   Registered Merit Reporter, Certified Realtime
16   Reporter, and Notary Public in and for the District
17   of Columbia, who officiated in administering the oath
18   to the witness.
19
20
21
22
```

Page 3

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF AND THE WITNESS:
 3        KELLY D. TALCOTT, ESQUIRE
 4        THE LAW OFFICES OF KELLY D. TALCOTT
 5        34 Grove Street
 6        P.O. Box 43
 7        Sea Cliff, New York 11579
 8        (516) 515-1545
 9
10   ON BEHALF OF DEFENDANTS UMG - POLYGRAM INTERNATIONAL
11   PUBLISHING INC. and CAPITOL RECORDS LLC:
12        ANDREW H. BART, ESQUIRE
13        JENNER & BLOCK LLP
14        919 Third Avenue
15        37th Floor
16        New York, New York 10022
17        (212) 891-1600
18
19
20
21
22
```

Page 4

```
 1         A P P E A R A N C E S  C O N T I N U E D
 2   ON BEHALF OF DEFENDANTS MICHAEL DIAMOND, ADAM
 3   HOROVITZ, AND THE ESTATE OF ADAM YAUCH, PERFORMERS
 4   KNOWN AS THE BEASTIE BOYS:
 5        THEODORE C. MAX, ESQUIRE
 6        SHEPPARD MULLIN RICHTER & HAMPTON LLP
 7        30 Rockefeller Plaza
 8        New York, New York 10112
 9        (212) 653-8700
10
11   ALSO PRESENT:
12        MICHAEL E. CILIBERTI, Videographer
13
14
15
16
17
18
19
20
21
22
```

Page 121

1  dated October 11th, 1984.
2      Have you seen any of those documents in the
3  last 30 years, since the time they were signed?
4   A   No.
5   Q   Okay. Do you recall reading the documents
6  that you signed before you signed them?
7   A   No, I don't recall reading the documents,
8  but I recall the documents being read by the lawyer.
9   Q   By Mr. Tisdale?
10  A   By Mr. Tisdale.
11  Q   So you recall that Mr. Tisdale read them,
12 he spoke to you guys and you guys signed the
13 agreement?
14     MR. TALCOTT: Objection.
15
16  Q   Is that correct?
17  A   No, it wasn't that simple. I remember some
18 agreements that we had to go back and actually change
19 some things.
20  Q   What do you recall --
21  A   And initial them.
22  Q   Okay.

Page 122

1   A   They were initialed and signed. The
2  changes were made.
3   Q   Okay.
4   A   And a lot of that stuff was with Island and
5  Maxx Kidd that you spoke of.
6   Q   Okay. You recall that there was a change
7  made in the document before you signed it.
8   A   Right.
9   Q   Because there was a provision saying that
10 Island wasn't going to pay you directly, and you
11 crossed that out and you initialed it, and then you
12 signed it with the change, correct?
13     MR. TALCOTT: Objection.
14  A   Yes. There were also some changes that we
15 had to make that Maxx had put in there as far as
16 trying to control and wanted us to give him full
17 control over our writers' rights and all that stuff.
18 That was crossed out.
19
20  Q   All right.
21  A   And initialed.
22  Q   Why don't you take a look first at what we

Page 123

1  marked yesterday as Exhibit 4.
2   A   Okay.
3   Q   First off, Mr. Fisher, without going
4  through this in detail, take a look at the back page,
5  page 18. That's your signature on the second line,
6  isn't it?
7   A   Yep.
8   Q   Okay. Now, you haven't seen this document
9  since it was signed in 1984, have you?
10  A   No.
11  Q   Okay. Take a look at the document itself,
12 and you'll see on page 2, there's a circle.
13  A   Mm-hmm.
14  Q   And an X underneath it. And you'll see on
15 page 5, page 5, that there is a bracket around
16 paragraph 2.02, and it says "James A." next to it.
17  A   Mm-hmm.
18  Q   And there's a little squiggly line under
19 the number 15,000 down near the bottom of the page on
20 301; do you see that?
21  A   No. Okay.
22  Q   And you'll see that on page 6, there is

Page 124

1  some handwriting, correct?
2   A   Yes.
3   Q   And finally, if you look at pages 15 and
4  17, you'll see that there is certain language that's
5  bracketed there as well?
6   A   Mm-hmm.
7   Q   It's fair to say, isn't it, Mr. Fisher,
8  that you don't know when the handwriting that is on
9  this copy of the document was put on this document,
10 correct?
11  A   Yes.
12  Q   Okay. And you don't know whose handwriting
13 it is either, do you?
14  A   You mean...
15  Q   Where there's handwriting. I'm not talking
16 about the brackets.
17  A   No. No, I don't.
18  Q   For example, on page 6, there's a bunch of
19 handwriting to the right of the top half of the page,
20 on the page that's marked 6.
21  A   I don't know. I have no idea.
22  Q   Okay. Fair enough. So other than being

Page 125

1  able to verify your signature on the document, you
2  don't have any other present recollection of any of
3  the terms or conditions of this agreement, do you?
4      A    No.
5      Q    Okay. And is it your testimony that prior
6  to the time you signed this agreement, that you
7  didn't read it, but your counsel explained it to you?
8  Is that a fair statement?
9      A    Yes.
10     Q    Okay. Let me show you -- you can hold it
11 if you want to. I'm not going to ask you anymore
12 questions on that. I'll show you what's been marked
13 as Exhibit -- well, let me show you 2 and 3, because
14 they're related. Exhibit 3 is an agreement between
15 Island Records and T.T.E.D. Records, as you put it,
16 correct?
17     A    Okay.
18     Q    Okay. Actually, you should, just for --
19 just bear with me one second. Keep this exhibit in
20 front of you for a minute as well, the Exhibit 4.
21 And let me just point you to the language. You have
22 Exhibit 4 in front of you?

Page 126

1      A    Yes.
2      Q    Now, this exhibit, Exhibit 4, is labeled an
3  exclusive recording agreement. And at the very, very
4  bottom of page 1, the very last line, it starts off
5  and says, "Island Records Inc. hereinafter Island,"
6  and you go to the next page, "Company have entered
7  into a record production contract of even date,
8  hereinafter the Island contract."
9           Do you see that language?
10     A    Yeah.
11     Q    And the date that's on this recording
12 agreement is October 11th, 1984, on the very first
13 page, on the first line. Do you see that? At the
14 very top, right underneath "Exclusive Recording
15 Agreement."
16     A    Yes. Mm-hmm.
17     Q    So there's a reference here to the fact
18 that on the same date as this, Island Records, and
19 the company, which is T.T.E.D. Records, are entering
20 into a separate agreement.
21          MR. TALCOTT: Objection.
22

Page 127

1      Q    Do you see that language?
2      A    Yes.
3      Q    Okay. Now, take a look at Exhibit 2, which
4  is in front of you.
5      A    Mm-hmm.
6      Q    Which is -- has the same date as the other
7  agreement, correct? It's also dated October 11th,
8  1984.
9      A    Okay.
10     Q    And it's between Island Records Inc. and
11 T.T.E.D. Records Inc. Do you see that?
12     A    Yes.
13     Q    Okay. Do you have any knowledge or
14 information that would suggest to you that this
15 second agreement, Exhibit 4 -- Exhibit 2, I'm
16 sorry -- is not the agreement referenced in Exhibit
17 4?
18          MR. TALCOTT: Objection.
19
20     Q    Do you understand my question?
21     A    No.
22     Q    Okay. I showed you Exhibit 4, which is the

Page 128

1  recording agreement, right?
2      A    Mm-hmm.
3      Q    And it says the same date that we're
4  executing this, Island Records and the company have
5  entered into a separate record production agreement.
6  Do you see that?
7      A    Yes.
8      Q    Okay. Then I showed you Exhibit 2. Do you
9  have Exhibit 2?
10     A    Yes.
11     Q    Which at the very top says, "This letter
12 when signed by you and us shall, along with the
13 attached production contract standard conditions,
14 constitute the agreement between you and us." It's
15 dated October 11th, 1984. It's between Island
16 Records and T.T.E.D. Records.
17          And I'm asking you, do you have any
18 knowledge that would suggest that these aren't the
19 two contracts that are referring to each other?
20          MR. TALCOTT: Objection.
21     A    No.
22

Fisher, Tony

Pages 125 - 128

Page 129

1  Q   You have no knowledge?
2  A   No.
3  Q   Fair enough. And again, just to make the
4  record clear, do you have any recollection sitting
5  here today that you have ever read the document that
6  is marked as Plaintiff's Exhibit 2?
7  A   No.
8  Q   Defendants' Exhibit 2, I'm sorry. No?
9  A   No.
10 Q   But that that may well have been a document
11 that was read by and reported to you by your counsel,
12 correct?
13     MR. TALCOTT: Objection.
14 A   Could have been. I don't know.
15
16 Q   Okay. Take a look at Exhibit 3, which says
17 "Letter of Inducement."
18 A   Mm-hmm.
19 Q   First let's go to the back of it, it's page
20 31. You see at the bottom, it says page 31?
21 A   Yes.
22 Q   Okay. And that's your signature on the

Page 130

1  second line, right?
2  A   It's hard to say. It's so faded, it's hard
3  to say. It looks like it could be my signature, yes.
4  Q   Okay. Take a look at page 18 of Exhibit 4,
5  and hold it up next to page 31 of Exhibit 3. Do you
6  have the two signatures? Those are both your
7  signatures, aren't they, Mr. Fisher?
8      MR. TALCOTT: Objection.
9  A   Yes. Exact.
10
11 Q   Thank you.
12 A   The exact same signature.
13 Q   Fair enough. Now, at the beginning of this
14 Exhibit 3, you can put Exhibit 4 away for right now,
15 this is a letter from the members of Trouble Funk,
16 right? It's signed by the four members who were
17 there, Taylor Reed, Robert Reed, Tony Fisher, and
18 James Avery, right?
19 A   Mm-hmm.
20 Q   Yes?
21 A   Yes, sir.
22 Q   By the way, are you familiar with the

Page 131

1  signatures of the other members of the band that if
2  you see their signature, you know it's them?
3  A   Yes.
4  Q   Can you just take a look at that same page
5  31 that we just looked at.
6      MR. TALCOTT: Back to Exhibit 4?
7      MR. BART: Of Exhibit 3.
8      MR. TALCOTT: Exhibit 3.
9      MR. BART: Yes.
10
11 Q   Do you recognize the signatures of the
12 other members of the band other than you?
13 A   Well, I recommend -- I recognize -- I
14 recognize Robert's.
15 Q   Okay.
16 A   We did a lot of signing together.
17 Q   Okay. Fair enough.
18 A   Yeah.
19 Q   Thank you. Do you recognize Carl Kidd's
20 signature?
21 A   Not really.
22 Q   Okay. Fair enough. Thank you. So this is

Page 132

1  a letter that is being sent by the members of the
2  band to Island Records dated as of October 11th,
3  1984, and it says in the first paragraph, "Pursuant
4  to an exclusive recording agreement, the artist
5  agreement, between me and T.T.E.D. Records"; do you
6  see that language?
7  A   No.
8  Q   You don't see the language?
9  A   Where is this?
10 Q   Okay. We're on Exhibit 3, at the very top,
11 at the very first paragraph. First page.
12 A   The first page?
13 Q   Yes. Are you with me?
14 A   Okay.
15 Q   Okay? It says, "Pursuant to an exclusive
16 recording agreement, the artist agreement, between me
17 and T.T.E.D. Records." Do you see that?
18 A   Yeah.
19 Q   Okay.
20 A   I have a question.
21 Q   Of course.
22 A   Who is "me"?

Page 165

1  there?
2  A   It wasn't really competing. They wanted --
3      (Simultaneous speaking.)
4  Q   Well, you had two of them, whether they
5  were competing or not.
6  A   One was the Trouble Funk that had Big Tony.
7  Q   Okay. You know, I'm not -- I'm not
8  expressing any opinions in this deposition,
9  Mr. Fisher. I'm just --
10 A   Yes, sir.
11 Q   So there was a point at which right after
12 the release of this that Tony Fisher had a Trouble
13 Funk and the other members had a Trouble Funk?
14 A   Yes.
15 Q   And they were both out in the marketplace
16 for a while?
17 A   Yes.
18 Q   And when did the members reconcile and come
19 back and have just one Trouble Funk?
20 A   When they realized that...
21 Q   Time-wise.
22 A   Okay. I don't remember. I don't remember.

Page 166

1  We did reconcile, though.
2  Q   How long a period were you running your own
3  Trouble Funk?
4  A   For about a year.
5  Q   And it was basically right after the
6  release of this record?
7  A   Pretty much, yes. After the release of
8  this record and the release of Trouble Funk on Island
9  Records.
10 Q   The Trouble Over Here, Trouble Over There
11 by Island Records?
12 A   I mean, when we pretty much was released
13 from the -- from the label.
14 Q   Oh, okay. Okay. Well, the album Trouble
15 Over Here, Trouble Over There was sort of like the
16 last big project that you did with Island, correct?
17 A   Right.
18 Q   And so they marketed that for whatever
19 period of time they marketed it.
20 A   Yes.
21 Q   And then ultimately, you had a termination
22 agreement with them, right?

Page 167

1  A   Yes.
2  Q   You basically parted ways?
3  A   Right.
4  Q   Actually, let me show you that. Take a
5  look at the third page. I'll wait for you. See it?
6  Is that your signature?
7  A   Yes.
8  Q   Okay. And you recognize Mr. Reed's
9  signature?
10 A   Yes.
11 Q   But not the other two, because you're not
12 as familiar with their signatures?
13 A   No, I'm not.
14 Q   Okay. And do you recall that there was an
15 agreement when you parted ways with Island Records in
16 1989?
17 A   Do I recall...
18 Q   That there was a written agreement at the
19 time you parted ways with Island Records.
20 A   Yes.
21 Q   Okay.
22 A   Yes.

Page 168

1  Q   Did you have counsel at that point? Did
2  you have a lawyer who was helping you negotiate or
3  deal with this agreement?
4  A   You mean...
5  Q   What's been marked as Exhibit 17.
6  A   I'm not sure -- I'm not sure what this --
7  what is this agreement supposed to be?
8  Q   Well, I can read it to you, but, you know,
9  if you don't have -- it basically says -- it's a
10 letter to the four of you.
11 A   Uh-huh.
12 Q   Saying, from Island Records, dated November
13 30th, 1989. So this is about two years after the
14 release of the Trouble Over Here, Trouble Over There
15 record.
16 A   Right.
17 Q   And it goes, "Reference is made to the
18 agreements dated October 11th, 1984, between you and
19 us," which we've looked at before, the agreements
20 that I showed you that had that date; do you
21 remember?
22 A   Right. Yes.

Fisher, Tony                                        Pages 165 - 168

Page 169

1  Q  Okay. "This letter when signed by you and
2  us shall constitute our mutual agreement to terminate
3  the term of the agreements upon the terms and
4  conditions set forth."
5      So this is a termination agreement that
6  terminates those other agreements, and basically
7  provides that Island keeps its rights, they will
8  continue to pay whatever they're going to pay, and
9  various other things. The agreement -- I don't want
10 to just give you a whole summary of it.
11 A  Right. Okay. Yes.
12 Q  But it's a termination agreement.
13 A  Yes. This is my signature. But I don't
14 remember the agreement.
15 Q  Okay. Underneath the four names on the
16 first page, right there where it's addressed to the
17 four of you.
18 A  Yes.
19 Q  There's a name, "care of Joseph Lloyd
20 Serling, Esq." Do you see that?
21 A  Yes.
22 Q  Do you know who Mr. Serling is?

Page 170

1  A  No.
2  Q  The "Esq." generally references an
3  attorney. So I think it's a safe assumption that
4  they're sending this to you in care of some attorney.
5  But you don't have any recollection of Mr. Serling or
6  having him represent you in any way?
7  A  No, I don't remember.
8  Q  Okay. Now, right before we got into the
9  discussion of the termination, I had asked you about
10 Woman of Principle, which was a single you didn't
11 like, and it came out roughly in 1987; do you recall
12 that?
13 A  Yes.
14 Q  And then they're working on the Trouble
15 Over Here, Trouble Over There album, right? That's
16 the one that was being recorded down in --
17 A  Yes. Woman of Principle came off that as a
18 single.
19 Q  Fair enough. And ultimately, the song
20 Trouble itself came off as a single, didn't it?
21 A  Yes. Yes.
22 Q  So there were at least two singles from

Page 171

1  that album; there was Woman of Principle, and there
2  was Trouble, right?
3  A  Yes.
4  Q  Was there an EP of that that was released
5  from that album as well?
6  A  Not that I know of.
7  Q  Do you know whether the other Trouble Funk,
8  the non-Tony-Fisher Trouble Funk did any touring to
9  support this record?
10 A  No.
11 Q  You don't know?
12 A  No, I know they did not.
13 Q  You know they did not?
14 A  Yes.
15 Q  Okay. So they didn't -- to your knowledge,
16 did they do any touring in the time when you were
17 running your own Trouble Funk?
18 A  No. We actually toured for a while. I
19 mean, we toured for a while.
20 Q  Oh, you toured in support of this record?
21 A  In support of this record, yes.
22 Q  Oh, okay. Before you created your own

Page 172

1  Trouble Funk, is that --
2  A  Right.
3  Q  Oh, okay.
4  A  Correct.
5  Q  So during the time that you were touring to
6  support this record, where were you touring?
7  A  The UK.
8  Q  Okay. The UK record that we talked about
9  before, that live record from London.
10 A  Yes.
11 Q  That came out in 1986, as I understand it.
12 But is it your recollection -- because it's your
13 recollection that matters. Is it your recollection
14 that that came out after the Trouble Over Here,
15 Trouble Over There album was released?
16 A  I'm not certain. I do know that we went
17 over there more than once.
18 Q  Oh, you went over to London more than once?
19 A  Yes.
20 Q  Oh, okay. Okay. And did you have more
21 than one European tour, or you just went back to
22 London one more time?

Fisher, Tony                                Pages 169 - 172

Page 277

1  A    No, I wasn't aware of the years.
2  Q    Have you heard of the song Hold It Now, Hit
3  It, a Beastie Boys song?
4  A    I've heard a few Beastie Boys songs, but
5  I'm not familiar with the titles.
6  Q    Okay. When was the first time you heard a
7  Beastie Boys song?
8  A    I guess MTV, when I seen the video.
9  Q    Okay. And was that before or after when
10 you were on tour with them?
11 A    I don't remember.
12 Q    Do you watch -- have you watched MTV since
13 it's come to be?
14 A    No.
15 Q    Do you listen to the radio?
16 A    Yes, sometimes. Yes.
17 Q    Have you ever purchased a Beastie Boys
18 album or CD or downloaded?
19 A    Absolutely not.
20 Q    Okay.
21 A    You don't have to, when it's free on
22 YouTube. I mean, yeah.

Page 278

1  Q    Have you ever seen the Beastie Boys on
2  YouTube?
3  A    Yeah.
4       MR. BART: We'll make you a witness in
5  another case, be careful.
6  A    Yeah, I'm -- yeah, I went back and I
7  listened to a few of the tunes that had the samples
8  in them, after I was, you know, told that we was into
9  a legal type of thing.
10 BY MR. MAX:
11 Q    That was back in the thousands [sic]?
12 A    Yeah, 2000s.
13 Q    2000s. Let me just take a moment.
14      MR. MAX: I think I'm done.
15      MR. TALCOTT: I have nothing.
16      MR. BART: Thank you.
17      THE VIDEOGRAPHER: We're going off the
18 record. The time is 3:30.
19      THE REPORTER: Mr. Talcott, are you
20 ordering copies of the transcripts from yesterday and
21 today?
22      MR. TALCOTT: Yes.

Page 279

1       THE REPORTER: And Mr. Max, are you also
2  ordering from yesterday and today?
3       MR. MAX: Yes, I'll order them.
4       (The videotaped deposition of TONY W.
5  FISHER was concluded at 3:30 p.m.)

Page 280

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2
3       I, Lee Bursten, the officer before whom the
4  foregoing deposition was taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the testimony given; that said testimony
7  was taken by me stenographically and thereafter
8  reduced to typewriting under my direction; and that I
9  am neither counsel for, related to, nor employed by
10 any of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 12th day of
14 May, 2014.
15
16 My commission expires June 30, 2014.
17
18
19
20 _____
21 NOTARY PUBLIC IN AND FOR
22 THE DISTRICT OF COLUMBIA