# EXHIBIT U

Page 1

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  ----------------x
4  TUFAMERICA, INC.,          :
5     Plaintiff,     : Index No.:
6  v.                : 12-CIV-3529 (AJN)
7  MICHAEL DIAMOND, et al.,   :
8     Defendants.    :
9  ----------------x
10
11  Videotaped Deposition of JAMES WILLIAM AVERY, Ph.D.
12         Washington, DC
13         Wednesday, April 30, 2014
14         11:18 a.m.
15
16
17
18
19
20
21
22 Reported By: Lee Bursten, RMR, CRR

Page 2

1     Videotaped Deposition of JAMES WILLIAM
2  AVERY, Ph.D., held at the offices of:
3
4
5         JENNER & BLOCK LLP
6         1099 New York Avenue NW
7         Suite 900
8         Washington, DC 20001
9         (202) 639-6000
10
11
12
13
14     Pursuant to Notice, before Lee Bursten,
15  Registered Merit Reporter, Certified Realtime
16  Reporter, and Notary Public in and for the District
17  of Columbia, who officiated in administering the oath
18  to the witness.

Page 3

1          APPEARANCES
2  ON BEHALF OF PLAINTIFF AND THE WITNESS:
3      KELLY D. TALCOTT, ESQUIRE
4      THE LAW OFFICES OF KELLY D. TALCOTT
5      34 Grove Street
6      P.O. Box 43
7      Sea Cliff, New York 11579
8      (516) 515-1545
9
10 ON BEHALF OF DEFENDANTS UMG - POLYGRAM INTERNATIONAL
11 PUBLISHING INC. and CAPITOL RECORDS LLC:
12     ANDREW H. BART, ESQUIRE
13     JENNER & BLOCK LLP
14     919 Third Avenue
15     37th Floor
16     New York, New York 10022
17     (212) 891-1600

Page 4

1     APPEARANCES CONTINUED
2  ON BEHALF OF DEFENDANTS MICHAEL DIAMOND, ADAM
3  HOROVITZ, AND THE ESTATE OF ADAM YAUCH, PERFORMERS
4  KNOWN AS THE BEASTIE BOYS:
5      THEODORE C. MAX, ESQUIRE
6      SHEPPARD MULLIN RICHTER & HAMPTON LLP
7      30 Rockefeller Plaza
8      New York, New York 10112
9      (212) 653-8700
10
11 ALSO PRESENT:
12     MICHAEL E. CILIBERTI, Videographer

Page 17

1  you took it out of a folder of other documents. What
2  other documents did you bring to the deposition
3  today?
4     A    What other...
5     Q    Documents did you bring to the deposition
6  today?
7     A    Just the copies of the documents that were
8  provided to me by my attorney.
9     Q    When you say your attorney, you mean
10 Mr. Talcott?
11    A    Yes.
12    Q    Okay. And when did you receive the copies
13 of these documents?
14    A    I don't know the exact date.
15    Q    Was it within the last two weeks?
16    A    I don't know the exact date.
17    Q    Was it before you signed your retainer
18 agreement with Mr. Talcott?
19    A    No.
20    Q    Were the documents that were provided to
21 you documents that you had in your possession
22 previously to receiving them from Mr. Talcott?

Page 18

1     A    I did not have these documents in my
2  possession.
3     Q    Did you review them in preparation for your
4  deposition?
5     A    Yes.
6     Q    May I see the folder, please.
7     A    The documents that I --
8     Q    Yes.
9     A    -- that I had?
10    Q    Unless there's other material --
11    A    There's other material in here. This is my
12 work-related material.
13    Q    When you say "work," you mean your work for
14 the EPA?
15    A    Not in this folder. I'm saying in my --
16    Q    No, I'm talking about the manila folder
17 that you have in front of you right now. Does that
18 consist solely of documents that you received
19 relating to this case?
20    A    Yes.
21    Q    May I see the folder, please?
22         MR. TALCOTT: He can just give it...

Page 19

1          MR. BART: He can give them one at a time.
2  I just thought it made more sense for me to mark them
3  collectively.
4
5     Q    Is that the full contents of the folder?
6     A    Yes.
7     Q    There are more documents inside there?
8     A    Those were the documents given by
9  Mr. Talcott.
10    Q    What were the other materials?
11    A    Those are my personal materials.
12    Q    Do they relate to this case?
13    A    Yes.
14    Q    Okay. May I see them, please.
15    A    These are just copies of the document that
16 I gave you.
17    Q    Thank you. Let me deal with what you just
18 handed me first. You handed me two documents that
19 you said were part of your personal papers, correct?
20    A    They are -- they are documents that were
21 given to me.
22    Q    By whom were they given to you?

Page 20

1     A    Taylor Reed.
2     Q    And when did Taylor Reed give you these
3  documents?
4     A    Two days ago.
5     Q    Did you have copies of either of these two
6  documents?
7     A    No.
8          MR. BART: Let's mark as Defendants' Avery
9  Exhibit 2 a document dated October 11th, 1984,
10 between Island Records and T.T.E.D. Records. And as
11 Exhibit 3, a document marked "Letter of Inducement"
12 of that same date.
13         (Defendants' Exhibit 2 and Exhibit 3 were
14 marked for identification and attached to the
15 deposition transcript.)
16
17    Q    Mr. Avery, let me show you first the
18 document which we've now marked as Defendants' Avery
19 Exhibit 2, and ask you if you can identify that
20 document for me.
21    A    This document was given to me by Taylor
22 Reed.

Avery, James                                                    Pages 17 - 20

Page 21

1  Q    Yes. Had you ever seen that document
2  before Mr. Reed gave it to you?
3  A    I did not recall it until he gave it to me.
4  Q    And once he gave it to you, did you recall
5  it?
6  A    No, I did not.
7  Q    Okay. And did you have a copy of this
8  document prior to getting a copy from Mr. Reed?
9  A    No.
10 Q    And sitting here today, do you have a
11 recollection of having seen that document before
12 getting it from Mr. Reed?
13 A    No, I did not.
14 Q    Can you state under oath that you never saw
15 it, or is it your testimony that you don't recall
16 whether you saw it or not?
17 A    I don't recall.
18 Q    Okay. Let me put in front of you a
19 document marked Avery Exhibit 3 and ask you to
20 identify that document for me.
21 A    This is a document that I received from
22 Taylor Reed.

Page 22

1  Q    And can you identify that document? What
2  is it?
3  A    The title of this document is "Exhibit A:
4  Letter of Inducement."
5  Q    Have you seen that document before?
6  A    This document I've seen before.
7  Q    And you signed that document, didn't you?
8  A    I did.
9  Q    And you signed it at or about the time
10 that's reflected on that agreement, correct?
11 A    That I do not recall.
12 Q    But you did sign the document, correct?
13 A    I signed -- my signature is on page 31 of
14 this document.
15 Q    Can I see that for one second? Here, you
16 can have that in front of you, Mr. Avery.
17 A    Okay.
18 Q    Your signature is the first signature on
19 page 31 of that document, correct?
20 A    Yes.
21 Q    Do you recognize the signatures of any of
22 the other people on that page?

Page 23

1  A    I don't recognize the signature. I
2  recognize -- no, I don't recognize the signatures.
3  Q    Do you recognize the signature at the
4  bottom middle of the page on the left side?
5  A    I don't recognize the signatures. I can
6  read them, but I don't recognize them.
7  Q    Okay. Fair enough. May I have that
8  document back? Thank you. Now, in addition, you
9  produced or you gave to me at my request certain
10 documents that Mr. Talcott gave to you.
11 A    Yes.
12      MR. BART: Let me mark those as well. I'll
13 mark as Exhibit 4 an October 11th, 1984 document
14 titled "Exclusive Recording Agreement."
15      (Defendants' Exhibit 4 was marked for
16 identification and attached to the deposition
17 transcript.)
18      MR. BART: We'll mark as Exhibit 5 a
19 copyright registration form bearing Bates stamps UMG
20 152 through 155.
21      (Defendants' Exhibit 5 was marked for
22 identification and attached to the deposition

Page 24

1  transcript.)
2       MR. BART: As Exhibit 6, a copyright
3  certificate bearing Bates stamps UMG 156 to 159.
4       (Defendants' Exhibit 6 was marked for
5  identification and attached to the deposition
6  transcript.)
7       MR. BART: As 7, a certificate from the
8  Copyright Office bearing UMG 163 to 166.
9       (Defendants' Exhibit 7 was marked for
10 identification and attached to the deposition
11 transcript.)
12      MR. BART: Whatever the next Exhibit Number
13 is, 8, UMG 160 to 162.
14      (Defendants' Exhibit 8 was marked for
15 identification and attached to the deposition
16 transcript.)
17      MR. BART: And 9, UMG 172 and 3.
18      (Defendants' Exhibit 9 was marked for
19 identification and attached to the deposition
20 transcript.)
21      MR. BART: Excuse me for just one second.
22      THE VIDEOGRAPHER: Going off the record.

Avery, James                                                                 Pages 21 - 24

Page 25

1  The time is 11:40.
2        (Recessed at: 11:40 a.m.)
3        (Reconvened at: 11:44 a.m.)
4        THE VIDEOGRAPHER: Back on the record. The
5  time is 11:44.
6
7    Q    Mr. Avery, right before the break, we
8  marked a series of documents. And the first of those
9  -- these are the documents that you received from
10 Mr. Talcott. Let me put back in front of you what's
11 been marked as Exhibit 4, which is titled "Exclusive
12 Recording Agreement," with a date of 10/11/84.
13       Mr. Avery, prior to receiving that document
14 from Mr. Talcott, did you ever see that document
15 before?
16   A    This exact document, I do not recall if
17 this is the exact document. I have seen -- I don't
18 know if this is the exact document. I've seen a
19 document similar to this one.
20   Q    Okay. But you've seen a document similar
21 to that, and you can't testify under oath today
22 whether that's the same one that you have in front of

Page 26

1  you, correct?
2    A    No, I cannot.
3    Q    Okay. Does your signature appear on that
4  document?
5    A    My signature appears on page 18 of this
6  document.
7    Q    Okay. Thank you. We'll come back and deal
8  with all of these. I'm really just marking what you
9  received for right now. The next document that we
10 marked was a copyright certificate bearing Bates
11 stamps UMG 152 to 155. Well, first off, there are a
12 whole series of copyright documents that we marked
13 here as Exhibits 5 through 8.
14       Had you ever seen any of them before?
15   A    No.
16   Q    Okay. Then we'll just deal with them in
17 the ordinary course. These are documents that you
18 received from Mr. Talcott recently, correct?
19   A    Yes.
20   Q    Okay.
21   A    These -- clarification. These documents,
22 when you say "these," which --

Page 27

1    Q    The copyright certificates, the ones that I
2  have just been alluding to.
3    A    Correct.
4    Q    Let me go back to the retainer agreement.
5  If you need to see it again, I'll give it to you.
6  It's the only copy I have right now.
7    A    I don't know what you're referring to.
8    Q    This is the April 14th, 2014 letter.
9    A    Okay.
10   Q    There's a reference at the top to James
11 Avery, care of Rasheed M. McWilliams, Esq. Who is
12 Mr. McWilliams?
13   A    Mr. McWilliams is my entertainment
14 attorney.
15   Q    Okay. And how long has he been your
16 attorney?
17   A    I don't know the exact date right now.
18   Q    For more than ten years?
19   A    No.
20   Q    Okay. And when you say your "entertainment
21 attorney," generically what types of services does he
22 render to you?

Page 28

1    A    With regard to music production and
2  advising me with regard to music production.
3    Q    When was the first time that you had a
4  conversation with Mr. Talcott?
5    A    I don't remember the first conversation.
6    Q    Was it this year?
7    A    Further back than this year.
8    Q    Okay. And was it relating to this
9  particular lawsuit?
10   A    No.
11   Q    What subject matter did it relate to?
12   A    With regard to my signing with Tuff City to
13 represent me and services for copyright
14 infringements.
15       MR. BART: Let me mark as Exhibit 10 -- let
16 me do one thing just to make sure I don't lose track
17 here. Let me mark this document as Defendants' Avery
18 Exhibit 10. It's a document bearing Bates stamps TA
19 158 through 160.
20       (Defendants' Exhibit 10 was marked for
21 identification and attached to the deposition
22 transcript.)

Page 129

1  Q    It also seems to reflect that both the
2  cover concept and the marketing for the record are by
3  Maxx Kidd. That's at the bottom of the third and
4  then the fourth columns.
5  A    Which column and row are you talking about?
6  Q    The third column, "Cover concept," at the
7  bottom. And then the fourth column, "Marketed by:
8  Close-Up Inc., Maxx Kidd," all the way on the bottom
9  right. Do you see those?
10 A    I see "Cover concept." What was the other
11 thing you said was --
12 Q    "Marketed by:" underneath -- and the fourth
13 column, under "Special thanks."
14 A    Okay. I see that.
15 Q    Okay. Did you or did the members of the
16 band have any agreement with Maxx Kidd at this point?
17 A    I don't recall a formal written agreement,
18 no.
19 Q    Okay. Do you recall having any oral
20 understandings with Mr. Kidd as to the services he
21 would provide to the band?
22 A    All I recall was Maxx was a record

Page 130

1  promoter. That's all I know.
2  Q    But he was around with the band for several
3  years, wasn't he, working with the band in some
4  capacity or other?
5  A    The time that I was there, he didn't come
6  until -- that's the only time I seen him, was here
7  and when he came to distribute records. That's it.
8  Q    Well, before you signed with Island
9  Records, wasn't Mr. Kidd the person who first
10 mentioned to the band the possibility that the band
11 could sign with Island Records?
12 A    Yes.
13 Q    And do you recall what he told you about
14 that?
15 A    Not exactly. All I know, that there was
16 interest in Trouble Funk.
17 Q    And --
18 A    And that he was shopping a deal. That's
19 all.
20 Q    Okay. But that's good. That he was
21 shopping the deal, that he was out there trying to
22 find interest in you signing with a bigger label,

Page 131

1  correct?
2  A    Yes.
3  Q    Okay. Do you know whether he was shopping
4  any other bands at the time, other than Trouble Funk?
5  A    I don't know.
6  Q    And did you tell him it was okay to shop
7  Trouble Funk?
8  A    I had no say-so in that. I didn't tell him
9  anything.
10 Q    Did other members of the band have any
11 say-so, or you don't know?
12 A    I don't know.
13 Q    Would either Robert Reed or Tony Fisher be
14 more likely in terms of their roles with the band to
15 have had those conversations than you?
16 A    Again, I came in the band -- before the
17 band was already started, so I don't know.
18 Q    Fair enough. But you knew that Maxx Kidd
19 said there was interest in Trouble Funk, and that he
20 was out shopping the band, correct?
21 A    That's all.
22 Q    Okay. And did he tell you that the way

Page 132

1  that he could shop you around is if you were signed
2  to a label of his?
3  A    No.
4  Q    Well, did he tell you that he had his own
5  record label?
6  A    No.
7  Q    Now, earlier this morning -- let me just
8  make sure I have this. Hold on. You gave me a
9  document I'll give back to you, Exhibit 4. Now, this
10 was a document that you said Mr. Talcott gave to you
11 to help you prepare for your deposition in this case;
12 is that correct?
13 A    Which document are you referring to?
14 Q    I just put it -- I gave it to you a second
15 ago. Exhibit 4. It's labeled "Exclusive Recording
16 Agreement."
17 A    Oh, okay. Say again about this document.
18 Q    This is one of the documents that
19 Mr. Talcott gave you to help you prepare for this
20 deposition, correct? This is one of the documents
21 you brought with you today.
22 A    One of the documents that Mr. Talcott gave

Avery, James                                    Pages 129 - 132

Page 133

1  me, yes.
2  Q    And that's your signature on the last page,
3  on page 18, correct?
4  A    Correct.
5  Q    Okay. Now, the document is entitled
6  "Exclusive Recording Agreement," correct? On the
7  first page.
8  A    Correct.
9  Q    And it has a date of 11 -- October 11th,
10 1984, correct?
11 A    Correct.
12 Q    And it reflects that it's an agreement
13 between four members of the musical group Trouble
14 Funk, care of Raphael Tisdale, who you've testified
15 before was your attorney at the time, correct?
16 A    Correct.
17 Q    And T.T.E.D. Records Inc., correct?
18 A    Correct.
19 Q    And you knew in 1984, did you not, that
20 T.T.E.D. Records was an entity owned or controlled by
21 Maxx Kidd, correct?
22 A    At the time of this, yes.

Page 134

1  Q    Yes.
2  A    Yes.
3  Q    Now, there is handwriting on the copy, on
4  this copy of the agreement, correct?
5  A    Correct.
6  Q    Okay. And before Mr. Talcott gave you a
7  copy of this agreement, you had not seen this
8  document since the time you signed page 18; isn't
9  that correct?
10 A    That's correct.
11 Q    Okay. Now, on page 2 to 3, there is a
12 circle around paragraph 1.05.
13 A    Correct.
14 Q    Which says that "Only master recordings
15 consisting of compositions not previously recorded by
16 the artist shall apply in reduction of the recording
17 commitment except as otherwise provided herein."
18      Do you see that?
19 A    Yes, I do.
20 Q    Do you have a recollection sitting here
21 today as having read or remembered that paragraph
22 from 1984?

Page 135

1  A    No.
2  Q    And just to be clear, and I should have
3  addressed this earlier, you don't have any legal
4  training, do you?
5  A    No.
6  Q    Okay. And you haven't studied contracts or
7  interpretation of contracts in any of your many
8  educational pursuits?
9  A    Say again.
10 Q    Have you ever taken a business law course
11 or taken --
12 A    Oh, no.
13 Q    -- a course which deals with the
14 interpretation of contracts?
15 A    I am a -- we have to have that kind of --
16 this is dealing with scientific contracts at EPA,
17 it's what's called contract to office representative,
18 but not a contractor, but as the technical expert,
19 you have to have basic training, but not legal
20 training.
21 Q    And certainly you didn't have that training
22 back in 1984, correct?

Page 136

1  A    No.
2  Q    Okay. Fair enough. Now, on page 5 of this
3  agreement, there's a paragraph, 2.02, that is
4  bracketed and has next to it on the right the words
5  "James A." Do you see that?
6  A    Yes.
7  Q    Taking a wild educated guess, I would take
8  it as a reference to you?
9  A    I do not know.
10 Q    That's not your handwriting?
11 A    That's not my handwriting.
12 Q    And you don't have any recollection sitting
13 here today of any issues or concerns or discussion
14 about that paragraph, do you?
15 A    No.
16 Q    Okay. There's also, on the bottom of that
17 same page, a squiggly line under the number 15,000,
18 for $15,000. Do you see that?
19 A    Yes.
20 Q    Do you recall any discussion or -- any
21 discussion about a $15,000 advance as part of this
22 agreement?

Avery, James                                    Pages 133 - 136

Page 137

1  A  Not as part of that agreement. The only
2  thing I remember about $15,000 is in the -- in the
3  one that I told you where I knew that my signature,
4  strikeouts and initials, any time I strike out or
5  write anything, it has my initials.
6  Q  So that's the letter of inducement?
7  A  Letter of inducement.
8  Q  So that letter has $15,000 also; is that
9  correct?
10  A  It does reference $15,000.
11  Q  Now, on the next page, page 6 of this
12  exhibit, there's handwriting to the right of the
13  first half of the page. Do you see that?
14  A  Yes, I do.
15  Q  Do you know whose handwriting that is?
16  A  No, I do not.
17  Q  Okay. Do you have any recollection of any
18  discussion about that handwriting from 1984?
19  A  No.
20  Q  Do you know whether any of the handwriting
21  on this document existed on this document in 1984?
22  A  I do not know.

Page 138

1  Q  And you don't have any understanding as to
2  why any of the bracketed handwriting appears on this
3  document; isn't that correct?
4  A  No.
5  Q  It is correct that you don't have a
6  recollection?
7  A  I don't have a recollection.
8  Q  Okay. Fair enough. All right. We can put
9  that agreement to the side. Let's take a look at the
10  letter of inducement that you gave me, which I put
11  somewhere and I have to find.
12      MR. MAX: It's 11.
13      MR. BART: It's 11. Thank you. There we
14  go. No, it's not. You were trying to trick me.
15      MR. MAX: I'm sorry.
16      MR. BART: It's all right. I'm out of
17  order here. So let me find out why I go from 1 to --
18  you know what, did I give you back Exhibit 2, by any
19  chance?
20  A  No.
21
22  Q  Do you have Exhibit 2 there?

Page 139

1  A  No.
2  Q  You don't have the one that says "Letter of
3  Inducement"?
4  A  It says 11, 4, 3.
5  Q  Which is 3?
6  A  Letter of inducement.
7  Q  Okay. Let's deal with that. So you recall
8  this exhibit, correct?
9  A  Correct.
10  Q  We've testified -- you testified about
11  this, and it bears your signature on page 31,
12  correct?
13  A  Correct.
14  Q  And it has the names of the three other
15  members -- or three other members of the band and a
16  reference to your attorney, Mr. Tisdale, correct?
17  A  Where is the reference?
18  Q  Right under the names on page 31. "Care
19  of," typed in, "Raphael Tisdale, Esquire," with a
20  street address.
21  A  Yes.
22  Q  Now, do you have a recollection sitting

Page 140

1  here today of having read this document back in 1984?
2  A  Yes.
3  Q  Okay. And do you recall any discussions
4  that you had with anyone at that time about this
5  agreement?
6  A  Yes, with our attorney.
7  Q  Okay. All right. I assume that you're
8  claiming attorney-client privilege with regard to
9  your conversations with your attorney about this
10  agreement, correct?
11  A  Yes.
12  Q  Okay. Now, the first paragraph of the
13  agreement -- well, let me ask you a different
14  question. Do you recall what if any sections of this
15  letter of inducement you discussed with your
16  attorney?
17  A  Discussed the whole thing. I think --
18  Q  Okay.
19  A  -- we discussed the whole...
20  Q  Fair enough. You'll see in the -- hold on
21  a second. I'm sorry. Let me take you back to
22  Exhibit 4 for one second, if I can. That's the one

Avery, James                                    Pages 137 - 140

Page 141

1  that's labeled "Exclusive Recording Agreement." Do
2  you have that back in front of you?
3     A    Yes.
4     Q    And this agreement, if you turn to page --
5  to the bottom of the first page.
6     A    Yes.
7     Q    Says, in paragraph 1.02-B, there's a
8  sentence --
9     A    Wait a minute.
10    Q    On the first page of the exclusive
11 recording agreement.
12    A    Okay.
13    Q    The last full paragraph on the first page.
14    A    Mm-hmm.
15    Q    It starts with the letter B.
16    A    Mm-hmm.
17    Q    And five lines from the bottom it says,
18 "Each option shall be exercised by company, giving
19 you written notice at least 30 days prior to the
20 expiration of the then-term of this agreement as the
21 same may have been suspended or extended as provided
22 herein."

Page 142

1         The next sentence, "Island Records Inc.,
2  hereinafter Island, and company have entered into a
3  record production contract of even date, hereinafter
4  the Island contract."
5         Do you see that reference?
6     A    Yes.
7     Q    And the Island contract is the document
8  that you provided to me this morning that's Exhibit
9  2, correct?
10    A    Yes.
11    Q    And these, these three agreements, the
12 recording agreement, the production agreement, and
13 the letter of inducement, were all signed and
14 executed at the same time, correct?
15    A    I don't know if they were all signed at the
16 same time.
17    Q    But they're all cross-referenced in each
18 other, right? There are references in the recording
19 agreement to the production agreement, and there are
20 references in the letter of inducement to both of the
21 other agreements; isn't that correct?
22         MR. TALCOTT: Objection.

Page 143

1
2     Q    You can answer the question.
3     A    I'm not an attorney. I can't make those
4  calls on whether they are related to or whatever.
5     Q    I didn't say "related to." I said they're
6  referencing. I'm only talking about the language of
7  the agreement itself. So take a look at the letter
8  of inducement that we were just looking at, which is
9  Exhibit 3.
10    A    Okay.
11    Q    And it says at the top, in the first
12 paragraph, "Pursuant to an exclusive recording
13 agreement, the artist agreement between me and
14 T.T.E.D. Records Inc.," do you see that reference?
15    A    Mm-hmm.
16    Q    And that recording agreement is Exhibit 4;
17 is it not?
18    A    Exhibit 4 is called an exclusive recording
19 agreement, yes.
20    Q    Right. And then it goes on to say,
21 "Producer is entitled to my exclusive services for
22 the recording of phonograph records. I hereby

Page 144

1  acknowledge that producer," and the producer here is
2  referencing T.T.E.D. Records, correct? That's what
3  it says on the second line, that T.T.E.D. is
4  producer.
5         "Producer is entering into a record
6  production agreement with you to which the foregoing
7  letter of inducement is attached, the production
8  agreement."
9         Do you see that language?
10    A    Yes.
11    Q    And that production agreement is Exhibit 2;
12 is it not?
13    A    Exhibit 2?
14        MR. TALCOTT: I'm going to object to the
15 question.
16
17    Q    You can answer the question.
18    A    Exhibit 2 has more than just that which
19 you've mentioned.
20    Q    Well, let's -- I don't want to parse it out
21 right now. It refers to the agreement between
22 T.T.E.D., the producer, and Island Records of the

Page 157

1 agreement with you to which the foregoing letter of
2 inducement is attached (the production agreement), a
3 copy of which I have received, read, and understood."
4     Do you see that language?
5  A  Yes.
6  Q  And so in signing this document, which you
7 did sign on page 31, which you've testified about
8 before, you were representing to Island Records that
9 the production agreement between T.T.E.D. and Island
10 is a document that you have received, read, and
11 understood, correct?
12  A  It is correct that I signed this document,
13 but I just don't recall this particular agreement.
14  Q  Okay. And you may not recall the
15 agreement, and that's fine. It's 30 years later,
16 Mr. Avery, and I accept that. All I'm trying to
17 establish is there's nothing about the document that
18 has been marked as Exhibit 2 or Exhibit 3 that gives
19 you any reason to doubt and to tell me under oath
20 that the production agreement was not the agreement
21 signed between Island and T.T.E.D., is there?
22     MR. TALCOTT: Objection.

Page 158

1
2  Q  You can answer the question.
3  A  I don't know.
4  Q  Okay. All you can tell me is what you
5 know.
6  A  Yes, I don't know.
7  Q  Okay. Fair enough. Now, in this letter of
8 inducement, and again, this is a letter of inducement
9 that you discussed and were represented by
10 Mr. Tisdale with relation to, correct?
11  A  Correct.
12  Q  Okay. And it says in paragraph 1-A that
13 "The producer has the right to enter into the
14 production agreement and to assume all the
15 obligations, warranties, and undertakings to you on
16 the part of the producer therein contained."
17     Do you see that language?
18  A  Yes.
19  Q  And this is your representation to Island
20 Records as part of the letter of inducement, correct?
21     MR. TALCOTT: Objection.
22

Page 159

1  Q  This is part of a document that you're
2 signing and giving to Island Records, right, a letter
3 of inducement from the four members of the band to
4 Island Records, correct?
5  A  Correct.
6  Q  Okay. And then the language I just read is
7 part of what you're telling them in this letter,
8 correct? Did I misread the paragraph -- the language
9 that I just read into the record, Mr. Avery?
10  A  No.
11  Q  Okay.
12  A  This is the agreement that I signed.
13  Q  Okay. That's fair enough. And you go on
14 in paragraph B right below that and say that "All of
15 producer's warranties, representations, covenants,
16 and agreements contained in the production agreement
17 which concern me are true and correct."
18     Do you see that language?
19  A  I have to back up for a minute. I said
20 that this is the agreement I signed. I again say
21 that there's an error in this agreement, and I recall
22 telling our lawyer to take that out. And so I can't

Page 160

1 say that this is the agreement that I signed. But I
2 recall signing an agreement. And what I recall, that
3 there were -- after we signed, that there were no
4 errors, that Tisdale Funk was not in it.
5  Q  You said that when you made changes to an
6 agreement, you would cross it out and initial it,
7 correct?
8  A  Right.
9  Q  And that's what happened here, correct?
10  A  Lines -- there are some strikeouts and
11 initials --
12  Q  There's one paragraph that's struck out.
13 There's not lines. There's one paragraph that's
14 taken out. And you each initialed it, correct?
15  A  Correct.
16  Q  Okay. And the reason that that paragraph
17 is taken out, if you look at it, the paragraph that's
18 there that's taken out is saying that Island -- if
19 you look at paragraph 6, "I hereby acknowledge and
20 agree that you shall not have any obligation to make
21 any payments whatsoever to me, it being agreed and
22 understood that I shall look solely to producer for

Avery, James

Pages 157 - 160

Page 161

1 any and all royalties, recording fees, and other
2 monies that will be payable to me."
3    Do you see that language? I don't need to
4 read the rest, but do you see that?
5    A    I see it.
6    Q    And in fact, the reason that was struck out
7 is because you reached a separate agreement which was
8 memorialized in a separate document that Island would
9 pay you directly because you didn't want to be -- to
10 take the risk of getting your money through Maxx
11 Kidd; isn't that correct?
12   A    I don't know if that's correct, the way you
13 stated it.
14   Q    Okay. It's a fact, is it not, that Island
15 agreed with you in a separate document that they
16 would pay you directly, and that that is why this
17 language was taken out, and that the parties
18 initialed it and took it out of the agreement; isn't
19 that correct?
20   A    We signed this to get paid directly from
21 Island, that is correct.
22   Q    Okay. But I'm saying something more than

Page 162

1 that. This agreement, if it wasn't struck out, would
2 have said that you didn't have a right to get paid
3 directly, correct?
4    A    Correct.
5    Q    And you didn't want that, correct?
6    A    Correct.
7    Q    You didn't want to have to chase Maxx Kidd
8 down to get your money, correct?
9    A    I don't -- I don't agree to what you just
10 said.
11   Q    Whether you agree with it or not, isn't it
12 a fact that Island agreed to take that out, and
13 signed a separate document with you providing that
14 they would pay you directly?
15   A    Island signed a letter of inducement saying
16 that they would pay us directly.
17   Q    Okay. But my question -- that's true too.
18 But my question to you is, didn't they sign a
19 separate document in addition to this providing that
20 they would pay you directly, and the percentages that
21 they would pay you?
22   A    I'm confused about -- which separate

Page 163

1 document are you referring to now?
2    Q    I'm asking as to whether you have a
3 recollection of there being a separate document
4 signed by the parties that -- pursuant to which
5 Island said that.
6    A    Could you point that document out, please?
7    Q    Okay. I will, but my first question to you
8 is, do you have a memory -- this is a deposition of
9 your memory, Mr. Avery. And so the question is --
10 and I grant you it's 30 years later and some of these
11 questions are hard, but that's what happens when
12 cases are brought on claims from 30 years ago.
13      But isn't it a fact that after the
14 execution of this letter of inducement by you and
15 Island, that there was a separate letter agreement
16 signed by the parties which provided expressly that
17 you would get paid directly from Island and how much
18 money you would get?
19   A    Yes. This letter of inducement.
20   Q    No, in addition to -- I said after the
21 execution -- I agree with you, the letter of
22 inducement was signed, and it provides that. But I'm

Page 164

1 asking you a different question. Isn't it in fact
2 the case that in addition to both of you people
3 signing the letter of inducement, that there was a
4 signed document that provided for the direct payment
5 from Island to you of your royalties?
6       Let me back up a minute. Is it your
7 testimony under oath, 30 years later, that there was
8 a later version of this letter of inducement that was
9 signed which had a different paragraph in it that
10 said that you were going to get paid directly by
11 Island?
12      MR. TALCOTT: I object to the form.
13   A    I don't understand what you're asking.
14
15   Q    I want to make sure I understand what
16 you're testifying. You agreed that -- several times,
17 that you signed this letter of inducement, correct?
18   A    I signed a letter of inducement, yes.
19   Q    No, that you signed the page that is page
20 31 of this document, correct?
21   A    Correct. Correct.
22   Q    And that you recognized that when you made

Avery, James                                Pages 161 - 164

Page 165

1 changes in documents, you crossed them through and
2 you initialed them, correct? And that's what
3 happened here, to reflect that you were signing it
4 subject to that change, correct?
5    A    I recall these strikeouts, yes. And I also
6 recall that we told him to take out Tisdale Funk. I
7 recall that.
8    Q    Well, you told him to do that, and you put
9 a cross-out through here, and initialed it to
10 indicate that you were signing it subject to that
11 deletion, correct?
12        MR. TALCOTT: Objection to form.
13   A    I recall this Tisdale Funk being corrected.
14 And that was the document that I signed. I recall
15 that.
16
17   Q    Really? Do you have a copy of that?
18   A    No, I don't have it.
19   Q    Does anybody have a copy of it?
20   A    I don't know.
21   Q    Is it your testimony under oath 30 years
22 later that there is a different copy of this

Page 166

1 agreement that was signed that has different language
2 in it other than paragraph 6 that relates to your
3 payment?
4    A    I -- say the question again.
5    Q    I'm asking you, you said that you signed a
6 document, the letter of inducement, that provided
7 that you were going to get paid directly by Island.
8    A    Correct.
9    Q    Okay. You agree with me, do you not, that
10 there's nothing in this exhibit that you have in
11 front of you that says that you're going to be paid
12 directly by Island, correct? This copy. This
13 document that you're looking at that's Exhibit 3. Is
14 there anything in here that says that they're going
15 to pay you directly?
16        In fact, there's a provision that says
17 they're not going to pay you directly which was
18 crossed out, correct?
19   A    Correct.
20   Q    Okay. It's not your testimony, is there,
21 that there was a subsequent version of this agreement
22 that you signed that provided that they were going to

Page 167

1 pay you directly, is there?
2    A    Subsequent...
3    Q    Yes. You're not testifying that the
4 document that you signed that was the letter of
5 agreement had an express provision in it saying that
6 they were going to pay you directly?
7    A    You mean the letter of inducement?
8    Q    Yes.
9    A    I don't recall. I don't recall.
10   Q    And in fact, there was a document in which
11 Island agreed to pay you directly, but it wasn't a
12 letter of inducement, it was a document that was
13 signed by the parties two months later; isn't that
14 correct?
15   A    I don't -- I don't know. Two months later?
16   Q    Yes. It's nothing that's in front of you.
17 This is not a quiz on something that you have in
18 front of you.
19   A    I don't recall.
20   Q    Okay. So my question to you is, you're not
21 testifying under oath here today that the letter of
22 inducement that you signed has a provision in it

Page 168

1 requiring Island to pay you directly, are you?
2    A    No.
3    Q    Okay. And is there anything in this
4 agreement in Exhibit 3 that you contend is erroneous
5 or false in any way other than the mistaken reference
6 in one of the five times the band's name is mentioned
7 in paragraph 8 to Tisdale Funk instead of Trouble
8 Funk?
9    A    That's the only thing that I can recall.
10   Q    Now, what I was trying to ask you before is
11 that you and other members of the band expressed to
12 Island by crossing off and initialing this signed
13 copy of the agreement, that you were not willing to
14 agree that they didn't have to pay you directly,
15 correct?
16   A    "They" being who?
17   Q    Island. That your approval and signing of
18 this agreement was subject to the fact that this
19 provision had to be taken out, that the provision
20 saying that Island doesn't have to pay you directly
21 was something that you were rejecting and indicating
22 that by crossing it off and initialing it, correct?

Avery, James                                          Pages 165 - 168

Page 249

1  A    I could not find any, no.
2  Q    Okay. Do you have any other agreements
3  other than the agreements that you brought here today
4  at your home?
5  A    No.
6  Q    So to your knowledge, there are no other
7  agreements relating to the copyrights of Trouble
8  Funk, apart from the agreements that we've gone
9  through today?
10 A    Rephrase -- say that again.
11 Q    I'm just trying to -- are you aware of any
12 other agreements relating to the copyrights of
13 Trouble Funk, other than the documents that we've
14 reviewed today?
15 A    That I have? No. I don't know that.
16 Q    You mentioned you testified in a bankruptcy
17 proceeding?
18 A    No.
19 Q    I'm sorry. A tax proceeding.
20 A    Tax court.
21 Q    Yes. Was that related to any of the
22 Trouble Funk -- did that have any relation to Trouble

Page 250

1  Funk in any way, shape, or form?
2  A    Not Trouble Funk, no. It was -- no. Not
3  Trouble Funk.
4  Q    What was the tax matter about? Was it a
5  personal matter?
6  A    I think it was Rio Edwards.
7  Q    Rio Edwards who was the manager?
8  A    Not paying taxes.
9  Q    Okay. Did that affect title to any of the
10 Trouble Funk musical compositions or sound recordings
11 at issue?
12 A    No.
13     MR. MAX: I have no further questions.
14     MR. BART: Thank you, Mr. Avery.
15     THE VIDEOGRAPHER: Going off the record.
16 The time is 5:26.
17     (The videotaped deposition of JAMES WILLIAM
18 AVERY, Ph.D. was concluded at 5:26 p.m.)
19
20
21
22

Page 251

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2
3      I, Lee Bursten, the officer before whom the
4  foregoing deposition was taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the testimony given; that said testimony
7  was taken by me stenographically and thereafter
8  reduced to typewriting under my direction; and that I
9  am neither counsel for, related to, nor employed by
10 any of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 12th day of
14 May, 2014.
15
16 My commission expires June 30, 2014.
17
18
19
20 _____
21 NOTARY PUBLIC IN AND FOR
22 THE DISTRICT OF COLUMBIA

Page 252

1      ACKNOWLEDGMENT OF DEPONENT
2  I, JAMES WILLIAM AVERY, Ph.D., do hereby certify
3  that I have read the foregoing transcript of my
4  testimony taken on 4/30/14, and further certify
5  that it is a true and accurate record of my
6  testimony (with the exception of the corrections
7  listed below):
8  Page   Line        Correction
9  ___|___|_____|_____
10 ___|___|_____|_____
11 ___|___|_____|_____
12 ___|___|_____|_____
13 ___|___|_____|_____
14 ___|___|_____|_____
15 ___|___|_____|_____
16 ___|___|_____|_____
17 ___|___|_____|_____
18 _____
          JAMES WILLIAM AVERY, Ph.D.
19
   SUBSCRIBED AND SWORN TO BEFORE ME
20 THIS _____ DAY OF _____, 20___.
21
22 _____   _____
   (NOTARY PUBLIC)      MY COMMISSION EXPIRES: